**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

RINAT HAFIZOV,                          :
                                        :
                        Plaintiff,      :        Civil Action No.:
                                        :
            v.                          :
                                        :        **COMPLAINT**
BDO USA, LLP, JANET BERNIER and         :
MATTHEW DYMENT, in their individual and :
professional capacities,               :        **Jury Trial Demanded**
                                        :
                        Defendants.     :
-------------------------------------------------------------X

Plaintiff Rinat Hafizov ("Mr. Hafizov" or "Plaintiff") hereby alleges against Defendants

BDO USA, LLP ("BDO" or the "Company"), Janet Bernier and Matthew Dyment (together,

"Defendants") as follows:

## PRELIMINARY STATEMENT

1.      Defendant BDO and one of its senior leaders, Defendant Janet Bernier, have a

documented history of engaging in blatant retaliation against employees who raise complaints of

discrimination and misconduct.  This is the second action in recent years demonstrating

discriminatory and retaliatory animus by Ms. Bernier and also showing BDO's acquiescence to

her unlawful conduct.  In the wake of Ms. Bernier's discriminatory conduct set forth in Sweeney

v. BDO and Bernier, No. 19 Civ. 07389 (GHW) (S.D.N.Y.), Ms. Bernier remains employed and

continues to operate in a "business as usual" manner.  Thus, when Mr. Hafizov raised complaints

about a myriad of discriminatory conduct by Ms. Bernier and at BDO, it is unfortunately not

surprising that he was subjected to retaliatory conduct up to and including his termination just

like Mr. Sweeney.  Even after firing Mr. Hafizov, BDO threatened that he somehow engaged in a

"breach of contract" by even raising claims of systemic discrimination at all.  BDO must be held

accountable for this ongoing pattern of discriminatory conduct after apparently no lesson was learned from the <u>Sweeney</u> matter.

2.      Defendants' conduct violated Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq.* ("Section 1981"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*  Plaintiff seeks all available declaratory, injunctive and monetary relief.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PROCEDURES

5.      Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), an administrative pre-requisite to filing an action under Title VII of the Civil Rights Act of 1964 ("Title VII"), and will amend this action to include claims under Title VII at the appropriate time.

6.      Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department,

Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

7.    Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

8.    Plaintiff Rinat Hafizov is a former employee of BDO.  Plaintiff currently resides in Brooklyn, New York.  At all relevant times, Plaintiff met the definition of "employee" and/or "eligible employee" under all applicable statutes.

9.    Defendant BDO is a Delaware limited liability company with its principal place of business located at 100 Park Avenue, New York, NY 10017.  At all relevant times, BDO met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

10.    Defendant Janet Bernier is Head of BDO's Northeast ("NE") State and Local Tax ("SALT") practice group ("NE SALT").  Ms. Bernier directly supervised Plaintiff at the time of his termination and directly participated in the unlawful and retaliatory conduct to which Plaintiff was subjected.  At all relevant times, Ms. Bernier met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

11.    Defendant Matthew Dyment is BDO's Tax Office Managing Partner.  Mr. Dyment directly participated in the unlawful and retaliatory conduct to which Plaintiff was subjected.  At all relevant times, Mr. Dyment met the definition of "employer" and/or "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.**    **Background**

12.    Mr. Hafizov immigrated to the United States from Russia in 1999, leaving home and nearly his entire immediate family to attend college.

13.     Mr. Hafizov, without question, excelled as a student.  He received a Bachelor of

Arts in Economics from the University of Pennsylvania, his law degree from Albany Law School

and his Master of Laws in Taxation from New York University ("NYU") School of Law.

14.     After graduating from law school, Mr. Hafizov's professional career took off

immediately.  Mr. Hafizov joined Ernst & Young ("EY"), one of the largest professional services

networks in the world, as a Senior Associate in New York, where he advised clients on state and

local taxation issues when making domestic and cross-border transactions.

15.     In 2012, Mr. Hafizov joined Hunton Andrews Kurth LLP as an Associate in the

Taxation division, counseling a wide range of clients, including the world's largest amusement

park corporation, as well as clients in the energy, construction and technology industries.

