UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                        Docket #22-cv-08853-
HAFIZOV, RINAT,                     : JPC-RWL

                    Plaintiff,      :

   - against -                      :

BDO USA, LLP, et al.,               : New York, New York
                                      June 6, 2023
                    Defendants.     :
                                      DISCOVERY CONFERENCE
------------------------------------ :

                        PROCEEDINGS BEFORE
                THE HONORABLE ROBERT W. LEHRBURGER,
                   UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          WIGDOR LLP
                        BY:  DAVID EVAN GOTTLIEB, ESQ.
                             MONICA HINCKEN, ESQ.
                        85 Fifth Avenue, 5th Floor
                        New York, New York 10003

For Defendants:         MCDERMOTT WILL & EMERY LLP
                        BY:  LINDSAY FAYE DITLOW, ESQ.
                        One Vanderbilt Avenue
                        New York, New York 10017-5404




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                          PROCEEDINGS                    3
 2            THE CLERK:  We're here in the matter for a
 3   discovery conference, Hafizov v. BDO USA, LLP, 22-cv-
 4   9953.
 5            Attorneys, please state your name for the
 6   record, starting with plaintiff.
 7            MR. DAVID E. GOTTLIEB:  Good afternoon, your
 8   Honor.  David Gottlieb and Monica Hincken from Wigdor
 9   LLP for the plaintiff.
10            HONORABLE ROBERT W. LEHRBURGER (THE COURT):
11   Good afternoon.
12            MS. LINDSAY F. DITLOW:  Good afternoon, your
13   Honor.  Lindsay Ditlow from McDermott Will & Emery on
14   behalf of defendants.
15            THE COURT:  Good afternoon.  All right, so on
16   account of the letter motion by the plaintiff that was
17   filed at ECF-50 on May 19, 2023, raising a number of
18   discovery issues, I have the response from the defendant
19   at document 53.  And, really, these clearly indicate a
20   disagreement about the scope, I would say, of the
21   lawsuit.  But we need to go through the various issues.
22   So the first one, I guess, is -- well, you tell me,
23   Mr. Gottlieb, what would you like to start with?
24            MR. GOTTLIEB:  Well, your Honor, if I may, for
25   a moment?
```

```
 1                          PROCEEDINGS                    4

 2              THE COURT:  Yes.

 3              MR. GOTTLIEB:  The parties have a number of

 4    disputes that go beyond the letter.  We've indicated in

 5    the letter that these highlight the sort of major

 6    issues, but there are additional issues, as well.  We

 7    were limited to a three-page limit under Judge Cronan's

 8    rules, so we included as much as we could.  We've had a

 9    number of meet-and-confers.  We've worked together

10    before, but we just have very -- very --

11              THE COURT:  You have a different view of

12    things.

13              MR. GOTTLIEB:  -- broad disagreements on the

14    scope --

15              THE COURT:  Yes.

16              MR. GOTTLIEB:  -- of discovery.

17              In terms of where to start, if it's okay with

18    your Honor -- and I promise I'll keep it brief -- I'd

19    like to just describe the case for a moment, if I could?

20              THE COURT:  That's all right.

21              MR. GOTTLIEB:  Your Honor, this is a

22    retaliation case.  Mr. Hafizov was an employee at BDO,

23    and the allegations of the Complaint, the gravamen of

24    the Complaint is that he raised a variety of complaints

25    about his manager, Janet Bernier, her mistreatment and
```

2   discriminatory conduct towards a variety of employees on

3   a variety of bases, discriminating against Jewish

4   employees, discriminating against employees based on

5   their sexual orientation.  Part of it included referring

6   to his own Russian national heritage in a way that he

7   felt was offensive.  And the case is about him being

8   retaliated against for raising all these concerns about

9   Ms. Bernier.  The defendants have repeatedly, in every

10  single document that's been filed in this case, tried to

11  reframe this as a case of merely Russian heritage

12  discrimination, which is not and has never been what

13  this case is about.  And the reason I think it's

14  important to address this is that it goes directly to

15  the heart of almost all the discovery disputes that

16  follow.  The Russian heritage discrimination allegations

17  constitute nine of the 156 paragraphs of the Complaint.

18  So I thought it was important to mention that from the

19  start.

20          There's a lot more I could get into in terms of

21  the details of the case, but I think in terms of

22  responding to your Honor's question where to start with

23  the discovery disputes, I think probably a logical place

24  to start would be the issue of the scope of plaintiff's

25  ability to take discovery on the discriminatory conduct

1                           PROCEEDINGS                    6

2    that Ms. Bernier engaged in towards others, including

3    the specific allegations in the Complaint, as well as

4    Ms. Bernier and the other decision-makers -- I shouldn't

5    strictly focus on Bernier even though she is the primary

6    wrongdoer here, Ms. Bernier and the other individual

7    defendant -- their engagement in discriminatory and

8    retaliatory conduct towards others.  And so this is a

9    dispute that comes up in these types of cases not

10   infrequently, and there's a substantial body of case law

11   that addresses a plaintiff's ability to take what's

12   called "me too" discovery evidence during discovery.  So

13   I think a logical place to start is the issue of

14   discriminatory and retaliatory conduct towards others

15   and our ability to take discovery on that.

16           THE COURT:  Okay.  And you conflated two issues

17   there, at least for me, which is you said "me too"

18   discovery.  There is discovery as to similarly-situated

19   individuals, which is narrow; and then there is what I

20   understand you to be seeking beyond that, which is

21   discovery into all these other alleged incidents that

22   the plaintiff raised in addition to the specific

23   comments directed to him.  At least according to the

24   Complaint, he complained not only about the statements

25   about him in Siberia but also the various incidents and

```
 1                          PROCEEDINGS                    7
 2  references, be it to Jews, be it to Italians, be it to
 3  others, that he raised.  And you're claiming that he was
 4  retaliated against for bringing to management's
 5  attention all of those.  Is that right?
 6           MR. GOTTLIEB:  That's correct.
 7           THE COURT:  All right, so Ms. Ditlow, why don't
 8  you help me understand why he wouldn't be entitled to
 9  discovery on those, which are alleged in the Complaint,
10  and also given Judge Cronan's denial of the motion to
11  strike?
12           MS. DITLOW:  Thank you, your Honor.  And I
13  think your first comment that, you know, there's
14  disagreement as to scope is correct.  I think they are
15  highlighted in the Complaint and now how they've taken
16  to frame their allegations are also very different, if
17  we look even at the Complaint, let alone what has come
18  out through the discovery that we have produced, which
19  is voluminous, to this time.  It's not as though he was
20  complaining about an environment in which he was
21  subsumed in, which is hostile, he's hearing all these
22  things.  In fact, his Complaint amounts to he and a
23  fellow coworker renumerating about allegations and
24  gossip that they might have heard about, you know,
25  things that Ms. Bernier has engaged in.  They don't have
```

```
 1                        PROCEEDINGS                      8

 2  any identified individuals; they don't have any

 3  identified statements; they don't have any identified

 4  departments, time frames or anything.  And, as we

 5  pointed out in our letter, this comparator -- take for

 6  the first bucket mentioned -- to be discoverable has to

 7  be similarly situated in all material respects.

 8            THE COURT:  But wait, wait.  Again, let's not

 9  conflate.  There is the issue of similarly situated, and

10  then there is an issue where someone, as here alleges,

11  retaliation for bringing up incidents related not only

12  to remarks directed to them but also remarks directed to

13  others.  And you could imagine, for instance, a manager

14  who might say, "That doesn't give "me too" much concern;

15  he's just talking about himself," whereas, that manager

16  might say, "Oh, my goodness, he's raising all these

17  concerns about all these other individuals; I've got to

18  get rid of this guy."  That could be theoretically

19  different situations.  So I just want to make sure we

20  treat those separately.

