# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RINAT HAFIZOV,

Plaintiff,

v. 22 CV 8853(JPC)(RWL)

BDO USA, LLP, et al.,

Defendants.

------------------------------x

New York, N.Y.
July 19, 2023
9:40 a.m.

Before:

HON. ROBERT W. LEHRBURGER,

Magistrate Judge

APPEARANCES

WIGDOR LLP
Attorneys for Plaintiff
BY: MONICA HINCKEN
DAVID GOTTLIEB

McDERMOTT WILL & EMERY LLP
Attorney for Defendants
BY: LINDSAY DITLOW

THE COURT: All right. We are here for Hafizov v. BDO USA, and others, 22 CV 8853, for a conference to address a variety of motions, including both discovery and a motion to amend.

Counsel, please put in your appearances, starting with plaintiff.

MR. GOTTLIEB: Good morning, your Honor. Dave Gottlieb and Monica Hincken from Wigdor LLP, for the plaintiff.

THE COURT: Good morning.

MS. DITLOW: Good morning, your Honor. Lindsay Ditlow from McDermott Will & Emery, on behalf of defendants.

THE COURT: All right. Good morning.

So I read everything, so just know that. And I'd like to start with the discovery issues. But before I do, I do have a question about what the scope of the claimed damages are here. And if you could give me an idea of that, because if I understand correctly, the relative term of employment was somewhat brief, and he eventually found a job, and there's a garden variety emotional distress, so help me on that.

MR. GOTTLIEB: Is your Honor asking about just emotional distress, then?

THE COURT: No, in total.

MR. GOTTLIEB: In terms of economic loss, your Honor?

THE COURT: Whatever damages you're claiming, I want

to understand what the scope and magnitude is.

MR. GOTTLIEB: Understood. We're seeking economic loss stemming from his termination going forward. He obtained a new job approximately seven -- approximately seven months after he left his employment. And he's largely, if not fully, mitigated his economic loss going forward. So that amount, I don't -- I can get you that in a moment if --

THE COURT: Give me a rough idea.

MR. GOTTLIEB: In the range of I'd say 150,000 or so.

THE COURT: Okay. For that seven-month period?

MR. GOTTLIEB: Yes, correct. But --

THE COURT: But he's also earned more subsequently, right? He's not --

MR. GOTTLIEB: He's mitigated since then. But, your Honor, again speaking a bit off the cuff -- I can give you a more accurate number if I had a moment, but that's in the sort of magnitude.

And then in terms of emotional distress, your Honor, we're seeking garden variety emotional distress.

THE COURT: All right.

MR. GOTTLIEB: Which is just -- for the record, is a term I do not endorse but that the case law does. So it would be that category. And then punitive damages, of course, under all the applicable laws, and attorneys' fees.

THE COURT: Okay. I'm putting punitive damages aside

for the moment. In terms of garden variety, fairly typical in this district for judges to identify a range of 30 to $125,000. That's not to say that that cannot be exceeded or also have amounts that go below that, but to put it roughly.

MR. GOTTLIEB: May I make a very brief comment on that?

THE COURT: Sure.

MR. GOTTLIEB: I agree with your Honor's summary of the damages ranges that are typically permitted for garden variety emotional distress, but there has also been a body of literature recently saying that that case law needs to be relooked at and revised, which is something we can address maybe at another point. But I want to --

THE COURT: Fair enough.

MR. GOTTLIEB: -- put that on the record.

THE COURT: Fair enough.

So what I'm hearing is other than punitive damages, we're looking at a max of 300,000, if that. Fair?

MR. GOTTLIEB: Reserving all rights, I agree, your Honor.

THE COURT: Thank you. All right. So I want to start with I guess Docket 73. This is plaintiff's application regarding compelling discovery for personal devices and e-mail accounts of individual defendants, Bernier and Dyment. And if I have this correctly, the plaintiff is specifically

referencing, or at least in your letter, Request 38 and 39 regarding communications involving either the individual defendants that reference Mr. Hafizov, and in 48 and 49, which request all communications involving the individual defendants involving discrimination and a number of other things.

And I guess -- well, defendants obviously oppose with respect to the personal devices and the personal e-mail accounts. Let me ask plaintiff, what basis at this point do you have to believe that there's anything relevant on their personal devices as opposed to their work devices? Of course, if they used their personal devices for work, that would be a different issue. But my understanding is these defendants have represented they do not.

MR. GOTTLIEB: My colleague and I are splitting up the various lines.

MS. HINCKEN: Good morning.

With respect to the evidence that we have that they use their personal devices, in a production yesterday, for example, Mr. Montorio produced communications subject to a subpoena, and in those communications, he had text messages with Matthew Dyment referring to Mr. Hafizov. He had him saved in his phone as Sarah Rose, he refers in the text messages to the use of burner phones in those discussions. And so that's just the most recent example that we know that there are communications that Mr. Dyment did not produce and that he was

using a personal cell phone to have communications about our client and about work more generally as well, not just about our client.

And so it's clear, I think, that there is use of personal devices related to this -- the discovery that we're seeking. Also, defendants obviously requested all personal communications from our client as well, and we produced those. And so their position that personal devices are irrelevant, they can't have it both ways, right?

So we produced all of those. We agreed to produce those, and we did. And they're saying now that any communications on personal devices from their clients is irrelevant. And we think that based on the production yesterday, and just more generally, that it's clear that they are using personal devices to have communications about work, that we're entitled to that discovery.

THE COURT: Ms. Ditlow?

MS. DITLOW: Yes. Thank you, your Honor.

So what -- we acknowledge that there were communications between Mr. Montorio and Mr. Dyment produced in a production sent yesterday. And we -- prior to even producing that, we spoke with Mr. Dyment about it, and even in connection with our original production, spoke with both defendants about any relevant personal communications they had, either through personal e-mail accounts or text messages.

Mr. Dyment represented that he does not keep contemporaneous messages, that following communications, he has a practice and routine policy of deleting his text messages, and so there was no documents produced at that time, and they've been produced through Mr. Montorio's phone. Mr. Montorio did not seem to have that similar habit of deleting any messages.

We conferred with individual defendant, Ms. Bernier, and she does not have any documents relevant to the -- to this matter. Now, what they are seeking is not documents relevant to this matter, any communications on their phones regarding any --

THE COURT: So let's hold off on that issue. That's a separate issue.

MS. DITLOW: Yes. So I would say, in regards, we're not withholding and refusing to produce relevant communications that would have been included on their personal devices. The response is that there are no relevant communications regarding to their possession, custody, and control.

THE COURT: Okay. I'm glad to hear that because that's essentially where I was going to go, which is that I'll grant this application in part and deny it in part as granted with respect to relevant communications; for instance, anything that references Mr. Hafizov. I'm not saying it's limited to that because we're going to get to other discovery issues, but

it's also not going to be just a free-for-all fishing expedition. But the defendant has made it clear that they are not withholding on the basis that responsive documents or information are on a personal device.

All right. The next issue are the similarly situated comparators. If I understand it, the defendants have identified five similarly situated comparators in the New York office. Do I have that right?

MS. DITLOW: Yes, that's correct, your Honor.

THE COURT: Okay. And it's not clear to me from the correspondence whether documents have been produced in regards to them, but the issue is that the plaintiff is asking for a larger group of comparators and to expand it to the entire northeast region. Do I have that right, plaintiff?

MS. HINCKEN: That's correct. I think there are two issues. The first, with respect to the five individuals identified in the New York office, no documents have been produced. And defendants' stated reason for that is because there were -- no employee that engaged in the level of unprofessional behavior and workplace misconduct as plaintiff, which what does that mean? I don't think that that's something that defendants get to unilaterally determine, and so we think we're entitled to those documents. So that's with respect to the five.

Outside of that, yes, we think given that there's only

five identified in New York, that doesn't give us a broad enough scope to make a determination of whether comparators were treated similarly. So we're seeking originally just the number of people so that we can make a determination, whether there is any undue burden on them in seeking those documents.

THE COURT: That's helpful because I was going to ask what is the number. That's one thing I'd like to know. But before I get to that, what can you tell me, Ms. Ditlow, about the documents related to the five comparators?

MS. DITLOW: Sure. First, I want to correct my fellow counsel because their request is specifically for information about how these comparators -- these five comparators were treated when they engaged in similar misconduct or performance deficiencies. So their request specifically seeks and requested similar conduct. So if no one engaged -- of those five comparators engaged in similar conduct as did the plaintiff in here, then there are no responsive documents.

What they're now trying -- because there's no evidence of discrimination or retaliation, which they cannot hang on, is now saying, well, no, that's not what we're seeking. We're seeking anything and everything regarding these potentially five comparators. And that's not accurate. And, again, for these comparators, they have to be similarly situated in all material respects. That would be similar conduct, but also to the second point of your Honor's question, is that broadening

the scope does not get you a similar comparator.

THE COURT: Don't get to that issue yet. I just want to talk about the documents related to the five comparators because "similar" is a loaded word, obviously. It's a term of art in this field. And people disagree about what "similar" is. And as you'll hear later, I have similar concerns about some of the other document requests. So how can that be phrased or treated objectively so that the plaintiffs receive some documentations so that they can assess whether they are similarly situated? What would you propose producing?

MS. DITLOW: Your Honor, to the extent we've investigated and looked into whether any of those five comparators have engaged in these similar performance issues, some were unprofessional conduct such as e-mailing clients and colleagues with inappropriate messaging, there was nothing to produce. It's not as though we're drawing this fine line and trying to be very nuanced in order to --

THE COURT: Let me broaden it. And I'm not saying this is the appropriate category for all discovery. But at least with respect to comparators, for these five, if one were to say all material regarding claims were formal or informal, that they -- well, I'm sorry. Are we talking about comparators to the plaintiff or to the defendants?

MS. DITLOW: No, comparators to the plaintiff.

THE COURT: All right. So to the extent that there

were any documents or complaints or anything associated from what their situation was that alleged discrimination, retaliation, or anything like that, or just what are the circumstances of their termination, wouldn't those documents be appropriate to produce? They can help evaluate whether they are similar?

MS. DITLOW: Your Honor, I mean, to the extent somebody's termination related to, you know, circumstances much different than plaintiff's, I would disagree that just because they were in the same office and reported to the same individuals and held the same title, that that would be in any way relevant to --

THE COURT: But, again, you're making a unilateral determination of what's totally different. I think it is important for what -- for five people that you've identified as similarly situated or at least comparators, that you do produce documents related to their termination or retaliation issues just so that they can be assessed.

I'm going to order those produced.

MS. HINCKEN: May I speak to that?

THE COURT: Sure.