16.     In 2014, Mr. Hafizov started at Morrison & Foerster LLP ("M&F") as an

Associate in State and Local Tax.  At M&F, Mr. Hafizov represented corporate taxpayers at

administrative tribunals and state trial and appellate courts.

17.     Prior to BDO, Mr. Hafizov returned to EY in 2016 as a Senior Manager assisting

their London, Munich and New York offices.  In this role, Mr. Hafizov advised European clients

on U.S. federal and state taxation laws and supported private equity and corporate clients in

structuring U.S. inbound transactions, including acquisitions of existing business and expansion

into the U.S. market.

18.     He also has participated in speaking engagements on issues of U.S. taxation

reform and published articles in the Journal of Taxation and the NYU Institute on State and

Local Taxation.

19.     In May 2019, BDO hired Mr. Hafizov as a Senior Manager within its NE SALT

division.

20.     For BDO, Mr. Hafizov's skillset and educational background were ideally suited to help grow BDO's cross-border business.

21.     Mr. Hafizov was excited that his work at BDO would offer the opportunity to work with high-level international clients and utilize his expertise in tax law.

22.     Given Mr. Hafizov's strong educational background and expertise in taxation law, it is unsurprising that he was successful at BDO.

23.     Since joining, Mr. Hafizov has generated approximately $1 million in revenue by acquiring international clients seeking tax advice on U.S. tax law.  He handled over 100 transactions, including mergers and acquisitions, for private equity and corporate clients and represented numerous clients in audits and administrative appeals.

24.     Importantly for BDO's growth, Mr. Hafizov was exceptional at cultivating new client relationships from scratch.

25.     In total, he developed new business with approximately 10 to 15 clients, which generated $500,000 to $1 million in fees alone.

26.     Notably, these clients were either completely new to BDO's platform or new to the U.S. entity of BDO.  To his knowledge, no one else at his level in SALT was developing new business at this rate.

## II.     Mr. Hafizov is Subjected to and Witnesses Discrimination at the Hands of Ms. Bernier

27.     Shortly after Mr. Hafizov joined BDO, his supervisor, Janet Bernier (Partner, Northeast Regional Leader of SALT) discriminated against him based on his Russian ethnicity.

28.     On multiple occasions, Ms. Bernier called Mr. Hafizov's office "Siberia," and unnecessarily reminded him, in the presence of other employees, that he was "all the way over in Siberia."

29.     These remarks were obviously based on Mr. Hafizov's Russian heritage and were repeated with such frequency that it almost became a mantra that she clearly thought was somehow clever, without consideration of Mr. Hafizov's perception.

30.     Ms. Bernier should have known that it is improper to target Mr. Hafizov's ethnicity with these remarks, particularly after Mr. Hafizov's other colleagues—including Kristen Fasano (Senior Manager, SALT) and Trudy Sinton (former Tax Manager, SALT)—began to follow suit and also started referring to his office as "Siberia."

31.     Mr. Hafizov tried not to let this bother him, but the reality was that it made him feel singled out and unwelcome within Ms. Bernier's group.  To Mr. Hafizov's knowledge, Ms. Bernier never referred to anyone else's office as "Siberia."

32.     Perhaps Mr. Hafizov would have let this go if it had happened in isolation, but the repeated nature of Ms. Bernier's conduct wore on him.

33.     While in Ms. Bernier's office sometime in late 2019 or early 2020, Ms. Bernier, Mr. Hafizov and Nicholas Montorio (Managing Director, SALT) were discussing an ongoing client project.

34.     Mr. Hafizov stated that, in an effort to resolve an issue with a client, he had "no problem being direct."  Ms. Bernier quickly replied, "We know that.  You're like that because you're from Russia."

35.     This reference to his heritage was gratuitous and completely uncalled for—Mr. Hafizov was offended that Ms. Bernier continually referenced his ethnicity in professional settings and clearly viewed Russians with a negative bent.

36.     With this comment, it was clear that Ms. Bernier viewed Russians as stereotypically blunt, authoritative and assertive.