21            MS. DITLOW:  Yes, your Honor.  And I think,

22  then, the scope of what would be "me too" and how these

23  similarly-situated employees would be treated, as you

24  said, this is, in their view, a retaliation case.  So

25  this would be "me too" evidence of retaliation.  They in
```

```
 1                        PROCEEDINGS                    9
 2  fact haven't requested evidence of "me too" retaliation;
 3  they've in fact requested alleged allegations related to
 4  all these types of discrimination that might occur.  And
 5  that's not what their Complaint frames.  As I said, it
 6  would be in retaliation for these complaints.  A "me
 7  too" component would be complaints related to somebody
 8  who has similarly said, "I raised all these allegations
 9  of discrimination, and then I was retaliated against."
10  But, as pointed out, that's not what they've requested,
11  and that wouldn't be relevant here if we're just going
12  on all their allegations about people who may or may not
13  have made allegations of discrimination but who do not
14  have any evidence of claims of retaliation in connection
15  with therewith.
16          MR. GOTTLIEB:  Your Honor, can I address some
17  of those issues?
18          THE COURT:  Yes, please go ahead.
19          MR. GOTTLIEB:  So I think it is important that
20  we don't conflate issues, but I think there may be a
21  lack of clarity over the issues here.  Mr. Hafizov
22  raised complaints about a variety of discrimination,
23  like I said; and defendants are going to a trial for
24  summary judgment, what-have-you.  They are going to deny
25  that Ms. Bernier engaged in any discriminatory conduct.
```

```
 1
 2   That should give us the opportunity to take discovery
 3   into her actual discriminatory conduct to demonstrate
 4   that Mr. Hafizov in good faith complained about things
 5   that he observed.  So they shouldn't be able to limit
 6   the "me too" evidence to retaliation; we should be able
 7   to take discovery on Ms. Bernier's conduct that is
 8   similar to that which our client complained about.  So
 9   that's, I think, one issue.
10            Then the next --
11            THE COURT:  Similar because that's what's
12   required for similarly situated, or are you talking
13   about some other scope?
14            MR. GOTTLIEB:  Well, I mean, when you look at
15   "me too" evidence, other people who have been subjected
16   to discrimination and retaliation and when is that
17   discoverable or admissible, I mean, the Supreme Court
18   has decided this issue in Sprint v. Mendelsohn, and
19   they've said that there's no per se rule against
20   discovery or even admissibility of "me too" evidence --
21            THE COURT:  Well, you're using "me too", but I
22   want to understand what you mean by that.  Do you mean
23   similarly situated, or are you talking about something
24   else?
25            MR. GOTTLIEB:  Well, what I mean by "me too" is
```

```
 1                         PROCEEDINGS              11
 2  when can a plaintiff use evidence that there was
 3  mistreatment towards others can be used to demonstrate
 4  mistreatment towards the plaintiff.
 5            THE COURT:  And isn't the test whether they are
 6  similarly situated?
 7            MR. GOTTLIEB:  Well, the test is actually not
 8  whether they're similarly situated; the test is whether
 9  there is enough -- under Sprint v. Mendelsohn, whether
10  based on a fact-intensive inquiry there's reason to
11  believe that that evidence is relevant.  And that can
12  take on --
13            THE COURT:  Well, wait.  That's very different.
14  So there's a -- how is this a different context than the
15  similarly-situated test?  You've just gone from
16  similarly situated in all material respects, which is
17  required for what you're calling "me too" evidence,
18  versus a standard that says because it's relevant under
19  the Federal Rules, essentially.  So something's not
20  right there.
21            MR. GOTTLIEB:  Well, the similarly-situated
22  test, that deals with when you're looking at how other
23  people are treated relative to you.  So --
24            THE COURT:  Yes.
25            MR. GOTTLIEB:  -- for instance, one person
```

```
 1                          PROCEEDINGS                    12
 2   engages in a certain type of misconduct and they're
 3   terminated; another person engages in similar misconduct
 4   and they maybe aren't terminated.  So that disparate
 5   treatment, you're going to look across similarly-
 6   situated people.
 7             THE COURT:  Agreed.
 8             MR. GOTTLIEB:  But when you're looking at --
 9   it's really -- it's 404(b) evidence, whether a
10   particular -- whether mistreatment, discrimination
11   towards another person at a company can be used in a
12   plaintiff's case, that is different than the disparate
13   treatment, similarly-situated test.  And what the
14   Supreme Court has done -- there's a lot of cases that
15   follow this -- is that you have to look at a
16   constellation of factors when determining whether
17   mistreatment towards somebody else can be used.  And the
18   factors include was the mistreatment by the same person.
19   That, under the case law, is the most paramount factor.
20   But then other things, such as same geographic area,
21   same department, same type of discrimination.  So
22   there's a constellation of factors that are considered,
23   but what Courts say across the board and what *Sprint v.*
24   *Mendelsohn* says in particular is that these factors
25   really only come into play when you're looking at --
```

when you're trying to introduce "me too" evidence of

wrongdoing by another supervisor.  So when the same

person, the same defendant, when you're looking for

information and discovery and evidence that the same

exact wrongdoer has engaged in discriminatory treatment

towards others, it doesn't matter whether the person was

a senior manager versus an associate versus a managing

director.  That might come into play in the similarly-

situated test, but if the same person is discriminating

against people at all different levels, that's all going

to be relevant.  That's all going to be relevant under

*Sprint v. Mendelsohn* because it shows, based on 404(b)

evidentiary test, that this person has a *modus operandi*

or has as plan or intent or opportunity to engage in

discriminatory conduct.

        And so that's why we're seeking documents and

information related to Ms. Bernier's discriminatory,

retaliatory conduct --

        THE COURT:  Well, again, now you're conflating

things.  So you start out by saying this is a

retaliation case.  Now you've focused on discrimination,

and now you've just said discrimination/retaliation.

And as Ms. Ditlow pointed out, she is making a point

about if it's a retaliation case, then we should be

1                              PROCEEDINGS                    14

2  looking at other instances where there was retaliation

3  for complaining about discrimination.  But you're taking

4  it to the discrimination focus.

5          MR. GOTTLIEB:  Well, respectfully, the gravamen

6  of the Complaint, if I were to point to the primary

7  claim here, yes, it is retaliation.  But this is not

8  merely a retaliation case.  There is a discrimination, a

9  substantial discrimination component, too.  And the

10  reason I thought it important to make the point that

11  this is primarily a retaliation case is that defendant

12  in every single paper keeps saying this is a Russian

13  heritage discrimination case and trying to narrow it to

14  that.  And that's not the way the Complaint is framed.

15  So, respectfully, it's not merely a retaliation case.

16  Even if it were merely a retaliation case, the issue

17  that under *Sprint v. Mendelsohn* would not be -- it would

18  not be because the other "me too" evidence is

19  discrimination, not retaliation, it's not relevant.

20  Then you start doing a fact-intensive inquiry; and,

21  respectfully, your Honor, given that all the evidence

22  that we're seeking is related to the same exact

23  wrongdoer, it's all Ms. Bernier and then Mr. Dyment, who

24  was involved in the termination decision, as well.

25          This should be noncontroversial.  If we were

PROCEEDINGS                    15

1

2  seeking evidence of discrimination or retaliation by

3  other people at BDO in other offices that has no

4  temporal, geographic or any other crossover, then that's

5  a different issue and then there's potentially a scope

6  issue.  But when we're talking about just Ms. Bernier,

7  whether it's discrimination or retaliation, that is

8  narrowly tailored to this case under the prevailing case

9  law on this issue.

10        And, your Honor, again, we were limited to

11 three pages in our brief.  I would be more than happy to

12 brief the extensive case law in a fully-brief motion

13 that described the -- when this issue comes up, the

14 issue is when a plaintiff is seeking a scope that goes

15 beyond the wrongdoers in this case.  And that's not what

16 we're doing.  So, respectfully, I don't think there's

17 any issue and any compromise to be made, given the scope

18 that we're seeking and the case law.

19        THE COURT:  So, according to you, then, in any

20 case where allegations are made that a particular person

21 engaged in discrimination, any incidents of

22 discrimination by that person against anyone else is

23 discoverable?

24        MR. GOTTLIEB:  Correct.  I mean, I guess I

25 would say this.  The case law is not -- does not provide

PROCEEDINGS                    16

1

2  for those sort of bright-line rules.  But under the case

3  law, the answer is almost always going to be yes, and

4  then the question becomes how far beyond that decision-

5  maker can you go.  Can you go to other people in the

6  same department who are supervised or discriminated

7  against by somebody else?  Can you reach to other people

8  in -- you know, who are maybe lower down within that

9  supervisor's organizational chart, even if they didn't

10 have direct discrimination from that supervisor?  So

11 that's -- those are the scope issues that come up in

12 these cases, and that's, again, what the case law says

13 in abundance.  I mean, there's a whole line of cases

14 following *Sprint v. Mendelsohn*, which was in 2008 that's

15 all about how far beyond the decision-maker can you go,

16 how far beyond the tort-feasor, the wrongdoer can you

17 go.  So for us -- again -- sorry, I don't want to

18 belabor and repeat myself, but that's our position, your

19 Honor.

20         THE COURT:  All right, okay, Ms. Ditlow?

21         MS. DITLOW:  yes, your Honor.  And Mr. Gottlieb

22 has, you know, quoted from the case law, but I think

23 he's still suggesting it's much broader than the law

24 allows.  He's suggesting that, if there's a claim of

25 discrimination, it's discoverable against the alleged