MS. HINCKEN: So we're seeking a wider range of performance issues that arose because they have claimed he was terminated for everything from missed deadlines, sloppy work, his unprofessional communications --

THE COURT: Fair enough. And I didn't include it, but that would include all documents related to the termination of these five employees and what the reasons were.

MS. HINCKEN: And we would just -- yeah, just also we would seek documents related to the discipline as well.

THE COURT: Yes. Agreed.

MS. DITLOW: And, your Honor, not a problem. Just to be clear, though, not all five of those employees have been terminated.

THE COURT: But in terms of complaints and treatment, obviously, one of the plaintiff's arguments would be that the comparators were treated more leniently.

MS. DITLOW: Understood.

THE COURT: So those are the documents related to the five.

Now, Ms. Ditlow, if you were to expand to the northeast region, what number would we be getting to? How many additional individuals would fall into that category?

MS. DITLOW: Your Honor, as I explained to plaintiff's counsel, one, not only would that not be somebody similarly situation --

THE COURT: Slow down, because it's really hard for the reporter to take it all in.

MS. DITLOW: Once you expand outside of the north, the New York SALT group, you no longer have reporting to the same

individuals. You'd be involving a third --

THE COURT: I thought there were reports to Ms. Bernier, but would they be indirect or --

MS. DITLOW: So if they are outside the New York office, yes, they'd be indirect. They would have, you know, another supervisor in their office. So the only relevant comparators would be those within the New York office of the SALT group, which would report to both Ms. Bernier and Mr. Dyment.

THE COURT: I think plaintiff put a different spin on that last time. Could you just clarify what your take on that is?

MS. HINCKEN: The larger issue is that reporting to Mr. Dyment, they would all report to Mr. Dyment in the northeast region, and he's an individual defendant in this case who's involved --

THE COURT: When you say they report, meaning the individual managers at the -- the senior managers? Or did they have somebody between that they were reporting to that reported to Dyment?

MS. HINCKEN: They -- for example, plaintiff also reporters to -- plaintiff reported to Ms. Bernier, defendant Bernier, and Mr. Dyment, he was -- as a job in line report. And Mr. Dyment is the person who terminated --

THE COURT: So let me, just for my own clarification,

maybe I'm missing something, Ms. Ditlow, and maybe it's because I didn't mention Mr. Dyment. But I thought the last time we met, my understanding was there were senior managers outside of New York who did report to one or more of the individual defendants. Is that not --

MS. DITLOW: That's correct, with respect to Mr. Dyment.

THE COURT: I see.

MS. DITLOW: So those in New York would only be Ms. Bernier. Just to clarify as well, so Mr. Dyment only became the head of the northeast region, so meaning that employees outside of his local office would be reporting to him in May of 2022.

THE COURT: And now, was that before or after termination?

MS. DITLOW: That was before termination.

THE COURT: Okay. And Mr. Hafizov was terminated when?

MS. DITLOW: Towards the end of May 2022.

THE COURT: Okay. And before May 2022, were any senior managers reporting to Mr. Dyment?

MS. DITLOW: Yes.

THE COURT: From New York or outside of New York?

MS. DITLOW: No. It would have been outside.

THE COURT: Okay. I thought you just said, though,

that May 2022, he assumed --

MS. DITLOW: As the northeast head. So meaning that everyone in the northeast would have then reported to him, whereas previously he was outside of that department and other senior managers would have reported to him, but certainly not within the northeast SALT group.

THE COURT: SALT. Okay. So hold on. If the universe were limited to SALT northeast, then the direct reporting to Mr. Dyment would be in May 2022; is that correct?

MS. DITLOW: That's correct.

THE COURT: At least with respect to when plaintiff was terminated?

So, yes, let me end it there.

MS. HINCKEN: I just wanted to clarify one issue with respect to the time frame of that. So in the text messages that we have that Mr. Dyment is discussing Mr. Hafizov's performance, it dates back to as early as 2021. And so he is talking about -- he says in one, I'd love to trash Rinat on this particular issue they're talking about. That's March of 2021. And it goes through all the way to 2022. But the conversations that he engages in about Rinat -- about Mr. Hafizov begin in 2021.

THE COURT: But at that point, Mr. Dyment was in New York? Or no?

MS. HINCKEN: He may not have been. But he had a --

he obviously had some authority over Mr. Hafizov.

THE COURT: I see. Ms. Ditlow, can you speak to that?

MS. DITLOW: Your Honor, Ms. D'Angelo from BDO is here. Can I take a moment?

THE COURT: Sure.

(Pause)

MS. DITLOW: So, your Honor, he was not supervising him at that time. He was obviously a partner at BDO during that period of time, so he had a larger engagement oversight, but he was not a direct supervisor.

THE COURT: Well, let me go back to the question of, if you were looking at comparators for outside the New York region, how many people would we be looking at?

MS. DITLOW: Unfortunately, this is something they explained to plaintiff's counsel, is that there's not a clear-cut avenue, especially dating back to the time frame. You'd have to individually look for each employee -- former employee or current employee during that period. So we've not been able to easily assess the number.

THE COURT: How many senior managers were there at the time in the northeast overall within SALT?

MS. DITLOW: Your Honor, we'd have to circle back with that information.

THE COURT: Okay. And so you're saying you'd have to basically look at each individual's file to make any assessment

about whether they were comparators in some way?

MS. DITLOW: That's correct. I mean, I think it's important to note, like in some way the only individuals who would be comparators in all ways, which I know your Honor was putting aside for a little bit, but which is really what the case law requires, are those five individuals who were in the northeast New York SALT group in the New York office and reported directly to both Ms. Bernier and Mr. Dyment.

THE COURT: Okay. And let me ask plaintiff, why aren't the five comparators enough? Sometimes you only have one comparator.

MS. HINCKEN: Your Honor, that may be. We haven't seen any documents, so we don't know what we can assess from those. And so we, based on their position that they aren't producing any documents related to those, we're seeking a broader scope. We think we're entitled to it regardless because we do think they are similarly situated based on the relationships between Mr. Hafizov and Mr. Dyment. But we're unable to make an assessment because of the lack of information provided.

THE COURT: All right. So what I'm going to do is this. I am going to order the production of the documents we talked about in relation to the five comparators identified already. And the defendant will also determine the number of senior managers within SALT in the northeast and assess and

provide a letter filed with the Court that will identify what burdens there may be in connection with determining whether those persons are comparators or not. And I'll ask for that letter to be filed within a week, which would be the 26th. And then -- I'm sorry. Go ahead, Ms. Ditlow.

MS. DITLOW: Your Honor, two things. In regards to the number of senior managers at SALT in the northeast, is that currently or at the date of Mr. Hafizov's termination or based on their requested time period, which goes back to 2011, seven years even before that?

THE COURT: I was going to get to a time period in a little bit. It's not going to go back to 2011.

MS. DITLOW: Also, your Honor, I'm actually flying internationally from the 25th, through the -- 24th and through the evening of the 25th, so if we could get additional time.

THE COURT: What would be a good date?

MS. DITLOW: Your Honor, there's a transition period going on in the HR SALT group right now, and if we could get some additional leeway to make sure that we have the --

THE COURT: How much time do you need?

MS. DITLOW: Your Honor, if we could request three weeks.

THE COURT: Okay.

MS. DITLOW: Thank you.

THE COURT: Three weeks. So that would bring us to

what? That would bring us to August 9.

MS. DITLOW: Thank you, your Honor.

THE COURT: And then the plaintiff can file a letter commenting on that submission within a week, which would be the 16th. But I'm not going to order production of comparator information outside of the five in New York until I see that correspondence. So I'm denying it at this point without prejudice.

All right. Then there's the question of personnel files of the individual defendants. All this sounds like it could be moot because the plaintiff apparently has narrowed its request, and the defendants say it has produced all complaints and investigation materials, non-privileged documents, et cetera. So from the plaintiff's perspective at this point, is this issue moot?

MS. HINCKEN: No, it is not.

THE COURT: Okay. So what hasn't been provided?

MS. HINCKEN: For -- so, for example, with respect to the responses that we received from defendants, specifically in reference to Ms. Bernier, they have said that they are not producing documents. So we -- whether -- we don't know what those documents are. They said they were standing on their objections and withholding documents as a result of an interrogatory response about list of complaints made against Ms. Bernier.

Second, with respect to their response, they are arguing that they had -- there's no evidence that they had warnings -- that the individuals had warnings. Again, we don't know what that means, what evidence are they talking about that they are looking at, and saying that's not responsive. We have no sense of what that is. It's -- they're not specifically saying there are no documents, that there are no documents or that they are refusing to produce documents. We just have no clarity on what it means.

THE COURT: Okay. So, Ms. Ditlow, maybe I misunderstood too. With respect to Ms. Bernier and Mr. Dyment, the individual defendants, what have you produced or agreed to produce that would otherwise be in their personnel files? I understand, to the extent you're objecting based on scope and things like complaints that may have nothing to do with discrimination, at the end we're going to get to that issue. So I just want to understand what the basis of your objection is that you are withholding documents.

MS. DITLOW: Your Honor, I want to clarify because I think your initial impression was the correct impression; that we've, you know, gone through and identified why there's no personnel --

THE COURT: Slow down.

MS. DITLOW: -- to see if there was any evidence that had any relevant warnings, you know, outside the scope related

to national origin, discrimination, retaliation, or disciplines issued to them. And to the extent that there are any non-privileged documents responsive to those requests, they've been produced. To the extent they were being withheld on the basis of privilege, they've been identified on the privilege log.

To the extent that plaintiff's counsel believes that we're withholding things because we made subjective judgments based on what a warning is or things of that nature, I'll say, what is a warning to them. You know, we've gone through the files and produced anything that we feel that meets that criteria. If there's greater clarity that they want to provide in what they believe that's not being produced, we welcome it and go back and search. But from our position, anything that was relevant and non-privileged has been produced.

THE COURT: All right.

MS. HINCKEN: And I think the keyword, and where the discrepancy is coming from, is the national origin discrimination that Ms. Ditlow just referenced. We're seeking any complaints of discrimination or retaliation outside of just national origin because that speaks to discriminatory animus that could be related to our claims. And with respect to -- we haven't received, for example, performance reviews, anything that, while they may not keep a traditional personnel file that you would expect to be able to be produced in these -- based on

these requests. So we've received no documents on these requests.

THE COURT: Have you produced any documents and also speak to the performance reviews?

MS. DITLOW: Your Honor, we did not produce -- we produced performance reviews as it relates to plaintiff. But to the extent performance reviews of the individual defendants, we have not produced, and we don't understand how the relevancy of their ability to serve as partners or managers within the SALT group has any basis to whether or not either engaged in discrimination or retaliation.