37.     Mr. Hafizov was upset by Ms. Bernier's insinuation that he was more assertive simply because he was Russian.

38.     Mr. Hafizov frequently witnessed similar inappropriate conduct by Ms. Bernier. The following are just a few examples:

- Mr. Montorio told Mr. Hafizov that when he and Ms. Bernier were interviewing candidates in or around 2018, Ms. Bernier rejected a highly qualified candidate who had also been recommended by a colleague, Andrew Greiner (former Senior Associate, SALT).  As Mr. Montorio explained, Ms. Bernier rejected the candidate because he was Jewish.  Ms. Bernier shared with him an experience that she had with a former Jewish employee who strictly observed holidays, suggesting to Mr. Montorio that she found it frustrating and would not accommodate such requests again.  Ms. Bernier's decision to pass on a qualified Jewish candidate was simply on the basis of his race.

- In or around December 2020, Ms. Bernier shared a story with Katrina Maranan (former Associate, SALT) and Ms. Sinton where she described the auditors who had been in the office.  Ms. Bernier pointed out their South Asian accents and claimed that they were acting like she "stole a hot dog from their cart in Central Park," perpetuating a racist stereotype that South Asian immigrants are only equipped for low paying non-professional jobs.

- Mr. Montorio informed Mr. Hafizov that on multiple occasions, Ms. Bernier would make offensive remarks about Italians to Mr. Montorio and Ms. Fasano, who are both of Italian heritage.  For instance, when working with Mr. Montorio and Ms. Fasano on projects, she would state in a disparaging manner, "You know how those Italians are."  She would also say about Italians that you need to "watch out" for them, as if Italians are somehow untrustworthy, deceptive or criminals.  Mr. Montorio interpreted her comments to be playing on the tired stereotype that all Italians are involved in organized crime.

- In a separate conversation with Mr. Hafizov and Mr. Montorio, Ms. Bernier mentioned that Rocky Cummings (Managing Partner, SALT Services National Practice Leader) and Steve Oldroyd (Tax Managing Director, National Compliance Leader and West Region Sales and Use Tax Leader) traveled to New York together

on business.  This, for some reason, perplexed Ms. Bernier, who then asked, "Why are they traveling together?  Are they gay?" Ms. Bernier also discussed male genitals and stated that gay men find Mr. Cummings attractive.  Obviously, Ms. Bernier's comments about the sexual orientation of colleagues (and male sexual body parts) are completely improper.  The idea that two men traveling together for work must be "gay" is a completely illogical inference to draw in the first place, but more to the point, their sexual orientation is irrelevant and speculation about it should not be used as fodder for workplace gossip.

39.     In sum, Ms. Bernier appeared to have a *modus operandi* to inject protected characteristics of all kinds into the workplace.  Mr. Hafizov observed this both first-hand and through communications from other employees which described the same behavior towards others.

### III.     Mr. Hafizov Learns of Ms. Bernier's Penchant for Retaliation

40.     Mr. Hafizov quickly learned that he was not alone in facing unlawful and discriminatory conduct by Ms. Bernier.

41.     In fact, Ms. Bernier willingly shared details of her past transgressions with Mr. Hafizov, which made him incredibly uncomfortable.

42.     In or around 2019, Ms. Bernier openly discussed in the office that Dennis Sweeney (former Managing Director under Ms. Bernier from 2012 to 2019), brought a discrimination and retaliation claim against her following his return from a medical leave of absence.

43.     Ms. Bernier shared this fact with several employees including Mr. Hafizov, Mr. Montorio, Ms. Fasano and Ms. Sinton.

44.     Ms. Bernier described Mr. Sweeney and his claims in a disparaging manner on every occasion where she raised the topic.

45.     Ms. Bernier expressed lingering resentment against Mr. Sweeney, often stating, in an angry tone, "How dare he?" and that she "was always so nice to him."

46.     Ms. Bernier was particularly frustrated by Mr. Sweeney's complaint because she helped hire Mr. Sweeney, who she now felt had turned "against her."  She would tell Mr. Hafizov, "That's what I get for being a good person."

47.     Ms. Bernier was fixated on Mr. Sweeney's lawsuit, mentioning it to Mr. Hafizov on at least 10 separate occasions.

48.     Prior to Ms. Bernier's disclosure, Mr. Hafizov was not aware of Mr. Sweeney's complaint.

49.     Despite Mr. Sweeney's lawsuit, it became apparent to Mr. Hafizov that Ms. Bernier had no intention of changing her ways.  Ms. Bernier did not in any way use the lawsuit as a moment of self-reflection or improvement.