```
 1                         PROCEEDINGS                    17

 2   employer or the individuals, anyone else.  And that's

 3   not the case.  What the case law says is that the

 4   relevant -- you know, to take the relevancy

 5   (indiscernible) 404(b) in Mendelsohn is that Courts have

 6   repeatedly held the allegations --

 7            THE COURT:  Can you just slow down a bit?

 8            MS. DITLOW:  -- allegations regarding employer

 9   hostility or discrimination towards an individual

10   protected class.  The relevant and potentially

11   discoverable information are those in the same protected

12   class.  So if Mr. Gottlieb wanted to amend and revise to

13   those national origin discrimination, then that would

14   possibly fall within the scope.  But that's not what

15   he's requested.  Discrimination regarding any individual

16   based on race, religion, ethnicity, gender, you know, a

17   myriad of things.  And those aren't relevant.  To say

18   somebody discriminates against, let's say, one race or

19   then also would discriminate against, you know, people

20   of a particular sexual orientation isn't necessarily

21   relevant there.  And beyond the scope suggests that just

22   because it relates to the same person, that that's a

23   narrow request.

24            THE COURT:  But if the person -- if the

25   plaintiff, as here, says they were retaliated against
```

2   for bringing to management's attention let's say ten

3   different incidents -- and they're all different types

4   of discrimination -- isn't it relevant that -- aren't

5   all those incidents relevant?  Because they reform part

6   of what he was complaining about tan was retaliated

7   against for?

8           MS. DITLOW:  But if the -- but he's not seeking

9   evidence regarding plaintiff's complaint; he's seeking

10  evidence potentially of other individuals --

11          THE COURT:  Well, but the allegation is that

12  he, the plaintiff, brought to management's attention

13  saying not only have I been discriminated against, but

14  there have been all these other incidents against other

15  people.  I think that's a problem.  Take care of it.

16  And then he claims he's retaliated against for raising

17  that issue, which includes all these other incidents.

18  Does that implicate them, at least to some extent?

19          MS. DITLOW:  Potentially.  But what I think is

20  different here and I think that's very where the fact-

21  specific and (indiscernible) come into play because

22  what's not happening here is here's all these instances

23  of potential discrimination, I'm raising them, you know,

24  take care of it.  They have not identified, even,

25  individuals or anything or even people that were

1                          PROCEEDINGS                    19

2  currently even employed by BDO.  So this is nothing more

3  than a fishing expedition.

4          THE COURT:  Okay.  Anything else you want to

5  say, Mr. Gottlieb?

6          MR. GOTTLIEB:  There is, your Honor.  This case

7  in particular, it would be extraordinarily -- it would

8  be impossible to try to say the plaintiff is entitled to

9  evidence that Ms. Bernier engaged in certain types of

10  discrimination but not others, because looked at in its

11  totality, the allegations that Mr. Hafizov has made in

12  the Complaint, including the allegations that are public

13  from other complaints that have been filed against Ms.

14  Bernier.  The allegations are that she discriminates

15  against virtually everybody.  She discriminates against

16  people on disability, on sexual orientation, on

17  religion, on race, on national origin and ethnicity.  So

18  say, oh, we're going to find one protected class and

19  carve it out," I mean, the point is that she is somebody

20  who engages in an extremely wide array of discriminatory

21  conduct.  And if the defendants at trial or at summary

22  judgment intend to argue that she does not do these

23  things, then we're entitled to take discovery on that.

24          THE COURT:  All right, table that issue for a

25  bit.  We come to other discovery, specifically about

1                           PROCEEDINGS                      20

2  similarly-situated comparators -- that's a subset of

3  this, I would say.  Is there an actual discrepancy,

4  disagreement as to who qualifies?

5          MR. GOTTLIEB:  Well, I think, your Honor -- I

6  don't think it is a subset, for the reason I was

7  starting to explain before, which is whether -- BDO says

8  Mr. Hafizov was terminated for certain specific

9  deficiencies.  And what we intend to establish is that

10 other people engaged in similar sorts of performance

11 issues and were treated dissimilarly.

12          THE COURT:  Okay, well, you can't -- it's not

13 just other people; it's people who are similarly

14 situated in all material respects.

15          MR. GOTTLIEB:  Well, that's a document, so

16 exhibit -- but this, your Honor, my colleague,

17 Ms. Hincken, is going to handle.

18          THE COURT:  Okay.

19          MS. MONICA HINCKEN:  Good afternoon, your

20 Honor.

21          THE COURT:  Good afternoon.

22          MS. HINCKEN:  So with respect to the similarly-

23 situated document requests, we're really talking

24 essentially about Request 22, 23, 25, 27, 30 and 32,

25 specifically.  And so with respect to the similarly

| 1 | PROCEEDINGS | 21 |

```
 2   situated, we have agreed, are ready to narrow the scope

 3   of those requests to only those senior managers or

 4   above.  The plaintiff in this case was a senior manager

 5   within his division, who reported directly to defendant

 6   Bernier and defendant Dyment.  So we've offered that

 7   compromise to ensure that they were similarly situated.

 8   All of those individuals, you know, reported to the same

 9   supervisor, and they were subjected to the same

10   performance standards and discipline standards.  And

11   that's really what the Court is looking at when they're

12   determining similarly situated.

13           So with respect to that, we under, like, with

14   respect to Request 22, which requested the entire

15   personnel file for those similarly situated.  We

16   understand, based on previous objections, that

17   defendants have maintained that the BDO does not have

18   traditional personnel files.  And so we have agreed to

19   specifically request the documents outlined in request

20   23, 25, 27, 30, and 32.  And so those are all requests

21   that go to the reasons that they're claiming that

22   plaintiff was terminated.  So, based on other people who

23   were disciplined, other people who were considered rude

24   in the workplace, other people can receive complaints

25   about their work and --
```

```
 1                           PROCEEDINGS                    22

 2               THE COURT:  But, again, we're talking about

 3    other people who are similarly situated.  Ms. Ditlow,

 4    where's the area of disagreement?

 5               MS. DITLOW:  Your Honor, our first area of

 6    discrim -- I've, you know, appreciated (indiscernible)

 7    working together with us after our meet-and-confers and

 8    narrowing the scope.  One of our objections is you heard

 9    them use the term "treatment."  We felt that that was a

10    little vague in terms of they're looking for, you know,

11    termination records for precisely disciplinary action.

12    Right now, "treatment" term was a little vague, and it

13    was hard to know, you know, what would potentially

14    encompass that.

15               THE COURT:  Okay.  Well, that's something you

16    can meet and confer about and figure out.