THE COURT: And, again, the national origin issue that has come up again speaks to the scope of discovery, and we're going to get to that in a little bit. But in terms of there being no formal personnel file, as defendant has represented, it sounds to me that defendant is not going to withhold documents because there is no personnel file. They'll produce whatever is required to be produced. Do I have that right, Ms. Ditlow?

MS. DITLOW: Within a defined scope, that's correct.

THE COURT: Again, yes. But you're not going to withhold it just because there's no formal personnel?

MS. DITLOW: That's correct.

THE COURT: So it just comes down, then, to other scope issues, as I understand it, except for the performance

review issue.

MS. HINCKEN: Correct. And the reason performance reviews could be -- again, we haven't seen them, so we don't know what's relevant in them or not. But, for example, if a performance review indicates that somebody engaged in unprofessional misconduct or that they had conversations that they shouldn't have --

THE COURT: Slow down.

MS. HINCKEN: To the extent that a personnel file indicates that -- I mean, excuse me -- a performance review indicates that there were any complaints related to a missed deadline, for example, something that our client was -- used as the basis for our client's termination.

THE COURT: Why does it matter if the defendants have an issue with that?

MS. HINCKEN: Well, it matters because, in part, if our client is terminated based on a -- a purported basis that we're saying is not accurate, is not true, and that they were not, as a result, then it's relevant to our position that he was terminated for --

THE COURT: Sorry. You're talking about whether the defendants themselves have a performance issue. So then you're asking about why weren't they -- they're not comparators to the plaintiff; are they?

MS. HINCKEN: But it's relevant to looking at the

reasons that defendant -- that our client was terminated by defendant. If the reasons are -- if the basis for his termination -- what else is excused for other people who haven't complained off discrimination, for example.

MS. DITLOW: But that's the comparator.

THE COURT: Hold on. I can take care of it.

We're not producing documents on the basis defendants may have been accused of unprofessional conduct. The question is, the extent to which other employed comparable employees have been treated in a certain way, and from plaintiff's perspective, the extent to which the defendants have engaged in similar conduct, writ large, from plaintiff's perspective, would be complaints about the defendants in regard to discrimination, retaliation across a whole slew of things.

So, again, it comes back to the scope of what that discovery is going to be. There's no objection, as I hear it, per se, on the basis that it's a performance review. The question is, is whether that performance review has information that falls within the scope of what's going to be produced. Do I have that right, Ms. Ditlow?

MS. DITLOW: Yes. And to the extent that there's larger issues that would be encompassed into that relevant warnings or disciplinary -- that would be produced, but we don't see the reason for the larger --

THE COURT: I understand. But to the extent that

there's a ruling that I make that affects the scope that would bring in information on those performance reviews, then that would have to be produced.

MS. DITLOW: We understand.

THE COURT: All right. I'm moving on from there to the motion to quash subpoenas.

So the plaintiff has filed the motion to quash subpoenas at Docket 74. Defendant has served subpoenas on plaintiff's former employers. And let me just ask Ms. Ditlow very quickly, are those subpoenas for documents and deposition, or only one?

MS. DITLOW: Just documents, your Honor.

THE COURT: Just documents. Okay.

And plaintiff says those should be admittable relevance and otherwise bar harassing. And the defendant, if I understand you correctly, has offered assorted justifications that include showing a pattern of plaintiffs bringing frivolous claims against former employers, credibility, and impeachment because the plaintiff has set forth assorted allegations in Paragraphs 12 to 22 of his complaint about his prior employment and his qualification.

And, finally, defendant says that the plaintiff's claim of harm from these subpoenas is purely speculative and conclusory, particularly given that the plaintiff already has his reputation in the spotlight by affirmatively seeking out

publicity in connection with this case, and he's already employed, so it's not as if discovery from former employers is going to affect his search for employment. So what does the plaintiff say about that?

MS. HINCKEN: With respect to the harm, in particular, Mr. Hafizov does have employment now. But within that employment, he works very closely with EY, for example. So on a daily basis, he works with EY. There have been a -- based on his current -- they're in a co-sourcing arrangement, and so he works with high-level supervisory employees that he ran into on a daily basis that affects -- can definitely affect his reputation, regardless of whether he has a current employer.

THE COURT: Just to clarify, he used to work at EY?

MS. HINCKEN: He did. That's the span that has been served already.

And more generally speaking, with respect to firms like EY and some of the other firms they identify, they are the largest tax employer in the country, I believe, and so employees often go back and forth between these types of firms. So it definitely has an effect on him in the future potentially, obviously for reference, et cetera. And so we just think that any information that they are seeking in particular could easily have just been asked through counsel. There was never, for example, a request about his -- whether he filed something against a former employer. We didn't have any

of those requests. Nothing like that came through us first. So there are ways to do this that are less harassing.

THE COURT: Ms. Ditlow?

MS. DITLOW: Your Honor, to touch base on the last point, we did request anything -- documents related to prior employment, and we were denied saying, no, that it is just propensity evidence; the fact that he would have performance issues or engage in similar behavior in the past doesn't mean that he would do so in the future. But as we pointed out in our letter, that's not the reason we are seeking it.

Upon information and belief from Mr. Montorio's affidavit, he has filed similar frivolous claims against Ernst & Young. Don't know how they would welcome him back to them based on that fact alone. But that goes to his motive and intent here as we strongly believe this is brought for harassment against BDO as well as the individual defendants.

To the extent -- you know, plaintiff didn't put into his complaint just one sentence that he's been employed in the accounting industry for ten-plus years. He devoted over ten paragraphs of his complaint to this in an effort to refute defendants' legitimate non-discriminatory business reasons for terminating him that was based on performance issues. To the extent deposition, trial, he would get on the stand and say, look, I have this long history, I'm a top performer at these three prior firms, there's no way that they could really have

conjured up performance issues against me, it must be pretext for the discrimination and retaliation that I've suffered -- we need to be able to test that credibility and impeach that testimony. And the way we can do so is through these prior performance records and information from his prior employers.

And to the point that, you know, it is harassment, because he may go back or because he's closely related in the industry, to point it out, plaintiff sought out media attention through a Law360 blog. Maybe in other industries, you know, that would not be something that would be on people's radar, but to the extent he works with tax attorneys who regularly would see Law360 communications, that the fact that he has filed a suit against his prior employer he sought from day one of this complaint, so to now utilize that as his excuse for why these subpoenas would be harassing is a bit hypocritical.

THE COURT: I don't have the subpoenas in front of me. So just remind me, in terms of scope of what was sought for review, does it go beyond his personnel file?

MS. DITLOW: It's personnel file as well as any allegations related to the complaint. One second.

MS. HINCKEN: I can read them if you'd like.

So the first request is all the personnel files.

THE COURT: Before you go on, how many requests are there?

MS. HINCKEN: There are three.

THE COURT: Okay. Go ahead.

MS. HINCKEN: The second is all documents and communications reflecting the reasons why his employment at EY ended. And the third is all documents or communications evidencing any complaints that he made that he was harassed, mistreated, or any other way discriminated against on the basis of his protected class.

THE COURT: All right. And that's -- it's EY. Was there another employer?

MS. DITLOW: There were two prior employers. We were -- we served Ernst & Young before they filed their pre-motion letter based on courtesies afforded in the accounting industry where they waive service and we e-mailed. The other two were out for process service and did not --

THE COURT: Tell me what are the other employers.

MS. DITLOW: Sure. It is Hunton Andrews, and Morrison & Foerster.

THE COURT: I'm sorry. I missed. Was that two?

MS. DITLOW: Yes.

THE COURT: So Morrison & Foerster, the law firm?

MS. DITLOW: Yes. And Hunton Andrews & Kurth.

THE COURT: All right. So what I'm going to do is I'm going to deny the motion in part in that I think that the subpoenas -- it's fine to issue limited subpoenas, but those subpoenas should be limited to the plaintiff's personnel file

and documentation of why his employment ended. I'm not going to have those entities search for documents about complaints that he may have made that aren't otherwise documented in his personnel file. Okay?

All right. Then there's a subpoena to Shayna Becker, his former girlfriend, and Eugene Gibilaro, a former colleague. And, if I have this right, the plaintiff says those should be quashed because the defendant can get any such communications from the plaintiff himself. They don't appear to argue relevance necessarily. And I think the defendant points out why that is, given that plaintiff identified both Becker and Gibilaro as someone that they had communicated with about subject matter in this case. Well, let me ask, did I get plaintiff's objections correct?

MS. HINCKEN: That's correct, your Honor. And I think the larger objection was just with respect to the lack of communication related to those requests. So there was initially a request related to Shayna Becker that we objected to in the first round of discovery, and there was never a request related to Gibilaro, that had never been requested. As is evident by the documents that have already been produced, we've been candid in our production of documents and communications. So it would have been very simple to have a conversation about those documents, and we would agree, and do agree, to produce any relevant communications.

THE COURT: In other words, you would be producing from the plaintiff any communications he has with Becker or Gibilaro regarding relevant subject matter?

MS. HINCKEN: Related to his employment.

THE COURT: All right. So, Ms. Ditlow, I did see, I think in your letter, that you had raised the point that the plaintiffs had previously objected to producing from Mr. Hafizov. But given what they have just represented, why is there a need for the subpoenas?

MS. DITLOW: Well, your Honor, in addition, Ms. Becker wasn't just plaintiff's former girlfriend. She was also a former BDO employee. So to the extent that she has also communicated with others outside of plaintiff himself or to the extent that plaintiff had deleted the text messages after they broke up or some other reason, we think it's also relevant to seek the documentation from her.

As regards to Mr. Gibilaro, similarly, he may have had conversations with Mr. Montorio or others at BDO or otherwise regarding plaintiff; his termination, his motivations for bringing a suit. So as plaintiff serves individualized subpoenas on the employees at BDO seeking communications that may not have been produced through BDO, the fact that they may have other additional communications that weren't just directly of plaintiff or maybe that plaintiff did not maintain should not stop us from seeking those communications through them

directly.

THE COURT: Okay. Do you want to respond?

MS. HINCKEN: Your Honor, I think that if they feel that way after the production is made, that may be the time to raise that issue. But, again, we've produced 2500 pages of communications. Our client has records of his text messages. And so I don't think that there's any need to make that determination at this point.

MS. DITLOW: Your Honor.

THE COURT: That's -- I'm going to rule because given the allegations -- I'm sorry. Given the disclosures in the initial disclosures, or maybe it was in the interrogatory answer, that Mr. Hafizov had communications with both Ms. Becker and Mr. Gibilaro regarding these issues and particularly given that they are both former BDO employees, I'm going deny the motion to quash those subpoenas.