50.     To the contrary, Ms. Bernier only seemed capable of viewing herself as the victim, despite the fact that she and the Company had been sued for discrimination due to her conduct.

51.     In or around mid-late 2020, Ms. Bernier also disclosed to Mr. Hafizov that a former Senior Tax Associate, "Employee A," made an internal complaint with Human Resources ("HR") against Ms. Fasano.

52.     To the best of Mr. Hafizov's knowledge, Employee A made the complaint in 2020 after Ms. Fasano allegedly made disparaging comments about Muslims.

53.     Yet, what concerned Ms. Bernier most about the incident—as Ms. Bernier described it to Mr. Hafizov—was not at all the discriminatory nature of Ms. Fasano's comments, but the fact that Employee A had the "gall" to file a complaint with HR.

54.     After Employee A filed her complaint, Ms. Bernier went to Mr. Hafizov's office, where he and Mr. Montorio were discussing work.

55.     Ms. Bernier closed the door and immediately told them, "Don't speak to [Employee A] again.  Don't give her any work."  She went on to explain, "She's causing us trouble and we can't get rid of her because *you know*."

56.     This obviously meant that BDO and Ms. Bernier could not fire her because she had made a protected complaint and it would look retaliatory to fire her right away.

57.     Mr. Hafizov also understood Ms. Bernier's comment to mean that BDO and Ms. Bernier could not fire Employee A because she was Black.

58.     As Ms. Bernier was leaving the office, she added, "Oh, and you should file a complaint against [Employee A]."

59.     Ms. Bernier's request was nothing more than a blatant attempt at retaliation.

**IV.    Mr. Hafizov Raises Protected Complaints About Ms. Bernier**

60.     Given Mr. Hafizov's knowledge of Ms. Bernier's past and ongoing retaliatory conduct, he was understandably hesitant to raise his concerns about her conduct to Ms. Bernier directly, or to HR.

61.     Mr. Hafizov did, however, confide in one of his supervisors, Mr. Montorio, both verbally and *via* email on numerous occasions.

62.     During these communications, Mr. Hafizov and Mr. Montorio shared their mutual frustration with how Ms. Bernier repeatedly subjected them, and others, to an environment that was unwelcome and hostile toward anyone whose nationality, background and/or ethnicity was even slightly different from hers and her persistent retaliatory animus toward those who reported her or made complaints.

10

63.     In fact, Mr. Montorio collected a list of grievances *via* emails to himself, which he updated as new incidents with Ms. Bernier occurred, and he eventually forwarded the entire email chain documenting Ms. Bernier's transgressions to Mr. Hafizov.

64.     The list Mr. Montorio compiled in real time included the following:

- "informing [employees] of the identity of the person who started an HR investigation";

- "'you know how those Italians are' in front of another colleague";

- "'do you think [Mr. Cummings] and [Mr. Oldroyd] are homosexuals?' In front of another colleague";

- "Mentioning conversation topics of testicles and how gay men are attracted to [Mr. Cummings]";

- "no body is allowed to speak to [Employee A].  Do not give her any work.  She is trouble and we can't get rid[sic] of her because she is (suggesting black).";

- "[Employee A] needs to put her Jesus is calling book away";

- "regular comments[sic] about [Mr. Hafizov]'s ethnicity, and that his office is in 'Siberia'";

- "Flatly rejecting a highly qualified and regarded candidate because she was Jewish.  The candidate was recommended by Andrew Greiner, as he was resigning"; and

- "In December 2020, telling a story to [Katrina Maranan (former Senior Associate)] and [Ms. Sinton] that the auditors had accents and were acting like [Ms. Bernier] 'stole hotdog from their cart in Central Park'".

65.     In or around December 2020/January 2021, Mr. Hafizov reported to Mr. Montorio during a phone conversation, as he had done many times before, many of the instances of

discrimination he experienced and witnessed, including but not limited to Ms. Bernier's attack

on Mr. Hafizov's Russian ethnicity by describing his office as "Siberia" and attributing his

character to being Russian.  In addition, Mr. Hafizov reported Ms. Bernier's racist and retaliatory

comments made about Employee A.