17               MS. DITLOW:  Yes.  Additionally, we felt it was

18    still a little overbroad.  Mr. Dyment, who you

19    asked -- is one of their supervisors.  But he oversees

20    the entire region, so technically, everybody reports up

21    to him.  So I felt that that was still a little

22    overbroad in the --

23               THE COURT:  Right.  It can't be everybody who

24    reports to him; it has to be people who are similarly

25    situated to the plaintiff.
```

```
 1                      PROCEEDINGS              23

 2           MS. DITLOW:  Right.  I understand.  But they

 3  were trying to narrow the scope in -- for those that

 4  directly report.

 5           THE COURT:  No, I understand.  And that comment

 6  is essentially directed to plaintiff.  It seems to me,

 7  though, that you're disagreeing but haven't really

 8  gotten down to the nitty gritty of people and which

 9  people you're talking about.  It seems like there's

10  still room for meeting and conferring.  Or no?

11           MS. DITLOW:  I would think that's accurate.

12  Obviously, I will leave it to Ms. Hincken, since it's

13  her request.  But I think some additional movement can

14  be made.

15           MS. HINCKEN:  And I think one of the issues is

16  we don't have a clear scope of the people because we

17  have requested an organizational chart, and they have

18  maintained that they don't have those.  And so we don't

19  have a way to understand the scope of the people that

20  we're discussing.

21           But with respect to reporting at the same

22  supervisor, I mean, we're limiting it to senior managers

23  or above, as well, not just anybody who reports to that

24  supervisor.

25           THE COURT:  Yes.  But I don't know what "senior
```

```
 1                         PROCEEDINGS                   24
 2  manager" means.  There could be senior managers in
 3  different types of departments, say; and the
 4  requirements for what you do in those different
 5  departments, they have many different demands, they may
 6  require a different task.  So they wouldn't necessarily
 7  be similarly situated.  But obviously, I just don't know
 8  what the scope of what we're talking about it.
 9          MS. HINCKEN:  Right.  And it's specific to his
10  particular division, the request is.
11          THE COURT:  And SALT's what division?
12          MS. HINCKEN:  The State and Local Tax Division
13  in the Northeast Region.
14          MS. DITLOW:  Your Honor, if I may?  And,
15  obviously, Ms. Hincken and I can talk about -- if to the
16  extent I could be (indiscernible) we talk about
17  similarly situated in the New York office, that may, you
18  know, limit the scope to something more manageable.
19          THE COURT:  How many other offices are there
20  within the Northeast --
21          MS. DITLOW:  Within the Northeast Region, I
22  think there's probably seven or eight, total.
23          THE COURT:  Okay, and --
24          MS. DITLOW:  And each one of those would report
25  up to Mr. Dyment, not Ms. Bernier, who's in the New York
```

 1

 2   office.  And then Mr. Dyment oversees the region, so

 3   everybody in New York, Ms. Bernier, and then Mr. Dyment;

 4   whereas, everybody in the outside offices would

 5   similarly, you know, have Mr. Dyment as a direct report.

 6          THE COURT:  Right.  What do you think of that

 7   proposal?

 8          MS. HINCKEN:  I think, your Honor, that may

 9   work, but we just don't have an idea of what number of

10   people we're talking about.  So we don't know if it

11   would be a good way to gauge his treatment in comparison

12   to others.

13          THE COURT:  Well, again, we have to look at

14   what similarly situated.  Do you -- Ms. Ditlow, if it

15   was the New York office, how many people do you think

16   you would have in mind that you'd be producing material

17   for?

18          MS. DITLOW:  Your Honor, I don't want to

19   speculate because I don't -- it would just be a guess at

20   this point.  But I think certainly, for similarly-

21   situated purposes, it would be individuals who reported

22   up to the same individuals and not where a, you know,

23   third person who is not named anywhere in the Complaint,

24   a manager in an outside office would come in.  So I

25   think, certainly, for similarly-situated purposes, the

```
1                          PROCEEDINGS                      26
2    construct of limiting it to New York would be
3    appropriate for there, regardless of the number of
4    employees.
5              THE COURT:  Okay.  I'm not sure I completely
6    followed, but there were people in other offices who
7    were reporting to Mr. Dyment as senior manager, is that
8    right?
9              MS. DITLOW:  Right.  So, in the other offices -
10   - Ms. Bernier manages the New York office, and then
11   everybody reports up to the regional head in the other
12   office, for example, in a Boston office.  There would be
13   another person in between them who, you know,
14   essentially fills Ms. Bernier's spot.  So they would not
15   be similarly situated.
16             THE COURT:  Okay.  Let's do this.  Let's limit
17   it to the New York office without prejudice to a future
18   application if for some reason plaintiffs think that
19   they have a basis to be seeking similarly-situated
20   persons in other offices.
21             MR. GOTTLIEB:  Your Honor, can we just ask for
22   a disclosure of how many people that may be?
23             THE COURT:  I think she just -- Ms. Ditlow, I
24   thought you just said she wasn't sure?
25             MS. DITLOW:  That's correct.
```

```
 1                          PROCEEDINGS                    27

 2              THE COURT:  So that's why I'm saying -- but why

 3  don't we have you find out how many people that is and

 4  let the plaintiffs know.  How long would it take you to

 5  find that out?

 6              MS. DITLOW:  Hopefully, short -- also the

 7  question would be is there a relevant time period that

 8  we're looking for -- I think their requests cover a

 9  period -- or is it just during the time period of

10  Mr. Redmond's employment so I can properly find out the

11  number of --

12              THE COURT:  Well, what's the relevant time

13  frame we're looking at?

14              MS. HINCKEN:  Well, the relevant scope that

15  we'd originally requested was from January 2012 to

16  present.

17              THE COURT:  When was the period of employment

18  of the plaintiff?

19              MS. HINCKEN:  He was employed from May of 2019.

20              THE COURT:  And you're seeking to go back to

21  2012?  On what basis?

22              MS. HINCKEN:  It's related to prior allegations

23  of discrimination and retaliation by defendant Bernier.

24              THE COURT:  All right, but there has to be some

25  time period that is not overly burdensome and
```

| 1 | PROCEEDINGS | 28 |

2  commensurate to the case.  I'm going to say back to

3  2014, five years before the period of employment.

4          MS. DITLOW:  Your Honor, with that, since it

5  goes a little further back, obviously, I will endeavor

6  along with my client to get the information as soon as

7  possible, but I don't yet know how long that would take

8  in terms of the number of employees that --

9          THE COURT:  That fall into that period, okay.

10         MS. DITLOW:  -- we're speaking of.  Correct.

11         THE COURT:  Well, let's set a date by which you

12  will aim to get them that information.  Will it take you

13  more than a week?

14         MS. DITLOW:  To be honest, I don't know.

15         THE COURT:  Let's say a week.

16         MS. DITLOW:  Okay.

17         THE COURT:  And if there are problems, you will

18  work it out with the plaintiff.

19         MS. DITLOW:  Absolutely.  Thank you, your

20  Honor.

21         THE COURT:  All right.  That's similarly

22  situated.

23         Let's see, there's a question about hit report.

24  And so defendant has claimed that the discovery has been

25  overbroad and overly burdensome, and the plaintiffs say

```
 1                        PROCEEDINGS                 29
 2  they would like a hit report so that they have a basis
 3  for assessing that and discussing it.  Has any further
 4  progress been made on that front?
 5            MS. DITLOW:  Your Honor, not further progress,
 6  but I do want to correct the record.  Following
 7  submission of our letter, Ms. Hincken reminded me that
 8  they did previously request it.  It was an oversight on
 9  my part.  It did not come up in any of our subsequent
10  meet-and-confers, so it was not something that we had an
11  opportunity to discuss further.
12            Notwithstanding that, I did respond to
13  Ms. Hincken and say that, you know, we did not feel that
14  at this time a hit report based on the overbreadth of
15  custodians and time period and term request was
16  appropriate.  We've already produce over 3,000
17  documents, many of which are extensive and relate to the
18  individuals on which we're seeking ESI on and that the
19  undertaking, you know, capturing that data, running the
20  hit report, going through and understanding how much of
21  the potential documentation would be not proportional to
22  the needs of this case, considering the voluminous
23  discovery we've already conducted.
24            THE COURT:  But do you have a hit report; and
25  if so, what search terms was it based on?
```

```
 1                         PROCEEDINGS                    30

 2             MS. DITLOW:  The entirety of their request, I

 3   believe.