That brings us to the subpoena to Law360 in regards to communications by plaintiff or his attorneys about reporting about the case, I guess. Do I have that right?

MS. DITLOW: Yes, your Honor.

THE COURT: And why would that be relevant?

MS. DITLOW: So, if your Honor recalls, one of the claims in the amended complaint is a post-termination retaliation that involves conversation -- a letter, written communication between myself and Mr. Gottlieb where we

referenced in response to a demand letter pre-litigation from Mr. Gottlieb that his characterization and use of Sweeney allegations as fact may be a violation of that prior settlement agreement. Mr. Hafizov was not a party to that settlement agreement, and there's never been any allegation that Mr. Hafizov was ever in breach of that settlement agreement. And without going into the terms of the prior settlement agreement, as referenced, painting those allegations of fact may cause an allegation or separate claim.

And to the extent that that was also raised and discussed with Law360, the allegations in the complaint, which, if your Honor may recall extensively argue about Mr. Sweeney, that would go to our defenses of that post-termination retaliation claim.

THE COURT: Because?

MS. DITLOW: Because to the -- the extent that Mr. Gottlieb have done so, and we've raised legitimate concerns of a breach in a letter directed to him, it would not be retaliation.

THE COURT: I see. In other words, if I have this right, you tell me if I'm wrong, it's possible that communications by counsel for the plaintiff may, at least from your point of view, have violated provisions of another settlement agreement. And so your having raised that issue, generally without identifying who may be liable, potentially

was a non-retaliatory reason. Do I have that right?

MS. DITLOW: That's correct.

THE COURT: Okay. So what does the plaintiff say given all of that?

MR. GOTTLIEB: Your Honor, I'll address this item. It sounds like -- well, let me take a step back here.

Pre-litigation, before anything was filed, we sent a demand letter in an attempt to have a dialogue and see if the case could be resolved. In response to that, we received a letter from BDO's counsel saying that there was a breach of the Sweeney settlement agreement in connection with the demand letter that we sent. Months later, or weeks or months later, however long it was, we filed a lawsuit, and Law360 reported on that.

So there's no possibility that any communication between our firm or Mr. Hafizov and Law360, which, frankly, I'm not sure if there was any, could be a justification for the earlier threat that we engaged possibly in some breach. So I don't think there's any possible connection there. So that's one issue.

But the other issue is -- I mean, if BDO believes that Sweeney, individually or through his former counsel, breached the settlement agreement, I mean, they can pursue whatever breach claim they want against him, against our firm. I mean, they can do whatever they want there, but that has nothing to

do with this case.

THE COURT: All right. I understand. There's a connection, though, that was made by Ms. Ditlow. But Ms. Ditlow, address the timing issue, because if I remember the complaint correctly, the allegations regarding the Sweeney issue were BDO's response to those allegations specifically about -- I mean early. Was that in the litigation after it had become public?

MS. DITLOW: I'm not necessarily sure I understand.

THE COURT: In other words, are the communications that you are saying potentially would be violatory of the settlement agreement -- was BDO's letter expressing that concern sent before or after Law360 published an article?

MS. DITLOW: It was sent before, but I think it goes and is potentially relevant, which -- to our defense of their post-termination retaliation claim. It's funny that Mr. Gottlieb is taking the position that, to the extent we feel that there may have been a breach of the settlement agreement, you know, by Mr. Sweeney or his former counsel had raised that to Mr. Gottlieb directly in our response to his letter, which similarly outlined the Sweeney allegations, that has nothing to do with this case, which has been our point all along. And now he's trying to utilize that as an opposition to the subpoena.

But to our point, and while the Law360 publication occurred after the fact, it goes to show a pattern of views and

defense to our post-termination claim -- post-termination retaliation claim defense there. To the extent that they have been breaching that settlement for communications identified in those as fact, whether in that demand letter or thereafter, and we have lawfully raised these in showing a pattern of this behavior, that goes directly to our defense there.

THE COURT: Okay. And have you asked -- I'm sorry. I can't remember. Did you ask counsel for such communications? In other words, did you ask counsel directly rather than going to 360?

MS. DITLOW: So I did not ask Mr. Gottlieb directly. Obviously, Mr. Gottlieb is not a party to this case.

THE COURT: Well, as a third-party subpoena.

MS. DITLOW: We don't believe Mr. Hafizov may have them. And to our point, we have never alleged that Mr. Hafizov has breached the prior settlement agreements. He's not a party to that. So we felt the -- rather than subpoenaing our co-counsel in this matter, since it has --

THE COURT: Understood.

MS. DITLOW: We decided to do what we thought was the more diplomatic route and subpoena Law360. But if your Honor is suggesting to subpoena Mr. Gottlieb, I'm happy to do so.

THE COURT: I'm not suggesting it. But you've explained why you went directly to 360.

Listen, I think it goes too far afield. I don't think

there's a particularly pressing need. I'm not going to have a party subpoena a legal reporting service about a party's affirmatively reaching out with news to report. I think the concern at the moment is entirely speculative. And I also think that part of the claim of post-termination retaliation, based on that event, is an extremely thin reading on what you base the claim of post-termination retaliation. I'm going to quash it as to 360.

All right. That brings us to assorted document requests. And I'm going to do this in a shortened fashion, just given the time.

So these are issues raised in a formal motion at Docket 63 regarding requests for a production from the plaintiff to the defendant. I have Requests 43 through 51 and 54 through 57. And they also involve Interrogatories 14 to 15 to BDO, and Interrogatories 7 and 8 to the individual defendants.

And I find that every single one of these is overbroad and goes way too far and is not proportional for the needs of this case, given all the factors that go into that. That said, and what I want to understand is whether there are other requests that may have included this material. But, for instance, I can see that it would be relevant potentially for there to be production of documents and communications in which Ms. Bernier, for instance, refers to anyone's nationality,

ethnicity, race, or religion, and that any documents concerning any complaints or follow-up regarding Ms. Bernier's reference or discrimination -- I'm sorry, reference -- that references Ms. Bernier's discrimination or retaliation based on nationality, ethnicity, or race or religion could be relevant.

So help me understand. Besides these way-wide requests that ask for essentially any complaint about anything and then other requests that ask about any complaint or issue regarding any unprofessional conduct such as whatever that may mean, offensive discriminatory conduct which also is subjective, et cetera, which I just think go way too far, help me understand what, short of that, has been asked for and has been agreed to.

I'll listen from the plaintiff for a moment.

MR. GOTTLIEB: Your Honor, may I use the lectern?

THE COURT: Sure.

MR. GOTTLIEB: So, your Honor, I would concede that the initial requests as worded were fairly broad. And so that's why in our meet-and-confers and our discussions with opposing counsel we have agreed to narrow them both with respect to -- both with respect to temporal scope and with respect to the forms of discrimination and the types of complaints.

THE COURT: And remind me the time frame that you agreed upon.

MR. GOTTLIEB: There's nothing that has been agreed upon.

THE COURT: I'm sorry?

MR. GOTTLIEB: But we have agreed to narrow it. We actually may not have mentioned this in our motion papers, but at the last conference, your Honor shortened our time frame for our requests on similarly situated comparators from -- we asked for seven years prior to our client, Mr. Hafizov, starting at BDO. Your Honor shortened it to five years. So we would concede that for purposes of symmetry, that would be appropriate for other complaints of discrimination and the issues that we're going to be discussing now.

But, your Honor, the -- in some ways this is a unique case in that a lot of the case law on Me Too evidence deals with a race discrimination case where somebody is also seeking complaints about national origin discrimination or sexual harassment.

THE COURT: Let me cut to the chase. Your allegations in the complaint are that Ms. Bernier, and possibly others at BDO such as Mr. Dyment or BDO as an entity, are non- discriminatory discriminators; meaning they discriminate against everybody essentially for national origin, sex, gender, religion, whatever it is, and that Mr. Hafizov allegedly registered that as a concern and allegedly was terminated or retaliated for bringing this to management's attention. Is

that a fair summary?

MR. GOTTLIEB: That's correct, and as well as he was subjected to hostile work environment because of all that. Correct.

THE COURT: Well, you say "because all that." But he didn't actually experience each of those. He experienced the reference to Siberia. I forget whether he alleges that he witnessed or heard any of the other types of alleged discrimination or mistreatment. But as I understand it, that list essentially came from his discussion with -- and I forget which individual that he met with, defendant claims was joking around. That's neither here nor there.

MR. GOTTLIEB: That's -- the comments that were directed at Mr. Hafizov related to his Russian heritage, but that --

THE COURT: Or where he was located in terms of the office, but I understand --

MR. GOTTLIEB: But -- well, it wasn't just the location of his office. It was also his style of communication, his bluntness. But beyond that, the other allegations of misconduct, some of which were witnessed and observed and said around Mr. Hafizov, some of them he learned about through his colleagues. So it's a combination. It was not merely --

THE COURT: If I hear from a colleague that they say

so and so has used X language, and don't X, Y, Z, how does that create a hostile work environment, that that person is just telling me that's what happened?

MR. GOTTLIEB: I would say this: If someone in the workplace merely hears that a supervisor or somebody else is discriminating against other people, and those are the only allegations, that probably would not rise to the level of a hostile work environment. But, here, we have conduct which is directed directly to Mr. Hafizov. We have conduct that is discriminatory and retaliatory conduct by Ms. Bernier that is around and said to Mr. Hafizov, and then you -- those three categories, and then you also have the third category which is discriminatory conduct that Mr. Hafizov hears through his direct colleagues.

THE COURT: Give me the ones in the second category. What are the ones that you allege were directed to him?

MR. GOTTLIEB: That -- you mean that were around him but were not directed about him?

THE COURT: In other words, you're saying that he was not told about but he witnessed or heard?

MR. GOTTLIEB: So Ms. Bernier made comments about the sexual orientation of several colleagues. At least, Steve Oldroyd and Rocky Cummings. If your Honor needs a citation for that I can --

THE COURT: No, that's fine.

MR. GOTTLIEB: This is a retaliation, Ms. Bernier disparaged Mr. Sweeney directly to Mr. Hafizov on several occasions, and the fact that he brought disability discriminations claims against her. There were -- Ms. Bernier, to Mr. Hafizov, insulted an employee in a complaint for -- for employee A, for making a complaint of being discriminated against on a basis of being Muslim and directed Mr. Hafizov to retaliate against her. So, I mean, those are some. There may be others as well. Those are just the ones that I frankly know offhand.