66.     Mr. Hafizov followed up this conversation with an email, where he told Mr.

Montorio that he was frustrated with his treatment by Ms. Bernier and felt that BDO was a racist

workplace.

67.     At some point, HR obtained the communications between Mr. Hafizov and Mr.

Montorio (presumably as a result of Mr. Montorio escalating Mr. Hafizov's complaint), yet for

unknown reasons, HR did not speak to Mr. Hafizov about his complaints for several months.

68.     During this period, Ms. Bernier was seemingly allowed to continue her ongoing

discriminatory and retaliatory behavior.

69.     Finally, in April 2021, Tenielle Comerford (HR, Northeast Region) asked to meet

with Mr. Hafizov to discuss his complaints regarding Ms. Bernier.

70.     Ms. Comerford asked him to share examples of her behavior.  Mr. Hafizov began

by explaining that he was aware of another matter involving Ms. Bernier (referring to Mr.

Sweeney's complaint).

71.     He then described the instances where he experienced or witnessed Ms. Bernier

acting improperly.

72.     Mr. Hafizov shared with Ms. Comerford that he is Russian, and that Ms. Bernier

repeatedly referred to his office as "Siberia."

73.     He told Ms. Comerford that Ms. Bernier's comment, that "[he's] like this because

[he's] from Russia," was offensive to him.

74. Mr. Hafizov further described Ms. Bernier's discriminatory conduct, including her directives to file an HR complaint against Employee A and not to speak to her or give her any work because of Employee A's HR complaint against Ms. Fasano.

75. Mr. Hafizov added that Ms. Bernier insinuated that it would look unlawful and discriminatory to fire Employee A and it was only for those reasons that it had not been done.

76. He also reported Ms. Bernier's comments, "you know how those Italians are," and her open questioning of Mr. Cummings and Mr. Oldroyd's sexual orientation.

77. Mr. Hafizov explained that his experience with Ms. Bernier was especially upsetting to him because BDO often touted its commitment to diversity and inclusiveness, even lauding its inclusive culture online.

78. For Mr. Hafizov, his experience at BDO had been much different.

79. Ms. Comerford agreed that Ms. Bernier's conduct was inappropriate and affirmed that BDO did not tolerate such behavior. She assured Mr. Hafizov that HR would speak with Ms. Bernier to determine what the next steps would be, suggesting that they may advise her to attend coaching on the matter.

80. Clearly, coaching would not be an adequate solution to Ms. Bernier's rampant discriminatory and retaliatory actions. Mr. Hafizov left the meeting feeling unsettled.

81. Ms. Comerford did not follow up with Mr. Hafizov until approximately three months later, where she essentially called as a "check in" with him to see how he was doing following his discrimination complaints.

82. During the follow up call, Mr. Hafizov learned that Ms. Bernier had been assigned to coaching, but was left with little to no detail apart from that.

83.     This was the only time since Mr. Hafizov's protected complaint that HR followed up with him.

84.     It was clear to Mr. Hafizov that the reporting process for complaints of discrimination was simply perfunctory for BDO and no legitimate remedial action would come from HR's involvement.

**V.     Mr. Hafizov is Subjected to Retaliation and Ultimately Terminated**

85.     Ms. Bernier reacted to Mr. Hafizov's protected complaint like she has typically reacted to complaints of a similar nature in the past—with an irrational amount of anger.

86.     Mr. Montorio told Mr. Hafizov that he had also been contacted by HR, and that when he spoke with them, he confirmed what Mr. Hafizov reported about Ms. Bernier was true.

87.     When Ms. Bernier learned that Mr. Montorio corroborated Mr. Hafizov's complaint, she was furious.

88.     She immediately called Mr. Montorio, complaining that, in sum and substance, she "got another call from the General Counsel's office."

89.     Mr. Montorio obviously knew that she was calling in response to his and Mr. Hafizov's HR complaints.

90.     While he confirmed that he had spoken with HR and admitted that he corroborated Mr. Hafizov's report, he remained as quiet as possible.

91.     Ms. Bernier, for her part, spoke the entire time, exclaiming "I can't believe you would say these things about me" and suggested that Mr. Montorio and Mr. Hafizov had "betrayed" her.  Mr. Montorio was speechless.