 4             THE COURT:  Including terms which are disputed

 5   right now --

 6             MS. DITLOW:  Correct.

 7             THE COURT:  -- in terms of, you know, Jewish or

 8   sex or whatever?  Okay.  So you have that hit report,

 9   and the question is what is the extent of documents that

10   may be covered by that versus what it would look like

11   taking out terms that you say aren't relevant,

12   essentially.

13             MS. DITLOW:  Your Honor, let me clarify.  We

14   have not run a hit report based on all the terms and

15   custodians they've requested.  To undergo and retrieve

16   that data, we felt that even on this stage based on the

17   lack of relevancy, the lack of proportionality, it was

18   an unnecessary exercise, you know, unless the Court

19   tells us otherwise.

20             THE COURT:  Okay, so what's the hit report

21   you're referring to?

22             MS. DITLOW:  Their request.  I just wanted to

23   correct the record that --

24             THE COURT:  Oh, okay, there is no actual hit

25   report?
```

```
 1                          PROCEEDINGS                  31
 2          MS. DITLOW:  Correct, yes.
 3          THE COURT:  Got it.
 4          MS. DITLOW:  She had made a request.  In our
 5   letter I had said they had not yet requested it, and I
 6   just wanted to make it clear to the Court that my
 7   recollection was incorrect.
 8          THE COURT:  All right, anything you want to say
 9   about that, Mr. Gottlieb?
10          MR. GOTTLIEB:  Well, your Honor, I mean, there
11   are actually a number of other items, just sort of basic
12   document items that still need to be addressed before we
13   even get to ESI.
14          THE COURT:  Well, a hit report was A under your
15   Section 3.  So I was just starting there first.  So
16   where are we before that?
17          MR. GOTTLIEB:  Well, like I mentioned, I mean,
18   we did include every last thing in our letter to --
19   limited by space.  So I'm happy to --
20          THE COURT:  There's hit report, custodians and
21   search terms.
22          MR. GOTTLIEB:  Right.  No, those are the
23   electronic discovery items, but Section 2 of our letter
24   outlined the major document issues.  But there are a
25   number of other document issues that are not mentioned
```

```
 1                        PROCEEDINGS                    32

 2   in the letter.  Again, we mentioned in the footnote that

 3   there were other items that we still --

 4          THE COURT:  Okay, well, I can't address those

 5   obviously here because they're not teed up for me.  I

 6   don't know if you've fully met and conferred on all

 7   those.  Have you?

 8          MR. GOTTLIEB:  We've met and conferred a number

 9   of times, probably close to half a dozen times within

10   letters and so forth, as well.  So we can either -- I'm

11   happy to address those issues however you'd like, with a

12   further letter submission or with a motion --

13          THE COURT:  Yes, we're going to have to do it

14   with some further submission, but we'll get to that in a

15   minute in terms of what the scope should be.

16          What I have in the letter right now is hit

17   report, custodians, and search terms.

18          MR. GOTTLIEB:  Yes.

19          THE COURT:  So there were -- as to custodians,

20   there was an issue about four different individuals,

21   Shannon Ford, Rocky Cummings, Katrina Marinen, and Tracy

22   -- I'm not going to try to pronounce it -- E-j-e-r-e-k-

23   h-i-l-e.  And the parties have a disagreement about the

24   extent to which those persons should be custodians.  And

25   has anything been resolved there?
```

```
 1                          PROCEEDINGS                    33
 2                MR. GOTTLIEB:  Nothing has been resolved, your
 3     Honor.  I mean, these are all individuals that the
 4     defendants have identified in their initial disclosures
 5     as being individuals likely to have relevant
 6     information.  So we're a bit befuddled how they're not
 7     relevant for ESI protocol.  The defendants agree they
 8     have relevant information.  You know --
 9                THE COURT:  Well, stop there.
10                So, Ms. Ditlow, what do you have to say about
11     that?  If you identify these persons as persons likely
12     to have relevant knowledge, why wouldn't they be
13     appropriate custodians?
14                MS. DITLOW:  Well, your Honor, because the
15     scope of what they're asking us to search for is beyond
16     the scope.  And we've identified and already produced
17     documentation relevant to where we've identified that
18     they would have knowledge and information.  Most --
19                THE COURT:  But that's not really directly
20     answering the question.  Why wouldn't they -- with
21     whatever scope you want to apply that you think should
22     be applied, why wouldn't they be included within that?
23     Are you suggesting that all their documents they're
24     likely to have would have been in someone else's,
25     another custodian's possession?
```

```
 1                        PROCEEDINGS                    34
 2           MS. DITLOW:  No, your Honor.  I think -- well,
 3  that is probably true, also -- but all their documents
 4  that are relevant, based on the knowledge and
 5  information they have had, based on plaintiff's
 6  allegation, we have already produced.
 7           THE COURT:  Oh, so in other words, you've
 8  produced -- but have you so produced from them or from
 9  elsewhere?
10           MS. DITLOW:  Produced from them.
11           THE COURT:  Oh, okay, so they were included as
12  custodians, then?
13           MS. DITLOW:  So, we did a 3,000-page production
14  based on targeted searches as opposed to blatant overall
15  ESI; we're collecting their entire mailboxes.
16           THE COURT:  No, I understand.  But they were
17  people whose documents were -- the defendant collected
18  documents from in order to produce discovery in this
19  case; is that right?
20           MS. DITLOW:  Yes.
21           THE COURT:  Okay.  And have you otherwise
22  agreed to individuals who would be included within ESI
23  discovery?
24           MS. DITLOW:  Other individuals we have agreed
25  upon.
```

```
 1                    PROCEEDINGS                35
 2           THE COURT:  Okay.  So this again goes back to
 3   ESI.  And so what I hear defendants saying,
 4   Mr. Gottlieb, is that insofar as they are likely to have
 5   information relevant to the dispute, that is information
 6   that was and can be located by whatever targeted means
 7   they used; but to include them generally in ESI would be
 8   disproportional to the litigation.  So it's not
 9   necessarily inconsistent, in other words.
10           MR. GOTTLIEB:  Well, your Honor, respectfully,
11   I mean, I heard something different.  What I heard was
12   they used their own unilateral search terms that were
13   not disclosed to us -- so there's a universe of
14   documents for, let's just say, Shannon Ford.  There's a
15   universe of documents that could contain relevant
16   information.  They narrowed that universe of information
17   using whatever search terms they felt appropriate
18   without disclosing what those search terms were to us.
19   And so we have no way of knowing whether they conducted
20   a reasonable, good-faith, diligent search.  And the way
21   that's done is the parties negotiate over the search
22   terms.  So they can't just say like, "Oh, we're going to
23   search that how we want; we're not going to disclose to
24   you how we did it.  But just trust us, it was diligent
25   and thorough."
```

```
 1                        PROCEEDINGS                  36

 2              THE COURT:  What you've just said I don't

 3    disagree with in principle.  But, again, I'm not sure I

 4    heard it that way.

 5              But, Ms. Ditlow, can you clarify exactly what

 6    defendants did with respect to these individuals and

 7    collecting documents?

 8              MS. DITLOW:  Sure.  Absolutely.  I mean, taking

 9    Ms. Ford, for example, she is in BDO's Human Resources

10    Department.  We, you know, collected all of her emails

11    related to plaintiff or plaintiff's complaint with other

12    people within BDO.  Now, to have her entire mailbox then

13    searched for, you know, terms such as "harass," we think

14    is entirely disproportionate based on this Complaint,

15    when we have -- and this is not a targeted search where

16    we applied certain things.  As we said, we collected

17    everything related to Mr. Hafizov and Ms. Shannon Ford,

18    who was part of HR.  To go beyond that and to then have

19    to search through relevant documents for an entire HR

20    organization based on, you know, very broad terms would

21    be an undertaking that just certainly isn't proportional

22    to this case when we've already produced that relevant

23    information.