In the complaint, there is a list of 20 or so allegations of discrimination on the basis of your Honor said earlier -- raised national origin and religion. It goes beyond. There's disability, there's sexual orientation.

THE COURT: There's a specific reason I mentioned those four, which I'll get to in a minute.

MR. GOTTLIEB: Your Honor, the case law says that where there's a -- where there's an isolated, essentially, allegation of gender discrimination, maybe then you don't get complaints or evidence of race discrimination.

THE COURT: Right.

MR. GOTTLIEB: But so long as there's a factual connection and predicate, it's all fair game. And here, for the reasons already articulated, there are allegations. And Ms. Bernier is picking on and discriminating against people

based on their protected characteristics, and that's what she does, and that when you complain about it, you're retaliated against.

THE COURT: And I understand that. And with respect to Mr. Bernier and Mr. Dyment, that may be appropriate to be getting that material, and it sounds like the defendant essentially has agreed to that. If I'm mistaken, she'll tell me. But based on the type of information she was talking about producing in regards to Ms. Bernier, I thought it sounded inclusive of that broadly. At the same time, it's not going to be this broad discovery in terms of type of discrimination or retaliation in regards to anyone other than Ms. Bernier or Mr. Dyment. Or was it also Mr. Montorio?

MR. GOTTLIEB: Mr. Montorio. But if I could, for a moment, your Honor, your Honor said earlier that we're not entitled to complaints that do not -- are not specifically about discrimination on the basis of protected characteristic. And the reason I think classifying it that way is difficult and problematic is that people often make complaints that don't specifically say national origin.

THE COURT: No, of course not. Of course not. But there will be references to terms and things that fall within that category. But again, I go back to -- which you conceded that these are essentially overbroad.

MR. GOTTLIEB: But we agreed to narrow them.

THE COURT: I know. But what have you agreed to narrow them to? I don't have them in front of me, do I?

MR. GOTTLIEB: It's described in the motion. Is there. We have not reissued the document request. But it's articulated in the motion, and I can articulate it right now, if you'd like.

THE COURT: Go ahead.

MR. GOTTLIEB: What we're seeking from Ms. Bernier, Mr. Dyment, Mr. Montorio, and as we phrased it, anyone else involved in Mr. Hafizov's termination, BDO says that's it. But that's our protection in case something comes up later. Any complaints about discrimination or the use of protected characteristic terms that are -- i.e., that would be reflective of discriminatory conduct and any other complaints -- so that's kind of one bucket.

And then the slightly broader, but I think still appropriate, are any complaints about their professionalism or misconduct unless that creates a burden. Because if there are complaints, then it should not be for BDO to unilaterally determine, is this a protected complaint or not. That should be produced. And there should be disclosure of that. And if it's a mere complaint about, you know, something unrelated, then it's just a document produced in discovery, and it won't be admissible at trial.

But for purposes of discovery, if there are complaints

made about the people who are accused of discrimination and who are involved in our client's termination, this is discovery, your Honor, and that should be discoverable.

THE COURT: How do you define professionalism or unprofessionalism?

MR. GOTTLIEB: Your Honor, if there's a complaint that somebody says, you know, she asked me to work late today, okay. That, I don't think, would be a complaint of professionalism. With any complaint that goes essentially beyond that.

THE COURT: I don't know what that is that goes beyond. I don't know how to define that. I don't know how the defendant is going to define it.

MR. GOTTLIEB: Your Honor, I think the point is, generally speaking, a complaint about a wrongdoer should be discoverable. That should be the sort of default position.

THE COURT: Complaint for anything?

MR. GOTTLIEB: Complaint for anything. Now, if that creates a burden, which, I mean, we're talking about three people here.

THE COURT: I understand.

MR. GOTTLIEB: So if that creates a burden, which would be I guess the objection, fine.

THE COURT: If there's a burden that's particularly burdensome, it might be because there's way too much material. Who knows? Which would speak to why you want it. I

understand. Okay. I get the point.

MR. GOTTLIEB: And then so that's the three individuals. And then, of course, we sought a broader scope for retaliation.

THE COURT: When you say "broader scope," meaning what?

MR. GOTTLIEB: Broader scope meaning not only retaliation by the three individuals who are involved in our client's termination.

THE COURT: I see.

MR. GOTTLIEB: And there, we sought more broad company-wide discovery. And we believe, your Honor, the case law makes it clear that where there's evidence of a pattern or practice or where plaintiff is pursuing a theory of a pattern of discriminatory or retaliatory conduct, that you can go beyond the individual decision makers. And, your Honor, here we have.

I mean, the retaliation that's been asserted in the complaint, not only our client's complaint, but other lawsuits too, Mr. Sweeney, shows that not only is there a pattern of retaliating against people who are -- who file complaints of discrimination internally, but then after they file lawsuits and try to enforce their rights, they are further retaliated against thereafter. And, your Honor, that alone should be enough of a factual predicate for plaintiff to get a broader

scope of discovery as to retaliation.

THE COURT: But what's the actual factual predicate?

MR. GOTTLIEB: The factual predicate is that BDO has retaliated -- I would not expect -- let's put it this way, your Honor, that Ms. Bernier has directed anybody to file counterclaims against Mr. Sweeney to --

THE COURT: We'll get to that in a minute.

MR. GOTTLIEB: The point is, these are actions of BDO, not Ms. Bernier. Perhaps, and part of our theory in this case, of course, is that Ms. Bernier and others directly retaliated against and terminated Mr. Hafizov. But the retaliation --

THE COURT: What's the factual? Again, that's why I asked about the factual predicate. One fact you said so far is that BDO committed the acts that you allege are post-termination retaliation. What else?

MR. GOTTLIEB: Well, you have a constellation of retaliation internally by Ms. Bernier.

THE COURT: I'm talking about beyond that.

MR. GOTTLIEB: But that -- the conduct by Ms. Bernier has happened over a period of time. And that demonstrates an acquiescence of that conduct by somebody, and that's by the company. So you already have a level of acquiescence by BDO to retaliation by Ms. Bernier against Sweeney, Hafizov, employee A, and speaking openly in --

THE COURT: Won't you be able to take discovery of

people who Ms. Bernier reported to or who made decisions about Ms. Bernier in that respect?

MR. GOTTLIEB: I'm sorry. Could you repeat, your Honor?

THE COURT: You tied it again to Ms. Bernier, and you talked about BDO's acquiescence, but presumably you will be able to depose somebody or get discovery from somebody who's responsible for making a determination about Ms. Bernier but not about any other employee.

MR. GOTTLIEB: You mean I would be able to take discovery of BDO's acquiescence?

THE COURT: Yes. To Ms. Bernier.

MR. GOTTLIEB: But the idea here is that the reason that they are acquiescing to Ms. Bernier's conduct, the -- BDO as an institution permits retaliation, and the factual predicate for that is that after Sweeney came forward to this case, after Mr. Hafizov came forward with this case, the institution, the company retaliated against each of them.

THE COURT: How?

MR. GOTTLIEB: How? For Sweeney, after he filed his lawsuit --

THE COURT: This isn't the Sweeney case. How here?

MR. GOTTLIEB: Your Honor wants to know what the factual predicate is for why BDO as an institution engaged --

THE COURT: Okay.

How did they retaliate against Sweeney?

MR. GOTTLIEB: Against Sweeney -- when he was fired -- when Mr. Sweeney was fired, and this is public record. When Mr. Sweeney was fired, he was offered severance under BDO's company policy, the company's severance policy which you only get severance if you're terminated without cause. If you're terminated without cause in New York, then noncompetes and restricted covenants are unenforceable. Nonetheless, after he came forward with a claim of discrimination and filed a lawsuit, they countersued him for breach of the covenant.

THE COURT: How are we not going to have litigation about every complaint that you're raising about other people?

Look, I'm going to rule. The discovery sought in -- for some of this is not proportional at all to the needs of this litigation and what's at stake. I do agree that what you described as the first and the second category with respect to Ms. Bernier, Mr. Dyment, and Montorio, fine. That scope is fine in terms of complaints and about protected characteristics or professionalism or misconduct.

But not beyond that. And in terms of retaliation, again, it's limited to retaliation by those individuals, not BDO as a whole, except to the extent that BDO had any -- as a company, had anything to do with retaliation stemming from those three individuals again.

All right. That is that.

Okay. Motion to amend. I will hear argument briefly on that, and I will set the stage. This is to add a set of facts, as a second incident of post-termination retaliation based on an 11-page letter sent by BDO's counsel, outside counsel in -- it's a discovery deficiency letter, based on a paragraph at the very end that indicated that a particular piece of evidence that the plaintiff produced, i.e., a recording, may have been made in violation of state law regarding non-consensual recording of phone calls.

My understanding is that the plaintiff contends that that was a threat of bringing counterclaims, and related counterclaims and claims, may be affirmative claims. And they point to the e-mail correspondence between plaintiff and defendant's counsel in which defendant's counsel said, yeah, this might be the basis -- I'm paraphrasing it because it didn't even say it this strongly. It referred to the fact that BDO and the defendants have a right to assert counterclaims and affirmative defenses. And from that, we get further instance of post-termination retaliation. I'm just setting the stage. You can correct me if I have mischaracterized anything.

So tell me why that's permissible. I understand the case law you've cited in terms of basic principles, so you don't need to review the law generally. But go ahead.

MR. GOTTLIEB: Your Honor, at our firm, we do pretty much exclusively plaintiff-side employment discrimination. And

there is a trend by some employers, some defense firms, to engage in conduct that attempts to chill our client's prosecution of their cases and any attempt to chill protected activity is potential retaliation. That has happened from the start of this case. And your Honor said earlier that perhaps the Court is not particularly moved by the threatened sort of breach of contract claim, as we've described it in the response to the demand letter.

And would I, your Honor, say, that that is some extreme and outrageous, egregious claim of retaliation? No, your Honor. But people who come forward with claims of discrimination should not be threatened. And if they are, there's a potential claim there. If there's an attempt to chill --

THE COURT: You're talking very generally. There are cases about threats that are made before litigation's brought that don't necessarily involve counterclaims. There are threats of bringing counterclaims that are made before litigation is brought. And there are threats of bringing frivolous counterclaims. I understand your position that it shouldn't have to be frivolous in order to be actionable, if I have that right. But I want to keep it not too general. You have to keep it more --

MR. GOTTLIEB: Your Honor, BDO said, yes, it was at the end of a letter -- a long letter that was mostly about

discovery. But that almost furthers the point; it was completely gratuitous to add in a -- at the time, I would say, it was a thinly veiled threat that you've engaged in civil and criminal misconduct, that you need to be careful about.