92.     He told Mr. Hafizov that he had never experienced such anger from Ms. Bernier before.

93.     After Mr. Hafizov met with HR, Ms. Bernier's attitude towards Mr. Hafizov was never the same.

94.     Ms. Bernier distanced herself from him, stopped speaking to him with the same level of frequency and stifled his career progression and opportunities for success and growth.

95.     For example, Ms. Bernier no longer staffed Mr. Hafizov on significant matters within the Company.  Ms. Bernier only gave a couple of menial assignments to Mr. Hafizov that she described as tasks that either no one else wanted to do, or tasks that she felt were unimportant.

96.      Toward the end of 2021, Ms. Bernier assigned Mr. Hafizov a matter and told him, "No one wants to do [the project] because the people on the team are horrible."  Ms. Bernier passed the project along to Mr. Hafizov without any support or guidance, leaving him to feel like he had been set up for failure.

97.     On top of his regular work, Mr. Hafizov interviewed approximately seven candidates for open roles at BDO subsequent to his protected complaint.

98.     While these interviews took a substantial amount of work, preparation and time, Mr. Hafizov believed it was necessary to eventually hire a new member on his team.

99.     However, once hired, the new employees were assigned to work with someone other than Mr. Hafizov, leaving him with no support and having expended significant time and efforts on hiring individuals that would not benefit his work.

100.     As a result of Ms. Bernier's mistreatment, Mr. Hafizov was isolated.

101.     Since Ms. Bernier refused to continue to give him business, he was forced to independently generate revenue from projects he had brought in himself.

102.    However, even with such challenges, Mr. Hafizov had still been successful in that regard.  In fact, Mr. Hafizov and Mr. Montorio had recently secured $2 million in tax refunds for two of their clients, which garnered approximately $350,000 in fees for BDO.

103.    He received public praise for his work by Matthew Dyment (Managing Tax Partner, Boston Office) on BDO's website.

104.    Despite his recent success, Mr. Hafizov's fate had been sealed and Ms. Bernier's acts of retaliation continued until his termination.[1]

105.    On May 18, 2022, BDO inexplicably fired Mr. Hafizov without any prior notice whatsoever.

106.    During his three-year tenure at BDO, Mr. Hafizov neither received any warnings or negative feedback about his performance, nor was he ever placed on a performance plan of any kind.

107.    Mr. Hafizov received only one performance review during his entire tenure at BDO, given to him by Mr. Montorio, which was extremely positive.

108.    Mr. Dyment terminated Mr. Hafizov *via* a Zoom call and when Mr. Hafizov asked him to explain why he had been fired, Mr. Dyment shut down the conversation by stating, "We're not talking about it.  This is not a performance review discussion" and vaguely added, "We're just moving on."

---

[1]     During his time at BDO, Mr. Hafizov co-authored an article, *NYC Unincorporated Business Tax: Reporting Sales of Partnership Interest After Petershill*, with Mr. Montorio and Kaitlin M. Jacob (Tax Associate).  After BDO terminated Mr. Hafizov, the article was published online in Tax Notes State, a premier subscription-based tax publication, without Mr. Hafizov's name.

109.    The only logical explanation for Mr. Hafizov's abrupt firing, when considering Ms. Bernier's retaliatory history, is that his complaint to HR was the catalyst for his termination.

## VI.    Public Allegations in Sweeney v. BDO and Bernier, No. 19 Civ. 07389 (S.D.N.Y.)

110.    Ms. Bernier's history of discriminatory and retaliatory behavior has been the subject of previous litigation in Mr. Sweeney's matter mentioned briefly above.  See Sweeney v. BDO and Bernier, No. 19 Civ. 07389 (GHW) (S.D.N.Y.).  The following is a synopsis of the allegations in that action:

111.    Mr. Sweeney excelled as Managing Director from 2012 to 2019, receiving outstanding performance reviews and substantial bonuses and raises.

112.    In January 2019, Mr. Sweeney had knee surgery that required him to take medical leave and request other reasonable accommodations to recover.  See Dkt. No. 18 at ¶¶ 21-23.

113.    Ms. Bernier, who supervised Mr. Sweeney, was displeased to learn that Mr. Sweeney needed to take time off.  When he returned from leave, Mr. Sweeney faced heightened scrutiny by Ms. Bernier, which included an inundation of emails, constant questioning of his billing entries and removal from projects.  Id. at ¶¶ 24-26.