24              THE COURT:  All right, so one thing I want you

25    to do is just in writing disclose to the plaintiffs what
```

1

2   was the scope of what you searched for and obtained from

3   these individuals already.  And then there'll be a

4   discussion or an issue about whether that's sufficient

5   from the plaintiff's perspective or whether they think

6   these individuals should be included in full-scope ESI.

7   Ms. Ditlow, you've provided a reason why it may be

8   appropriate for them not to be -- I don't know.  But I

9   think at the very start we need to have you disclose

10   what it was exactly that you've searched for and

11   produced.  So, again, I'd ask you to do that within a

12   week.

13          I think, you know, part of the problem here is

14   running custodians and search terms, they somewhat tie

15   together because they both influence the breadth and

16   burden and proportion of what's going on.  But at least

17   there are four individuals identified with respect to

18   custodians.  Mr. Gottlieb, take a look at what

19   defendants say was done, and then have a discussion

20   about whether those individuals still need to be

21   included within full-scope ESI.

22          All right, in terms of the search terms, this

23   ties back to the first issue because, as I understand

24   it, some of the terms that are asked to be used include

25   *discrimina!*, *retalia!*, *harass!*, *hostile!*, *offensive!*,

```
 1                          PROCEEDINGS                  38
```

 2  *sue!*, *complain!*, *gay homo!*, *Jew!*, *Shabbat!*, *Sweeney* and

 3  *recording!*, and many others.  So are these words that

 4  plaintiff proposed to use individually, or were they in

 5  combination, Mr. Gottlieb?

 6          MR. GOTTLIEB:  Those were individual terms for,

 7  I believe, Ms. Bernier and Mr. Dyment, the two

 8  individual defendants.  Having done a lot of ESI work,

 9  it's possible some of them may yield a large volume of

10  hits, in which case we could consider using connectors

11  or various things that can be done to bring the volume

12  in line with what's appropriate.  But we don't know; we

13  don't have the hit report at this point.

14          THE COURT:  Well, and there is no hit report at

15  this moment, it sounds like.  And the defendants have

16  said they haven't even tried running these terms to see.

17  But I think that's because in the first instance one

18  would look at this and say this is quite broad in terms

19  of what it may be looking for.

20          Just something you said, just tell me again,

21  these were terms that were proposed to be used

22  individually for just two individuals, or was it more

23  people?

24          MS. DITLOW:  Mr. Montorio, as well, I see a

25  member of those --

1
2          MR. GOTTLIEB:  Maybe for three individuals.

3          THE COURT:  Maybe three?

4          MR. GOTTLIEB:  I can go back and look at it to

5  give -- if your Honor gives me a moment.  Those were, I

6  believe, for three individuals -- or maybe -- we have a

7  heavily redlined ESI protocol.  I believe it's for three

8  people, your Honor.

9          THE COURT:  All right.  So it says -- put it

10  this way, it's a relatively contained number.  It's not

11  like it's being applied to tens or twenties of people.

12  Ms. Ditlow, why can't you at least run a hit report to

13  see what would happen if you did run these terms across

14  those individuals?

15          MS. DITLOW:  Your Honor, I will say we can.  I

16  think we had not yet endeavored to do so.  We were

17  hoping to reach an agreement on custodians, so when we

18  are able and work with the IT departments between our

19  firm and our client; that we are gathering everything

20  and loading it up into the server at that time.

21  Obviously, before we had settled on the custodians, we

22  were not yet undertaking that.  If we can agree at least

23  at this point that the custodians that we've agreed upon

24  we would move forward with and conduct a hit report on,

25  I can begin that process.

```
 1                           PROCEEDINGS                  40
 2              THE COURT:  Well, I think that makes sense that
 3    we start getting some information.  What do you think,
 4    Mr. Gottlieb; do you agree?
 5              MR. GOTTLIEB:  I think so, too.
 6              THE COURT:  Okay.  Yes, because it will be --
 7    you know, look, there's going to be one -- in
 8    determining production, obviously, and what should be
 9    produced, burden and scope and proportionality are going
10    to be important.  And hits, hit report may tell us, at
11    least give us something information, certainly not the
12    end-all and be-all, by any means.  How long do you think
13    it will take to get that?
14              MS. DITLOW:  Your Honor, can we get back to the
15    Court and plaintiff at least by tomorrow?  We'd have to
16    connect with the IT Department.
17              THE COURT:  Yes, why don't you just speak with
18    opposing counsel about it?  If for some reason there's a
19    disagreement saying you're going to take way too long
20    and you need it sooner, then you'll let me know, but --
21              MS. DITLOW:  We will obviously endeavor to --
22              THE COURT:  -- I suspect you'll be able to work
23    it out.
24              MS. DITLOW:  -- it as soon as possible.
25              Mm-hmm.
```

```
 1                      PROCEEDINGS                  41
 2          THE COURT:  All right, so you'll be running the
 3   terms sought by the plaintiff against those three
 4   individuals that those terms are indicated for use with.
 5   So it's hit report, custodians and search terms, okay,
 6   all of which -- a lot still hasn't been resolved,
 7   obviously; but I think we're on our way to doing that.
 8   And there is the large looming issue of really what is
 9   going to be relevant here.  I'm going to take a little
10   further look into that.  If you would like to brief that
11   further, that's fine.  And why don't -- I take it that's
12   something you'd like to do, Mr. Gottlieb?
13          MR. GOTTLIEB:  It is.
14          THE COURT:  Okay.  So let's say a brief of no
15   more than 10 pages; would that be okay?  I think that
16   should be sufficient.
17          MR. GOTTLIEB:  Sure.
18          THE COURT:  And when would you be able to get
19   that by?
20          MR. GOTTLIEB:  Two weeks, your Honor.
21          THE COURT:  Okay.  Ms. Ditlow, is 10 pages okay
22   with you; and how long to respond?
23          MS. DITLOW:  Two weeks, your Honor?
24          THE COURT:  Okay.  Ten pages, okay?
25          MS. DITLOW:  Yes, your Honor.
```

```
1                       PROCEEDINGS              42

2           THE COURT:  All right, and for reply I'll give

3    you five pages, due a week later, okay?

4           MR. GOTTLIEB:  Okay.

5           THE COURT:  So it will be two weeks, two weeks,

6    one week.  I'll put that in an order so you have

7    specific dates.

8           And then if there are other issues -- you

9    mentioned, Mr. Gottlieb -- that aren't in the letter

10   that are teed up and you think are ripe, you can put an

11   additional letter on that.  If you have -- I don't want

12   to deprive you of your ability to say what you need to

13   say.  Let's say there were six issues and it took two

14   letters to do that, I don't have a problem with that.

15   Just try to be economical as best you can.  Hopefully,

16   it's not just a letter per issue.  So I'll leave it to

17   your discretion as to how you think it best to package

18   that.  You'll submit those, and defendant will respond.

19   Depending on the number of issues raised, the defendant

20   may need more than the typical three days.  Just let me

21   know, once you see whatever it is they submit, as to

22   what you think you need.  Okay?