THE COURT: Well, maybe that's actually a good thing for the plaintiff so that he was aware of it. And how is bringing it to the attention of the opposing counsel that they may have an issue with a piece of evidence that they produced, that's in a letter about discovery months into the litigation, how is someone supposed to defend themselves in this type of litigation if they can't be affirmative and assertive in terms of potential issues?

MR. GOTTLIEB: Your Honor, I am not at all saying that they can't defend themselves. I'm saying that if --

THE COURT: Well, part of defense is a good offense, isn't it?

MR. GOTTLIEB: And they can assert a good offense. If they assert an offensive tactic, they can sue him if they want to. They can do whatever it is they want.

THE COURT: They haven't done it yet.

MR. GOTTLIEB: They haven't done it yet. But they can threaten to sue him, they can sue him. If they think a good offense is the best defense, they can do that, and we have the right to say, well, that's really not a defense, you're really threatening --

THE COURT: Even if it's a meritorious claim?

MR. GOTTLIEB: The question, your Honor, is the motivation. Is the motivation to retaliate?

THE COURT: And you argue this even for meritorious claims; as long as there was a motive in part to retaliate, then it becomes fair game for a retaliation claim. Is that fair?

MR. GOTTLIEB: That's correct, your Honor.

Now, your Honor, even if, though, if the initial -- I'm going to say threat, that's how we interpret it -- but at the end of an 11-page letter, the e-mail that reflects -- it was not merely, by the way, plaintiff's counsel, you should know this. They were saying it because they intended to let us know there are potential counterclaims.

THE COURT: Potential, yes.

MR. GOTTLIEB: But, your Honor, not only do I think the motivation behind this was unlawful, but again, there are claims asserted --

THE COURT: What were they supposed to do? Were they supposed to not raise that issue and go ahead and file a counter? You would have alleged the counterclaim itself was retaliatory. What are they supposed to do to avoid being accused of taking a litigation tactic during litigation that plaintiff has brought and not shied away from in any way?

MR. GOTTLIEB: I didn't get --

THE COURT: Well, it's not like plaintiff has packed up and run away because there was this reference at the end of the letter to a piece of evidence that could pose the basis for his liability.

MR. GOTTLIEB: Thankfully here, he hasn't. But there are other people who might be, and who might be concerned about that or might question.

THE COURT: And so wouldn't they like to know that, rather than been caught by surprise later on after they've gotten into it that they committed a violation that could be actionable?

MR. GOTTLIEB: The question, your Honor, what is BDO to do? Like I've said, they can do whatever they want. But if they do threaten against a discrimination claim, then that claim is within his or her rights to do whatever they want in response. Then it's all fair game in litigation. But there should not be a pass for engaging in conduct that may have a chilling effect. Your Honor, some of the threats that were in this letter did not even involve BDO, they involved a recording of Shannon Ford, who is not even a party of this litigation.

THE COURT: So what? It was part of a call, and if it violates the state law that's associated with where she is, it's all part and parcel of the same issue.

MR. GOTTLIEB: There's no counterclaim. BDO --

THE COURT: They didn't say they were bringing a

counterclaim based on it. They were just apprizing this is a problem that is there. And what they did threaten -- threaten, was to bring a claim potentially, and they didn't even do this. But in your interpretation, the counterclaim, based on the plaintiffs having gotten this evidence in violation of these laws, but it doesn't matter that Ms. Ford herself isn't going to be the one involved or have a claim, she was just party to it, and it might implicate an additional state's law the plaintiff might have violated.

MR. GOTTLIEB: The only potential violation would be towards Ms. Ford, not towards BDO. If plaintiff recorded a conversation unlawfully between him and Ms. Ford, Ms. Ford has a potential civil claim against him, not BDO.

THE COURT: Wasn't Ms. Ford on the call that's at issue?

MR. GOTTLIEB: She was.

THE COURT: So she was on the call with Mr. Hafizov?

MR. GOTTLIEB: Correct.

THE COURT: So she happens to be part of the call. It's not like a separate, isolated --

MR. GOTTLIEB: No. Ms. Ford could arguably assert a claim. But Ms. Ford is not a party to this litigation, so BDO, who is a party to this litigation, says there might be a claim here against you, but that's not their issue.

THE COURT: She recorded a conversation in which two

people, Ms. Ford and Mr. -- BDO, or whoever it was -- was involved. And if he -- Mr. Hafizov may have violated two different states' laws, and you want Ms. Ford there to press it. It's part of BDO's claim, if there is one, if they were to bring one, that there was a violation.

MR. GOTTLIEB: But that's my point, your Honor. BDO does not have a claim there for Mr. Hafizov recording the conversation with Ms. Ford.

THE COURT: I'm not saying they do.

MR. GOTTLIEB: Maybe I'm not understanding --

THE COURT: They have a claim that -- never mind. I'll explain it when I get to it in my opinion when I address that issue. I'm not persuaded on that particular point. I think we're getting a little too far afield. If it comes down to Ms. Ford being an unreasonable threat, given it was in a footnote, it just -- it's not going to get there.

MR. GOTTLIEB: Well, again, your Honor, whether it's a footnote, I don't know that a party is entitled to, you know, a defense because something was in a footnote. I've said it --

THE COURT: Don't the Courts often say that we ignore this argument because it was in a footnote? I'm not analogizing. I'm just --

MR. GOTTLIEB: Your Honor, we believe very firmly that BDO has threatened Mr. Hafizov in an attempt to chill him, and it's not merely an isolated letter. This is part of a series

of threatening acts towards people who have asserted their rights. And it is our -- frankly, our duty and our obligation to protect our client from conduct intending to chill his protected activity, and we believe the case law supports that.

THE COURT: Okay. Fair enough. All right. Ms. Ditlow, do you want to respond?

MS. DITLOW: Yes. Thank you, your Honor. I know you said you weren't persuaded by Ms. Ford. I want to point out that I think that footnote versus body of the letter highlights the distinction between party and not a party.

THE COURT: Slow down.

MS. DITLOW: Ms. Ford herself was in a two-party consent state, and just bringing that to plaintiff's attention kind of highlights the fact that the motive was not to chill or threaten counterclaims because we -- Ms. Ford is not a party to the case, and we were just identifying, simply to the extent maybe plaintiff wasn't even aware where Ms. Ford was sitting at the time of the call, that she too was sitting in a two-party consent state like Mr. Dyment, who was sitting in Massachusetts at the time of the call. Trying to understand from plaintiff's counsel in a discovery letter where the discovery they produced came from, its origins, how -- why was it recorded, are you aware it was --

THE COURT: Well, you didn't raise it as a discovery issue in the letter. You raise it as a discovery issue when

the plaintiff in their briefing on this issue said there's no possible use in discovery.

MS. DITLOW: Well, I think there is. To the extent it's unlawfully obtained isn't then admissible.

THE COURT: I know. I'm not disagreeing with the principle. I'm just saying that your response to the plaintiff when he was asking for an explanation of why you raised this, you didn't raise an evidence issue at all. You said, we have -- BDO has a right to defend itself and to assert counterclaims, which seems to suggest that you, I think, very clearly suggests that you, or BDO, is suggesting there may be liability there that could be asserted in this.

MS. DITLOW: Well, I think it's two-pronged. The fact that we raised it initially in a discovery letter by itself highlights the fact that we saw this as an evidentiary issue.

THE COURT: Okay.

MS. DITLOW: To the fact that plaintiff's counsel then followed up in separate correspondence as to, you know, what may be the reason otherwise inquiring this and making this threat, and I want to use those quotes very loosely. Because we certainly didn't see it as any threat. I was pointing out to experienced counsel who we had been litigating with for months at that point that this may, in fact -- almost is like a courtesy. Like, are you aware that maybe you produced something that may be violative of the law? I mean, all at

stake could potentially be a lawful counterclaim if it ends up being something where he didn't have, you know, the consent of both parties to articulate and being able to raise that in a discussion with counsel in discovery back and forth, correspondences back and forth, is part of the litigation processes.

Your Honor correctly pointed out, what else are we supposed to do? Do we not raise this? Do we sit on it? Is the first time we raise it if they try to introduce it at trial? Oh, wait, we didn't raise anything before because we're now being hindered. Talk about chilling prosecution. If anything, you know, they are trying to really chill prosecution by saying anytime you raise legitimate -- I mean, this wasn't frivolous. This was a legitimate concern that we weren't even aware of until they produced it in discovery. And now we've raised a legitimate concern, and they're like, more retaliation.

THE COURT: Let me reduce it now down to a particular issue where the parties obviously disagree, and the parties and plaintiff in particular has pointed out there seems to be pretty clearly a division of opinions among district courts in the Southern District about whether a meritorious counterclaim can be the basis of retaliatory conduct in response to termination.

And I don't know if any of the cases that are on

either side of that involved threats of bringing a counterclaim that definitely address the counterclaim issue, but some courts say it has to be -- it has to not have merit in order to be actionable as post-termination retaliation, particularly once you're in litigation.

There are other courts that say -- I'm sorry. I added that particularly when you're in litigation, I'm going to take that out and assert this in this later thought. The later thought being that there are other courts that say you need to have both, not having merit and being motivated by retaliation. And if you have both, then, yes, you can assert a claim. But both, I would think are particularly necessary once litigation has begun. But what do you make of this provision of the law? Who's right? The Second Circuit hasn't answered it. They made that clear.

MS. DITLOW: I think, your Honor, and while I won't play judge here and say this is specifically who's right, I think the distinction in that case law versus what we have here is the timing.

This was not a situation where plaintiff has brought a complaint and maybe there was a counterclaim that routinely maybe a company may not bring once an employee leaves, but then after the employee files suit, they say, oh, you kept some company property so we're going to file a counterclaim against you. Really, the only reason the counterclaim was potentially

brought was because, you know, plaintiff filed a complaint, here's our counterclaim in response.

Here's something that went on for months. Litigation was going. We didn't raise any counterclaim. Then all of a sudden in the regular course of litigation and discovery, something becomes aware to us, and then we're like, well, potentially this might be a counterclaim. We didn't say we're threatening, but then is the modus — if we do — retaliation? No, because if we simply wanted to retaliate against plaintiff for filing a complaint, sure, we could have potentially raised a counterclaim much sooner. In fact, we answered, we've done an amended answer, and we haven't. So then --

THE COURT: Well, maybe you had no basis.

MS. DITLOW: Well, but at some point if -- but that would be then potentially the retaliation. The fact here that after all that time in litigation we did not make any attempt to file any counterclaim, and then after only coming across lawful consideration and didn't rush to the Court to file a counterclaim, in fact, didn't take any action directly against plaintiff raised in correspondence, which invited a response from plaintiff's counsel that potentially there might be a counterclaim here, shows that the -- there's not retaliation for filing a complaint.