114.    In April 2019, Mr. Sweeney filed a complaint against Ms. Bernier with Mr. Oldroyd and HR, explaining that he felt Ms. Bernier's behavior towards him changed after he took time off for medical leave.  Id. at ¶¶ 27-32.

115.    The day after he made his complaint, Ms. Bernier called Mr. Sweeney completely irate.  She said she had been fielding calls all morning regarding his complaints and expressed frustration that Mr. Sweeney had reported her.  Id. at ¶ 3.

116.    Ms. Bernier questioned Mr. Sweeney, "how could you do that?"  Id. at ¶ 34.

117.    Ms. Bernier warned Mr. Sweeney against making further complaints, essentially telling him to "keep [his] head down."  Id. at ¶ 35.

118.    Yet, just one week after he filed his complaints of discrimination and only one month after he returned from medical leave, BDO abruptly terminated Mr. Sweeney in a nearly identical manner to the way Mr. Hafizov was terminated—without any justification at all.  Id. at ¶¶ 37-41.

119.    What is more, BDO doubled down on Ms. Bernier's retaliatory conduct after he commenced litigation against her and the Company.  Specifically, BDO sent Mr. Sweeney a threatening letter stating that following his termination he had engaged in conduct prohibited by a non-solicitation agreement he had signed during his employment.  Id. at ¶¶ 44-45.

120.    In this letter, BDO threatened legal action against Mr. Sweeney.  Id. at ¶ 46.

121.    That is, BDO fired Mr. Sweeney and then attempted to intimidate him and prevent him from finding alternative employment.  BDO then followed through with this threat and filed counterclaims against Mr. Sweeney.  Dkt. No. 26.

122.    Not only was this entire sequence of events inherently intimidating and retaliatory, but under New York law non-solicitation agreements are unenforceable as to former employees after the employee is terminated without cause.[2]  Dkt. No. 18 at ¶ 48.

---

[2]    See e.g. Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 397 N.E. 2d 358 (1979) (non-compete clause unenforceable because "[a]n employer should not be permitted to use offensively an anticompetition clause coupled with a forfeiture provision to economically cripple a former employee and simultaneously deny other potential employers his services."); Arakelian v. Omnicare, Inc., 735 F.Supp.2d 22, 41 (S.D.N.Y. 2010) ("New York courts will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated."); Design Partners, Inc. v. Five Star Electric Corp., No. 12 Civ. 2949 (PKC), 2018 WL 3636700 at *15, n.23 (E.D.N.Y. Feb. 24, 2018) (same); SIFCO Industries, Inc. v. Advanced Plating Technologies, Inc., 867 F. Supp. 155, 158 (S.D.N.Y. 1994) (same); Stanacard, LLC v. Rubard, LLC, No. 12 Civ. 5176 (CM), 2016 WL 462508 at *23 (S.D.N.Y. Feb. 3, 2016) (same); Handel v. Nisselson, No. 98 Civ. 6662 (AGS), 1998 WL 889041 at *3.

*                    *                    *

123.     Thus, viewed in totality, Ms. Bernier's history of discrimination and retaliation—and BDO's acquiescence to and even support of such conduct—is well established and documented.

124.     Ms. Bernier, despite having been sued and being given a "coach," is either incapable or unwilling to conduct herself in a non-discriminatory and non-retaliatory manner.

125.     Likewise, BDO has emboldened her to act in this manner without any legitimate repercussion.

126.     The logical result of BDO's refusal to address this in a meaningful manner is that more people will be discriminated against and subjected to retaliation.

127.     Mr. Hafizov is only the most recent such victim, but it seems inevitable that more will follow.

## VII.    BDO Further Retaliates Against Mr. Hafizov Post-Termination

128.     On August 2, 2022, after his termination, Mr. Hafizov through his counsel sent BDO a letter detailing his claims of discrimination and retaliation and informing BDO that he intended to file litigation based on the unlawful conduct described herein.  The letter included relevant allegations related to the Sweeney action that are a matter of public record accessible by any member of the public.