23          MS. DITLOW:  Your Honor, I just want to raise,

24   also in response to Mr. Gottlieb's premotion letter, we

25   also raised in our premotion letter.  I just wanted to
```

```
 1                        PROCEEDINGS                    43
 2   make sure that we either get an opportunity to address
 3   that here today or in subsequent briefings.
 4            THE COURT:  Let's take a look.
 5            Well, one of them was about the prior lawsuit.
 6   To me, that goes to scope that we're talking about;
 7   that's the Sweeney lawsuit.  And then what else was it
 8   that you thought needed addressing that's not addressed
 9   -- we haven't addressed already?
10            MS. DITLOW:  Yes, generally and prior to your
11   Honor being in the courtroom, Mr. Gottlieb informed us
12   that they are working on producing some additional
13   documents.  But I think a number of post-termination
14   documents related to plaintiff's conduct still remain
15   and which there's a dispute over, as well as some
16   communications with other BDO current and former
17   employees, as well as clients.
18            THE COURT:  So Mr. Gottlieb, is there a
19   disagreement there on those issues?
20            MR. GOTTLIEB:  I'm not -- I'm sorry, your
21   Honor; I just am not following what -- I'm not sure what
22   I'm supposed to be responding to.
23            THE COURT:  Well, in their letter of May 24th,
24   at ECF-53, in item 2B, Discovery Issues Regarding
25   Plaintiff's Post-Termination Retaliation Allegation, it
```

PROCEEDINGS                    44

1

2   seems to me that's one of and perhaps the both items

3   that were being addressed by Ms. Ditlow.

4           MR. GOTTLIEB:  Well, but that actually

5   category, that's an issue that we've been seeking

6   discovery from defendants on post-discrimination *[sic]*

7   retaliation against him that we have not been able to

8   obtain.

9           THE COURT:  Okay.

10          MR. GOTTLIEB:  So I'm not --

11          THE COURT:  Did I get the issue wrong,

12  Ms. Ditlow?

13          MS. DITLOW:  No.  I think that's correct.  In

14  fact, the middle of the paragraph highlights that we are

15  still seeking, awaiting documentation related to efforts

16  by plaintiff to mitigate his damages, including post-

17  termination efforts he made, correspondence between

18  plaintiff and other current and former BDO employees,

19  including Mr. Montorio, which he said he would be

20  providing.  But Mr. Sweeney, Mr. Jimenez and Ms.

21  Ejerekhile, medical records related to mental health,

22  plaintiff's deficiencies --

23          THE COURT:  Okay, okay, stop there.

24          MS. DITLOW:  Yes, sorry.

25          THE COURT:  So but, you know, I think you've

1

2  been pointing out that those haven't yet been produced.

3  But is there a dispute as to whether they will be

4  produced?

5          MS. DITLOW:  Regarding the post-termination

6  conduct, which relates to a lot of information related

7  to plaintiff's travel, plaintiff's social media account,

8  they have refused to produce that, to my knowledge and

9  based on our prior conversations.

10          THE COURT:  Okay, Mr. Gottlieb?

11          MR. GOTTLIEB:  Okay, so this category of 2B of

12  their letter is actually in response to 2B of our

13  initial letter, which again we're seeking discovery from

14  BDO about conduct against our client after he was

15  terminated, which is an item I'd like to address.  But

16  to address what Ms. Ditlow said, we have agreed to

17  produce documents reflecting his job search -- he now

18  has another job, and I don't mind saying it on the

19  record -- the other side knows he's fully mitigated in

20  terms of his damages; he has another job.  Maybe I

21  shouldn't be so definitive, but he's largely mitigated.

22  And so we've produced documents and evidence to

23  substantiate that.

24          The issue that they have been seeking discovery

25  on is after he was terminated, he did some travel.  Now,

```
 1                        PROCEEDINGS              46
 2   while he was traveling, he was applying for jobs online,
 3   on various websites and so forth.  They've sought
 4   documents and information relating to his travel.  And
 5   that we have not agreed to produce because we do not
 6   think it's relevant so long as we provide the documents
 7   that relate to his job search.  And if he's not making
 8   enough efforts to obtain a new job, that will be
 9   reflected in the lack of emails seeking jobs, job
10   applications applied for online.  But where he
11   physically is when he's looking for a job, no, we do not
12   think that's relevant, your Honor.
13            THE COURT:  Okay, but I -- well, the letter
14   doesn't -- I didn't think referred to travel, but I do
15   see "correspondence between plaintiff and other current
16   or former BDO employees" and then "post-termination
17   activities related to his allegations."  I'm not even
18   sure what that would be, necessarily.  "Evidence
19   regarding emotional distress," I mean, these are all
20   very basic things.  But what about the "correspondence
21   between plaintiff and other current or former BDO
22   employees," is that something that's in dispute?
23            MR. GOTTLIEB:  Well, your Honor, they've asked
24   for all communications, no matter that the communication
25   is about, between plaintiff and a list -- well, they
```

1   request that every single current or former BDO

2   employee, including but not limited to, and they gave a

3   list of like a dozen different people.  We said we would

4   -- even though we think it goes far beyond the scope --

5   fine, we'll give you all of the communications he has

6   with the specifically listed people.  And so we've

7   agreed to produce that, and we've provided that for all

8   but one person who's or -- I think all but one person,

9   and we just got that last sort of tranche of

10   communications from our client.  And before this

11   conference started, I just let Ms. Ditlow know we'd be

12   providing it.

13          THE COURT:  Okay, so I don't hear anything in

14   dispute except travel documents.  Is there anything

15   else, Ms. Ditlow?

16          MS. DITLOW:  Well, I will say we pointed out to

17   them that, despite their agreement, that we have

18   knowledge that they're withholding documents.  In fact,

19   we've produced documents from other BDO current and

20   former employees which show communications between them

21   and Mr. Hafizov that they have failed to produce.  So

22   there's documents that they are withholding or failed

23   yet to produce.

24          THE COURT:  But have you brought that to their

 1

 2  attention?

 3          MS. DITLOW:  Yes.  Yes, we have.

 4          THE COURT:  Okay.

 5          MS. DITLOW:  Additionally, the social media

 6  accounts, not only does it go to the travel-related

 7  documents, not only does it go to mitigation efforts

 8  regarding finding subsequent employment and the length

 9  of time that he would be unemployed, but also as

10  emotional distress claims.  To the extent that he would

11  get up there and testify during a trial about the

12  hardships, how this made him suffer emotional distress

13  resulting from the alleged discrimination-retaliation,

14  and then a month later we have, you know, smiling, happy

15  accounts of him traveling, I certainly think that would

16  undermine claims of emotional distress and would be

17  relevant there.

18          THE COURT:  Mr. Gottlieb?

19          MR. GOTTLIEB:  On the communications with the

20  former employee or the other employee that Ms. Ditlow

21  said we are withholding, I believe that is referring to

22  his communications with Mr. Montorio.

23          MS. DITLOW:  Mr. Montorio and Mr. Jiminez.

24          MR. GOTTLIEB:  Okay, and the Montorio

25  documents, we just received that tranche from our

```
 1                        PROCEEDINGS              49
 2    client.  I let Ms. Ditlow know we would be producing
 3    that.  I don't think there are any -- I'll have to look
 4    back on that Jiminez, so --
 5            In terms of social media posts, no,
 6    respectfully, your Honor, I don't think a full-scale
 7    production of all of the plaintiff's social media posts
 8    are put at issue just by virtue of a wrongful
 9    termination claim.
10            THE COURT:  Is he seeking emotional distress
11    damages beyond garden variety?
12            MR. GOTTLIEB:  We're still determining that,
13    your Honor.
14            THE COURT:  I mean, certainly, if he's looking
15    for more than that, it might expand the scope of what
16    would be appropriate.
17            MR. GOTTLIEB:  I understand that.  And this is
18    an issue that we're still very much speaking to our
19    client about because of what it does implicate in terms
20    of disclosures.  So we're talking about that with our
21    client, and we can certainly make a decision on it; and
22    once we make that decision, we understand that will
23    implicate discovery.
24            THE COURT:  Ms. Ditlow?
25            MS. DITLOW:  I think we can then, you know,
```

```
 1                          PROCEEDINGS                    50
 2   agree to revisit the issue upon that.
 3            THE COURT:  All right, so I'm going to just
 4   deny that without prejudice at this time.  Absolutely
 5   you can bring it up at a later point if it still is
 6   relevant.
 7            Anything else we need to discuss?
 8   Mr. Gottlieb?
 9            MR. GOTTLIEB:  Well, the one other -- well,
10   there's one item and then a smaller item.  So, you know,
11   we raise this issue in 2B of our letter, post-
12   termination retaliation against plaintiff.  That was
13   really our issue.  And part of the allegations in this
14   case, your Honor, is that, similar to another former
15   employee who was terminated by Ms. Bernier named Dennis
16   Sweeney, who also had a case that was before the
17   Southern District, there was retaliation against him
18   after he was terminated, after he retained counsel.  The
19   same thing happened to Mr. Sweeney.  It's in our --
20            THE COURT:  Yes.  Is that what's going to be
21   the subject of the amendment?
22            MR. GOTTLIEB:  Well, that's -- there was then
23   yet another post-termination retaliatory act, we
24   believe.  But just after Mr. Hafizov retained our firm,
25   we sent a letter outlining his plans and outlining that
```

```
 1                        PROCEEDINGS              51

 2   it was similar to the claims of Mr. Sweeney, which were

 3   all public record.  In response, we got a letter from

 4   BDO's counsel saying that the letter that we sent on

 5   Mr. Hafizov's behalf was what they believed a breach of

 6   a settlement agreement.  And we --

 7            THE COURT:  Right.  They alleged breach of

 8   contract.