It's -- we've discovered information. We may have a meritorious counterclaim, and we have a right to bring it if we

potentially choose it. So not only is it meritorious, the question of retaliation comes to, is this in response to your filing complaint. The lack of temporal proximity shows that this is not a, you know, snap judgment, even if meritorious in response to filing your complaint. You filed your complaint, we engaged in the litigation process, we're ongoing, we have engaged in extensive back-and-forth, we're not attempting to chill your process, we've written a lot of motion letters --

THE COURT: Well, so you say --

MS. DITLOW: Some things come to our attention that, then, what is the alternative, that defendants always have to be concerned about raising anything or else tacking on --

THE COURT: Well, apparently the plaintiff's position is yes.

MS. DITLOW: I mean in ways, and we talk about unfair gamesmanship, I think really, that is a much more chilling effect, that defendants are forced to kind of sit on their hands based on meritorious claims to avoid the potential of an additional claim against them. I don't think that would be the precedent that any Court would want to set.

THE COURT: Plaintiff, you can reply.

MR. GOTTLIEB: Your Honor, the reality of the situation, your Honor, is that we're not saying anybody should be precluded from doing whatever they think is appropriate. And it's up for the Courts, and ultimately juries, to decide

these issues. I think it's important, your Honor, to reflect on the stage of the litigation that we're at with respect to this particular issue, which is a motion for leave to amend. Not -- we're not at summary judgment, we're not at admissibility at trial, we're not at that stage. The only issue is, have we asserted a plausible claim that the conduct that the defendants engaged in had a chilling effect.

Your Honor asked about the split in the courts. And I would suggest to the Court that the split is actually -- even though your Honor is correct, of course, it's not been decided by the Second Circuit, this split is not nearly as equal on both sides as the word "split" suggests.

The antidiscrimination laws all dictate that adverse conduct is actionable when it's motivated by an unlawful reason. And there should not be any reason why analyzing counterclaims or threatened counterclaims should be modified from that. What's the motivation? Is there an unlawful motivation to that, particularly at the pleading stage, a determination on whether the claims or threatened claims are meritorious? So at the pleading stage, your Honor, we have asserted more than enough using the plausibility standard, if they follow the plausibility. Thank you.

THE COURT: All right. I'm prepared to rule. And I'll read my opinion from the bench. I'm going to hand my document to the court reporter so that she has it to follow in

case she needs to pick up something. The document itself is not for release, the opinion. I'm just providing it to the reporter for her aid.

This employment discrimination and retaliation case comes before the Court on Plaintiff's motion to amend his complaint. See Docket 39, 40 and 41.

The motion is fully briefed, the Court has just heard oral argument and has fully considered the parties' arguments. The Court will read its decision from the bench, as I said.

I'm going to start with background.

Plaintiff's motion requested leave to amend in two represents. One aspect of the motion sought to add Title VII claims. The Court previously granted that request to which Defendants consented, and Plaintiff filed an amended complaint accordingly. See docket 60.

That aspect of Plaintiff's motion is resolved. The remaining issue is Plaintiff's desire to augment his existing retaliation claims with additional allegations of post-termination retaliation.

The currently operative amended complaint contains claims for retaliation based on several pre-termination events and one post-termination event. The alleged post-termination event relates to a letter from BDO's counsel responding to Plaintiff's post-termination letter detailing his claims and declaring his intent to litigate. The BDO letter suggested

that Plaintiff's efforts to describe an earlier lawsuit between BDO and an employee other than Plaintiff, "may constitute a breach of the settlement agreement." The amended complaint alleges that that aspect of BDO's letter was a threat to assert frivolous claims in response to plaintiff's protected activity of asserting allegations of discrimination against BDO. See Amended Complaint, Paragraphs 128 to 131. I note that Defendants previously moved to strike those allegations along with all other allegations related to the settled litigation involving the other employee. The Court denied the motion to strike. The arguments at issue there, however, are not at issue on the instant motion. Accordingly, the ruling on the motion to strike has little no to no relevance to the instant motion.

Plaintiff's proposed additional amendment seeks to add a second post-termination event of alleged retaliation similar to the first one in that Plaintiff alleges that BDO, through counsel, made another post-termination threat of legal liability against Plaintiff.

More particularly, the additional facts relate to a letter from defense counsel sent on February 22, 2023, approximately four months after the litigation began, to Plaintiff's counsel setting forth in detail many purported deficiencies in Plaintiff's discovery responses. I'm going to refer to that as at deficiency letter. And that can be found

at Docket 41-7.

The length of the deficiency letter was more than 11 pages, and generally appears to be a typical deficiency letter an attorney would send in an intensely litigated case such as this one.

At the end of the Deficiency Letter, following a request for Plaintiff to correct the purported deficiencies, defense counsel included a paragraph concerning a recorded telephone call that Plaintiff had produced during discovery. That paragraph, which is the basis for Plaintiff's proposed amendment, reads in relevant part as follows:

"Finally, we wanted to make you aware of the fact that pursuant to Plaintiff's initial production of documents, it has come to Defendants' attention that Plaintiff appears to have recorded a telephone conversation between Plaintiff, Matthew Dyment, who is one of the defendants, and Shannon Ford, a non-party, on May 18, 2022. As Plaintiff is aware, Mr. Dyment is a Massachusetts resident, worked and continues to work, out of BDO's Boston office at the time of plaintiff's termination and was in his home in Massachusetts at the time of the recorded call. Massachusetts' wiretapping law makes it a crime to record a wire conversation without the prior consent of all parties to the communication." See *Mass General Laws Ann. CH* 272, Section 99(C).

Therefore, in addition to breaching his Code of

Conduct with BDO, which forbids recording telephone conversations with BDO employees, Plaintiff may have violated Massachusetts' Wiretapping Law and Mr. Dyment may be entitled to a civil remedy under the law.

The paragraph ended with a footnote stating that Plaintiff may have violated Florida's Wiretapping Law with respect to Ms. Ford. See Docket 41-7 at Pages 11 to 12.

In late February 2023, Plaintiff's counsel provided defense counsel with Plaintiff's proposed amendment ask whether Defendants consented to the amendment. The relevant portion of the proposed amendment includes 18 paragraphs devoted to the deficiency letter. See Docket 41-1 at Paragraphs 132 to 149. The proposed new paragraphs follow the existing allegations about the alleged threat related to the settlement agreement and characterize the deficiency letter as a second instance of post-termination retaliation.

The first proposed additional paragraph sums up the new allegations; claiming:

"Defendants, through their counsel, have accused Plaintiff of engaging in criminal and civil wrongdoing by virtue of having recorded a conversation at work, the recording of which was produced in discovery, and threatened to pursue bogus and bad faith claims against him by virtue of the recording." See Docket 41-1 at Paragraph 132.

Among other allegations, the proposed amendment

asserts that upon information and belief, Defendants would not have threatened any potential civil counterclaims or criminal liability had Defendant learned about Plaintiff's recording in any other context other than after he asserted legal claims against Defendants. See Docket 41-1 at Paragraph 146.

After having had a chance to review the proposed amendment, defense counsel responded by e-mail that Defendants could not consent to the amendment. That response and the e-mail exchange that followed bear mentioning.

In her initial response, defense counsel stated that "the proposed amendments are a gross mischaracterization of the facts and completely ignore your client's wrongdoing." See Docket 41-8 at ECF5, which is an e-mail from Ms. Ditlow to Christina Sabato, dated February 28, 2023, at 8:11 p.m.

In an e-mail responding to defense counsel, Plaintiff's counsel characterized the deficiency letter as an obvious threat but inviting defense counsel to provide an alternative explanation if there was one. Docket 41-8 at ECF 4 which is an e-mail from David Gottlieb to Lindsay Ditlow how, February 28, 2023 at 9:10 p.m.

Defense counsel then denied that the deficiency letter made any threat and was not an attempt to intimidate Plaintiff. Defense counsel added "Defendants are permitted to defend themselves in this litigation with appropriate counterclaims and affirmative defenses and doing so is not retaliation."

That's at Docket 41-8 at ECF3, an e-mail from Ms. Ditlow to Mr. Gottlieb, March 1st, 2023, at 1:43 p.m.

Plaintiff's counsel then responded to defense counsel's e-mail "makes it clear that the purpose of writing the letter was to assert counterclaims." Plaintiff's counsel added, "Whether counterclaims or threatened counterclaims are retaliatory is a question for a jury. You have also not explained the letter's reference to the word 'criminal' as opposed to civil wrongdoing." That's at Docket 41-8 at 2, an e-mail from Mr. Gottlieb to Ms. Ditlow, March 1, 2023, at 2:54 p.m.

Plaintiff's counsel again gave defense counsel an opportunity to further respond before seeking leave to amend. In the final e-mail response, defense counsel asserted that "The purpose of the letter, as you well know, is to identify issues and deficiencies with Plaintiff's discovery production." Defense counsel further stated that "Nowhere in the letter did we threaten your client with either actions related to criminal wrongdoing or civil liability for the prosecution of his claims." That's at Docket 41-8 at 2, an e-mail from Ms. Ditlow to Mr. Gottlieb, March 1, 2023, at 6:49 p.m.

On April 14, 2023, Plaintiff filed his motion to amend. The amendment as proposed folds in allegations about counsel's exchange of e-mails. The amendment thus alleges that

Plaintiff had given Defendants an opportunity to explain the reason for the statements made in the deficiency letter. The Defendants admitted that the reason "was because they intended to assert counterclaims against Plaintiff"; and that Defendants never provided a reason for referring to Plaintiff's potential criminal liability. See Docket 41-1 at Paragraphs 138 to 143.

The proposed amendment concludes with the following paragraph: "It is clear Defendant's conduct is an attempt to intimidate Plaintiff and chill his prosecution of his claims. Consistent with BDO's many-times-over documented practice of retaliating against those who pursue claims." It's at Docket 41-1 Paragraph 149.

To be clear, the proposed amendment does not add a new cause of action but instead incorporates allegations about the deficiency letter to Plaintiff's existing claim for pre- and post-termination retaliation. Finally, the Court notes that Defendants have not asserted any counterclaims, let alone ones based on the alleged threats in the deficiency letter.

And now I'll explain some of the governing standards.

The legal standard for considering a motion to amend is well-established. Pursuant to Federal Rules of Civil Procedure 15(a)(2), the Court should give leave to amend when justice so requires. Whether to grant or deny a motion to amend is within the Court's sound discretion but generally should be granted in the absence of futility, bad faith, undue

delay, or undue prejudice to the opposing party. See *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d. Cir. 2007).