129.     In response, BDO through its counsel sent a letter on September 28, 2022 that threatened Mr. Hafizov and/or his counsel, claiming that they had somehow been involved in a breach of a settlement agreement by explaining that the public allegations in the Sweeney matter

_____

(S.D.N.Y. Dec. 18, 1998) (same); In re UFG Intern., Inc., 225 B.R. 51 (S.D.N.Y. 1998) (same); and Marsh USA, Inc. v Alliant Ins. Services, 2015 WL 6499525 at *3 (N.Y. Sup. Ct. 2015) (same).

demonstrated the veracity of his allegations.  Specifically, BDO stated that "efforts to describe the Sweeney lawsuit . . . are improper and may constitute a breach of the settlement agreement."

130.    BDO's counsel failed to articulate any possible basis for breach of the settlement agreement and was clearly asserted as a form of intimidation and dissuade him and other BDO employees from engaging in protected activity.

131.    Counsel's threat of asserting frivolous claims simply constitutes further acts of unlawful retaliation in response to Mr. Hafizov's protected activity.

### FIRST CAUSE OF ACTION
**(Discrimination in Violation of Section 1981)**
*Against All Defendants*

132.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

133.    By the conduct described above, Defendants discriminated against Plaintiff and others based on race and/or ethnicity in violation of Section 1981 and, among other things, subjected Plaintiff a hostile work environment, stripped Plaintiff of business opportunities and terminated his employment.

134.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, mental anguish and emotional distress for which he is entitled to an award of damages.

135.    Defendants' discriminatory actions constitute reckless, malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)
#### *Against All Defendants*

136.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

137.    By the conduct described above, Plaintiff engaged in protected activity by way of protesting Defendants' discriminatory conduct.

138.    By the conduct described above, Defendants retaliated against Plaintiff by, among other things, taking adverse employment actions against Plaintiff in response to his protected activity, including but not limited to, subjecting Plaintiff to a hostile work environment, stripping Plaintiff of business opportunities, terminating his employment and threatening him post-termination.

139.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, mental anguish and emotional distress for which he is entitled to an award of damages.

140.    Defendants' retaliatory actions constitute reckless, malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
#### *Against All Defendants*

141.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

142.     By the actions described above, among others, Defendants discriminated against Plaintiff and others in violation of the NYSHRL, and Ms. Bernier and Mr. Dyment aided and abetted the unlawful conduct to which Plaintiff was subjected.

143.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, mental anguish and emotional distress for which he is entitled to an award of damages.

144.     Defendants' discriminatory actions constitute reckless, malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

145.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

146.     Defendants retaliated against Plaintiff by, among other things, subjecting Plaintiff to a hostile work environment, stripping Plaintiff of job opportunities, terminating his employment after he protested discrimination and threatening him post-termination.

147.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, mental anguish and emotional distress for which he is entitled to an award of damages.

148.     Defendants' retaliatory actions constitute reckless, malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
*Against All Defendants*

149.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

150.     By the actions described above, among others, Defendants discriminated against Plaintiff and others in violation of the NYCHRL, and Ms. Bernier and Mr. Dyment aided and abetted the unlawful conduct to which Plaintiff was subjected.

151.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, mental anguish and emotional distress for which he is entitled to an award of damages.

152.     Defendants' discriminatory actions constitute reckless, malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
*Against All Defendants*

153.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

154.     Defendants retaliated against Plaintiff by, among other things, subjecting Plaintiff to a hostile work environment, stripping Plaintiff of job opportunities, terminating his employment after he protested discrimination and threatening him post-termination.

155.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or

economic harm, mental anguish and emotional distress for which he is entitled to an award of damages.

156.     Defendants' discriminatory actions constitute reckless, malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, through the following relief:

A.     A declaratory judgment that Defendants violated federal, state and city laws;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

E.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.     An award of punitive damages in an amount to be determined at trial;

G.     An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

H.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: October 17, 2022
      New York, New York                  Respectfully submitted,

                                         **WIGDOR LLP**

                                         By: _____
                                             David E. Gottlieb

                                         85 Fifth Avenue
                                         New York, NY 10003
                                         Telephone: (212) 257-6800
                                         Facsimile: (212) 257-6845
                                         dgottlieb@wigdorlaw.com

                                         *Attorney for Plaintiff*