 9            MR. GOTTLIEB:  -- included in our Complaint

10   that that was done to chill either him or his counsel.

11            THE COURT:  Yes.

12            MR. GOTTLIEB:  And they moved to get that

13   stricken, and it was not.

14            THE COURT:  Right.

15            MR. GOTTLIEB:  All we've sought to do is to

16   take discovery on the decision that was made to engage

17   in that, what we believe was a threat.  And defendants

18   have resisted engaging in discovery on that topic.  And

19   it's fair game for discovery because it's part of the

20   case.

21            THE COURT:  Ms. Ditlow?

22            MS. DITLOW:  Your Honor, Mr. Gottlieb conflates

23   the sentence there, to be -- it was a letter signed by

24   me -- you read the letter.  We were not in any way

25   suggesting that Mr. Hafizov, who is not a party to the
```

```
 1                        PROCEEDINGS              52
 2   prior settlement agreement, was in any way in breach.
 3   You know, without divulging the terms of the prior
 4   settlement agreement, we were suggesting that, you know,
 5   including certain facts and circumstances of the prior
 6   case by Mr. Gottlieb in the letter could potentially be.
 7   And in no way was that a threat or retaliation against
 8   Mr. Hafizov.  And beyond the letter itself, which was
 9   written by me, signed by me, I don't know what other
10   discovery there is related to it.
11           THE COURT:  Well, so just to unpack that --
12           MS. DITLOW:  That would not be --
13           THE COURT:  -- just on --
14           MS. DITLOW:  -- covered by privilege.
15           THE COURT:  Yes, just -- I was going to unpack
16   it a bit and say certainly a lot of discovery around
17   that, to the extent there is, would be subject to
18   privilege, presumably.  And so what is it that the
19   plaintiff is actually seeking, decision-making process
20   by business folks as to whether to make that so-called
21   threat as alleged?
22           MR. GOTTLIEB:  Well, at a very basic level,
23   we've asked in interrogatory, asking BDO to identify who
24   was involved in agreeing or approving that which, again,
25   we believe was a threat.  And BDO's refuse -- somebody
```

```
1                          PROCEEDINGS                    53

2   has to take ownership of that.

3            THE COURT:  You can dis -- look, there are

4   allegations about that in the Complaint -- you can

5   disagree about what it is or isn't and whether it's a

6   good claim or not.  And if there were a motion to

7   dismiss that were appropriate, that's certainly an

8   avenue, motion for summary judgment, whatever it is.

9   But right now it's something that's live, and discovery

10  is appropriate on it.  And I would think that an

11  interrogatory that asks who was responsible for writing

12  it at least can be answered.  Why not, Ms. Ditlow?

13           MS. DITLOW:  If the question is who was

14  responsible for writing it, I signed the letter.  We --

15           THE COURT:  Okay.  Well, I don't know what the

16  interrogatory says.  If the interrogatory is asking for

17  identification of people involved or somehow connected

18  to a letter, answer it.  Okay?  That's what I'm saying.

19           Is there, beyond the interrogatory, was there

20  other discovery related to that issue, Mr. Gottlieb?

21           MR. GOTTLIEB:  Well, it was -- and documents

22  relating to that decision.  And they may be privileged,

23  and maybe they just need to be logged.  But I don't

24  think Ms. Ditlow identifying herself as the author of

25  the letter really addresses the issue.  The issue is who
```

1                        PROCEEDINGS                    54

2  -- the claim is against BDO.  And if BDO is going to

3  wash its hands of it and blame, you know, put it on

4  Ms. Ditlow, that's their decision.  But we're entitled

5  to a legitimate response to the interrogatories.

6          THE COURT:  Right.  It may be that -- I don't

7  know if they have inside counsel.  It might have been

8  inside counsel, it might have been an inside business

9  person.  It might have been both, might have been

10  others.  I don't know.  It might have been a secretary.

11  Who knows?  So just answer the interrogatory.  And if

12  there are documents that are not otherwise subject to

13  privilege or some other protection that are about the

14  decision to send that letter, then those should be

15  produced -- if there are any.  There may not be.

16          MS. DITLOW:  Your Honor, let me clarify.  The

17  decision to respond to the letter in total or that

18  singular sentence in the letter?

19          THE COURT:  Well, it was about the letter that

20  you sent.

21          MS. DITLOW:  So Mr. Gottlieb sent a pre-

22  litigation letter to BDO.  We responded to that.

23          THE COURT:  Ah.  So in regards to that portion

24  of it.  That would seem appropriate.  And if there is

25  reason why that wouldn't be appropriate, Mr. Gottlieb,

```
 1                        PROCEEDINGS                    55
 2   you can let me know later.  But it seems like it should
 3   be.
 4             MR. GOTTLIEB:  Well, I guess, your Honor -- I
 5   think it should just -- the interrogatory itself should
 6   just be responded to.  It's interrogatory number 19.
 7             THE COURT:  Well, I have no problem with that
 8   with that with respect to the interrogatory identifying
 9   the persons.  But in terms of documents about the
10   decision to send a letter, there is going to be a lot of
11   documents potentially about various things in the letter
12   that have nothing to do with the portion you about.
13             MR. GOTTLIEB:  Correct.
14             THE COURT:  Okay.  So for the documents, I'm
15   limiting it in that fashion.
16             All right, anything else?
17             MR. GOTTLIEB:  The last thing, your Honor, is
18   we have a deadline to amend our Complaint to include
19   Title 7 claims of June 22nd, just give the date of our
20   right to sue.  So I understand that our motion for leave
21   to amend, which includes other things, is outstanding.
22   But we would like to be able to amend just to include
23   Title 7 claims before our 90 days expires.
24             THE COURT:  Ms. Ditlow, do you have a position
25   on that?
```

```
 1                    PROCEEDINGS                56

 2          MS. DITLOW:  No.  We have no objection to the

 3  amendment.

 4          THE COURT:  All right, so it is so granted.

 5          MR. GOTTLIEB:  Thank you, your Honor.

 6          THE COURT:  When do you think you'll do that?

 7          MR. GOTTLIEB:  Within the next week or two.

 8          THE COURT:  Okay.  All right, I think that's

 9  it.  Anything else?

10          MR. GOTTLIEB:  Not from plaintiff.

11          THE COURT:  Anything from Ms. Ditlow?

12          MS. DITLOW:  Nothing from defendants.

13          THE COURT:  All right.  Very nice meeting you

14  all.  And we'll move things forward, and we're

15  adjourned.  Thank you.

16          (Whereupon, the matter is adjourned.)

17

18

19

20

21

22

23

24

25
```

57

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the case of Hafizov v. BDO
USA, LLP et al, Docket #22-cv-08853-JPC-RWL, was
prepared using digital transcription software and is a
true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

              Carole Ludwig

Date:    June 12, 2023