A good-cause standard applies pursuant to Rule 16 where a party moves to amend after the court-ordered deadline for doing so is has expired, but that rule does not apply in this instance because Plaintiff sought leave to amend prior to the deadline for doing so as set forth in the amended scheduling order of April 14, 2023 at Docket 32.

Proposed amendments are deemed futile when they fail to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See *IBEW Local Union Number 58 Pension Trust Fund and Annuity Fund v. Royal Bank of Scotland Group*, PLC, 783 F.3d 383, at 389 (2d. Cir. 2015)

Accordingly, to avoid futility, a proposed amended claim must be plausible on its face. Here, Defendants oppose the proposed amendment based on futility and also bad faith.

All right. I'll move onto the discussion.

Defendants argue that the amendment is futile because it fails to satisfy two essential elements of a retaliation claim. To properly assert a claim for retaliation, a plaintiff must plausibly allege four elements: That one, plaintiff engaged in statutorily protected activity; two, the employer was aware of that activity; three, the employer took adverse action against the plaintiff; and four, there is a causal connection between the protected activity and the adverse

action. See, for example, *Kessler v. Westchester County Department of Social Services*, 461 F.3d 199, at 205 to 206, (2d. Cir. 2006). The first two elements are not in dispute on this motion. Plaintiff has alleged that he engaged in protected activity by complaining about and asserting claims for discrimination and a hostile work environment. He also has adequately alleged that his employer, BDO, was well aware of his complaints and legal claims. Defendants focus on the third and fourth elements, arguing that Plaintiff's amendment fails to allege, one, any adverse employment action based on the deficiency letter, and two, any causal connection between protected activity and the alleged threats made in the deficiency letter.

An adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting [similar] charges." *Burlington Northern and Santa Fe Railway v. White*, 548 U.S. 53, at 68, 126, Supreme Court 2405, and that was in 2006.

Plaintiff contends that the deficiency letter was an adverse employment action because the last paragraph threatened Plaintiff with counterclaims and raised the prospect of criminal and civil liability in connection with Plaintiff's recording a phone call without consent of other participants. That threat, according to Plaintiff, would dissuade a reasonable worker from continuing to advance their claim.

The Court credits Plaintiff's counsel with creative and zealous representation of their client. They have taken a routine discovery letter with observations about evidence that the Plaintiff produced, and contorted it into an adverse employment action. The last paragraph of the deficiency letter merely points out that certain evidence produced by Plaintiff was, allegedly, obtained in violation have of the law.

To be sure, in the e-mail exchange that followed, plaintiff's proposed amendment -- I'm sorry. To be sure, in the e-mail exchange that followed Plaintiff's proposed amendment defense counsel made a declarative statement that "Defendants are permitted to defend themselves in this litigation with appropriate counterclaims and affirmative defenses." But neither that statement nor the deficiency letter itself can reasonably be considered a threat that would dissuade a reasonable worker from continuing to pursue litigation that he had already filed.

Nor does Plaintiff gain ground by pointing to the fact that Defendants' brief opposing the proposed amendment discussed the evidentiary vulnerability of the recorded call; rather than contriving a new justification as Plaintiff seems to suggest. Defendants merely responded to Plaintiff's conclusory allegations that "assertion of Mr. Hafizov's potential criminal and civil liability have no relation to any discovery issues" or other reason for Defendants to bring it

up. See Docket 41-1, Paragraphs 135 to 36.

Quite simply, the deficiency letter does not qualify as an adverse employment action. Rather it is merely an assertion of factual statements and alleged legal consequences made in regard to the very discovery material that Plaintiff had produced.

As legal support for his argument that the deficiency letter is an actionable adverse employment action, Plaintiff offers three legal propositions: First, an employer's post-termination conduct can be actionable retaliation; second, counterclaims and lawsuits, even meritorious ones, can be actionable retaliation; and third, threats of retaliation can be actionable. Plaintiff has cited case law supporting each of those three propositions. But what Plaintiff has not done is cite any case that is on point to the facts and circumstances of this case.

The case Plaintiff relies on as being most analogous, *Van Apphen v. Tocqueville Asset Management, L.P.*, Number 18-CV-4154, Docket Numbers 37 and 43, Southern District of New York, February 21, 2019, is materially distinguishable both because the plaintiff in that case was still employed by the defendant employer at the time his attorney received the allegedly retaliatory communication from defendant's counsel, and because the threatened action was tied, either explicitly or implicitly, to whether the plaintiff accepted the defendant

employer's settlement demands.

Moreover, the deficiency letter cannot be actionable adverse action because Plaintiff last not plausibly alleged that the counterclaims and actions purportedly threatened or baseless. See Defendant's Memorial at 10 to 12. As Defendants argue, for a counterclaim or other claim made during ongoing litigation to be actionable retaliation, the claim must be both objectively baseless and filed in bad faith. Plaintiff responds that even meritorious claims can be actionable retaliation. See Plaintiff's Reply at Pages 6 to 9. District courts in this Circuit appear divided on that issue, and the Second Circuit has not correctly addressed it. See *Kim v. Le*e, Number 22-CV-61, 2023 WL 2317248 at *3 and Note 5, Second Circuit, March 2nd, 2023, stating, in context of wage and hour retaliation case, "we need not decide whether and understand what circumstances a non-frivolous counterclaim may constitute unlawful retaliation."

But, as Judge Failla recently noted, "a greater number of courts have required that a filing made in the course of an ongoing litigation be both baseless and made in bad faith in order to constitute an adverse employment action for purposes of a retaliation claims." That's *Figueroa-Torres v. Kleine*r, Number 20-CV-4851, 2022 WL 768483 at *10, Note 10, Southern District of New York, March 14, 2022. Emphasis in original with respect to the words "both" and "and." See also

*Sherman v. Fivesky, LLC*, number 19-CV-8015, 2020 WL 5105164 at *2, Southern District of New York, August 31, 2020, which denied motion for leave to file an amended complaint by the plaintiff, a former employee, because the former employer's service of a subpoena on the plaintiff's current employer and ensuing motion to add a counterclaim for breach of contract were not objectively baseless.

There are good reasons why both bad faith and baselessness should be required in context of a case like this one, where the employee already has filed litigation claiming discrimination and retaliation, the employer is vigorously defending itself in the litigation, the case is well into discovery, and the alleged threat appears as a final mention in a routine discovery letter between counsel.

For example, as Judge Liman observed in denying a plaintiff's motion to amend to include claims of retaliation based on counterclaims actually filed, let alone ones that are merely threatened, "no reasonable employee should expect that the employer-defendant would simply surrender in the face of litigation." Sherman -- that was from *Sherma*n, 2020 WL 510516 at *6. And, "absent both elements" bad faith and baselessness, employers already have been sued, could well be chilled from asserting viable counterclaims and defenses which "raises First Amendment issues." That's from *Figueroa-Torre*s, 2022 WL 768483 at *10, note 10, quoting *Ki*m, 2021 WL 6052122 at *11.

In reply, Plaintiff attempts to portray *Figueroa-Torre*s as an outlier relying on *Ki*m, which was appealed. *Ki*m, however, was affirmed on appeal. See 2023 WL 2317248.

And Plaintiff's attempt to portray the Second Circuit as "making it clear" that courts are to consider whether a claim is baseless or in bad faith, reads far too much into what was simply the Second Circuit's noting that it did not need to address the question.

Notably, the proposed further amended complaint does not allege that a counterclaim by Defendant Dyment against Plaintiff in regard to the recording would be baseless; rather, Plaintiff merely denies that he violated the applicable law. Docket 41-1 at Paragraph 144.

Instead, Plaintiff alleges that other theoretical counterclaims would be frivolous such as those asserted by other of the Defendants. But one against, Plaintiff goes out of his way to contort the deficiency letter beyond reason. The only reference to remedial relief in the relevant paragraph is that "Mr. Dyment may be entitled to a civil remedy under the law." Plaintiff nonetheless, spins the paragraph into a threat of five separate claims. See Plaintiff's Memorandum at 18, enumerating one, threatened counterclaims by Mr. Dyment; two, "unexplained, threatened" counterclaims by other Defendants; three, threatened civil liability as to Ms. Ford; four, threatened criminal liability as to recording

Mr. Mr. Dyment; and five, threatened criminal liability as to recording Ms. Ford.

In short, instead of basing his proposed amendments on what the last paragraph of the deficiency letter actually says, and instead of considering the context of the last paragraph within the deficiency letter, Plaintiff bases his proposed amendment on imagined claims that conceivably could be asserted. That simply is not plausible and is no basis for granting leave to amend.

Nor does it matter that Plaintiff seeks to introduce the additional allegations as a second post-termination incident of retaliation rather than as an entirely new cause of action. Allowing the amendment would only lead the parties and the Court down a wayward path of unnecessary time and expense.

Having determined that the proposed amendment is futile due to failure to allege a cognizable adverse employment action, the Court need not and does not address Defendants' additional arguments that the proposed amendments also fail to allege the requisite causation.

Aside from futility, the only other basis Defendants argue for denying the motion to amend is bad faith. In that regard, Defendants assert that Plaintiff's motion is predicated on several misrepresentations. The examples provided, however, evince aggressive advocacy and hyperbole, and disagreement about characterizations or conclusions to be drawn; they do not

demonstrate bad faith. See Defendants' Memorandum at 19 to 20, taking issue with one, Plaintiff's characterizing Defendants' assertions in the deficiency letter as advancing "bogus and bad faith claims," two as threatening Plaintiff "when the letter does no more than relay factual recitations," and three as "insinuating the Defendants had included information related to Ms. Ford and Florida's wiretapping statute in the body of the letter," when such information was included only in a footnote; and four, Plaintiff's failure to acknowledge his breaching BDO's Code of Conduct as a claim made by any Defendant other than Mr. Dyment. But even though they are not in bad faith, they are no less futile.

For the foregoing reasons, Plaintiff's motion is denied. To the extent not otherwise mentioned above, the Court has considered Plaintiff's arguments and determined them to be without merit.

This is the end.

All right. So you have your marching orders on discovery. Any questions or anything else we need to address? Anything from the plaintiff?

MR. GOTTLIEB: So, just your Honor, on the discovery issues, the record created will constitute the Court's order?

THE COURT: Yes, correct. And you should order a copy of the transcript.

MR. GOTTLIEB: Understood.

THE COURT: Anything else from the defense?

MS. DITLOW: No. Thank you, your Honor.

THE COURT: We're adjourned. Thank you for the very good lawyering on these issues.

(Adjourned)