# Exhibit A

# Browder's Grudge Over Prevezon Led to Defamation, Court Told

POSTED ON FEB. 4, 2019

By

AMANDA ATHANASIOU
Contact Author

A second member of Prevezon Holdings Ltd.'s defense team accused of Kremlin connections condemned allegations that he's a Russian spy and insisted that Hermitage Capital Management CEO William Browder be tried for defamation.

In a January 31 brief filed with the U.S. District Court for the District of Columbia, Rinat Akhmetshin argued that Browder publicly characterized him as a foreign spy and Russian intelligence officer in retaliation for Akhmetshin's work in the defense of Prevezon against allegations that it laundered proceeds of a Russian tax fraud. The fraud was exposed by Sergei Magnitsky, a lawyer representing Hermitage, which claimed to be a victim in the fraud. The Russian government has tried to implicate Magnitsky in the scheme, and both Browder and Magnitsky have since been convicted of tax evasion in Russia.

Akhmetshin, a dual citizen of the United States and Russia who has challenged Browder's assertions that Russian officials were involved in both the Russian Treasury fraud and the murder of Magnitsky, initiated the defamation suit against Browder in July 2018. Akhmetshin has claimed that Browder's defamatory comments have caused him injury in the District, where he works and lives.

In widely disseminated statements, Browder has referred to Akhmetshin as a Russian intelligence asset, a member of Russian President Vladimir Putin's secret police, and a "spy operator in Washington," none of which are true, according to Akhmetshin's brief. Browder's "pursuit of fame as a critic of Putin does not grant him license to defame a perceived political rival," Akhmetshin said.

Baker & Hostetler LLP represented Prevezon in its U.S. money laundering case and hired Akhmetshin to help examine documents, including forensic reports and criminal filings, the brief says. As a result of that work, Akhmetshin proposed a campaign to cast doubt on Browder's characterization of the tax refund scheme and the death of Magnitsky, and acted as a lobbyist, arguing that Browder "had committed tax fraud with Magnitsky's assistance," the brief states.

Akhmetshin said his efforts to have Magnitsky's name removed from the Magnitsky Act provided another motive for Browder's false statements. The Magnitsky Act, signed by then-President Obama in 2012, provides for sanctions against Russian officials believed to be responsible for human rights violations. "Browder harbored a grudge against Akhmetshin," thanks to his lobbying and defense of Prevezon, Akhmetshin's brief says. The U.S. government's forfeiture suit against Prevezon settled in May 2017, with Prevezon agreeing to pay the United States just under $6 million.

In July 2017 Browder tweeted that Akhmetshin attended an infamous campaign-season meeting at Trump Tower roughly a year earlier. Browder called Akhmetshin a "Russian GRU officer," referring to Russia's military intelligence agency. He said on *CBS This Morning*, also in July 2017, that Akhmetshin was hired by fellow Trump

Tower meeting attendee and Prevezon defense team member Natalia Veselnitskaya, Akhmetshin's brief says. During that appearance, Browder said Akhmetshin was "some kind of shady former Soviet spy," it says.

The brief says Browder has investigated Akhmetshin and filed a complaint against him with the U.S. Department of Justice. The complaint letter, submitted in 2016, says Akhmetshin was acting for the Russian government in secret and was in violation of the Foreign Agents Registration Act, according to Akhmetshin. As a result of his investigation, "Browder is surely well aware that Akhmetshin is not a spy or other sort of intelligence operative" for Russia, his brief says.

"Browder renounced his United States citizenship, and therefore, enjoys no First Amendment right to petition the U.S. government," the brief says. Akhmetshin mentions Browder's renounced U.S. citizenship several times throughout the brief. "Whereas Akhmetshin proudly sought U.S. citizenship, Browder renounced his own U.S. citizenship in 1998," reportedly to avoid paying taxes, the brief says.

Veselnitskaya was presumed by some observers to be acting for the Russian government during her work on the Prevezon case and was recently indicted for her role in the defense, which allegedly included drafting documents, ostensibly from the Russian government, to discredit the United States' case. She was charged with obstruction of justice by a grand jury in December 2018.

Browder moved to dismiss Akhmetshin's defamation case November 30, arguing that Akhmetshin has "openly touted his experience as a Soviet intelligence officer," and that the defamation litigation is part of a larger effort "to undermine the Magnitsky Act." When Browder appeared on *CBS This Morning* and accused Akhmetshin of being a former Soviet spy, and a current spy operating in Washington, Akhmetshin never asked for a retraction or correction, Browder said.

Browder further asserted that the district court lacks personal jurisdiction over him. Browder lives and works in the United Kingdom and the business he does in Washington qualifies for the governmental contacts exception to the applicable long-arm statute, he said.

Akhmetshin argued that letting Browder off would effectively grant him immunity. "If Browder cannot be sued here, where Akhmetshin lives, then he likely cannot be sued anywhere," his brief says. The court should avoid giving Browder "carte blanch to defame D.C. residents" by misapplying the District's long-arm statute, it says.

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | UNITED STATES RUSSIA CYPRUS |
| SUBJECT AREAS / TAX TOPICS | FRAUD, CIVIL AND CRIMINAL LITIGATION AND APPEALS |
| AUTHORS | AMANDA ATHANASIOU |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-4133 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-8 |

# Germany Notes Status of Tax Treaty Negotiations

POSTED ON FEB. 4, 2019

By

LARISSA HOAGLUND
Contact Author

Germany is negotiating tax treaties with Chile, San Marino, and Slovakia, and amending protocols to its tax treaties with China, Lithuania, Malta, and South Africa, according to an update published January 17 by the German Ministry of Finance.

The income tax treaties with Chile and San Marino would be the first such agreements between Germany and these countries. The treaty with Slovakia would replace the existing agreement, signed in 1980 between Germany and Czechoslovakia, as it applies in relations between Germany and Slovakia. (German text.)

The protocol with China would be the first amendment to the tax treaty signed March 28, 2014. (Chinese text; German text.) This would be the first amendment to the Germany-Lithuania tax treaty signed July 22, 1997. (German text; Lithuanian text.) It would be the second amendment to the treaty with Malta signed March 8, 2001. (German text.) An earlier protocol was signed in 2010. (German text.)

The protocol with South Africa would be the first amendment to the tax treaty signed September 9, 2008, which has not yet entered into force. (German text.) The new treaty will eventually replace the existing agreement signed in 1973.

All the negotiated tax instruments would have to be finalized, signed, and ratified by the contracting parties before entering into force.

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | GERMANY CHILE CHINA, PEOPLE'S REPUBLIC OF LITHUANIA MALTA SAN MARINO SLOVAKIA SOUTH AFRICA |
| SUBJECT AREAS / TAX TOPICS | TREATIES |
| AUTHORS | LARISSA HOAGLUND |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3947 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-19 |

# HMRC Must Urgently Revamp Employee Grievance Process, Report Says

POSTED ON FEB. 4, 2019

By

STEPHANIE SOONG JOHNSTON
Contact Author

The U.K. tax authority must address "low-level behaviors" and make changes to its grievance process as soon as possible to help vastly improve workplace conditions for its employees, according to an independent review.

In the "Respect at Work" report, published February 1, Laura Whyte, a former human resources director at U.K. retail company John Lewis Partnership, found HMRC staff had to put up with a "significant amount of so-called 'low level' poor behaviors that would not be acceptable in other environments." These behaviors include swearing, colleague mocking, and breaches in confidence, Whyte found. HMRC staff also said they experienced abusive and abrasive behaviors as well, she wrote.

The report found that there were 115 reported cases of bullying, harassment, and discrimination in 2017-2018, but 63 percent of individuals surveyed in 2018 said they had experienced bullying or harassment but didn't report it. HMRC's mediation service was asked to get involved only 12 times in 2018-2019, the report added.

Individuals who work at HMRC and were interviewed as part of Whyte's research reported, among other things, that HMRC's work culture lacked common courtesy and that those working in contact centers experienced a "dehumanizing work environment." Others complained about the cleanliness of offices, lack of response to reports of health and safety issues, and substandard toilet facilities in older offices, the report added. HMRC also does not invest in management and job skills training, according to the review.

"Overall, I was genuinely surprised as an independent reviewer by how the HMRC environment was described in the inputs we received," Whyte wrote. "This creates a snowball effect where the environment may not feel a safe space for some colleagues, and more serious or extreme behaviors may emerge."

Whyte also saw shortcomings in HMRC's processes that are supposed to support a respectful work environment, such as in the areas of whistleblowing and discipline, as well as the handling of dismissals, suspensions, and investigations within the organization.

The report also noted a significant lack of staff confidence in HMRC's grievance process. Whyte pointed to recent recommendations in a review of the Civil Service's work environment, noting that that review had included specific guidance related to "sexual harassment, appeals, and inclusive behaviors" that all government departments should adopt.

"This should be used as part of the redesign of grievance and discipline policies to see how this can help HMRC to handle these issues," Whyte wrote. Mediation should also be used more often to tackle problems before they enter into a more formal process, according to the report.

Other priority recommendations for HMRC include creating an inclusive work culture, reviewing its attendance management policy to properly take into account such issues as mental health, and being clearer about basic standards and what happens if staff fall short of those standards. HMRC should make it clear that behavior in the work environment should also extend to other environments, such as socializing after work, the report adds.

Whyte's report was published the same day as a report from *The Guardian* that said Mark Nellthorp, who once served as an HMRC deputy director in charge of tax avoidance investigations, had been fired in September 2018 amid sexual misconduct allegations.

HMRC said it accepted all of the report's recommendations. "I take seriously the scale of the challenge that HMRC has," HMRC Chief Executive Jon Thompson said.

"As a result of the report, we will take forward immediate, fast-paced work to reform our policies and processes, make our data systems more robust, and most importantly communicate more clearly what behaviors we expect to see," Thompson added.

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | UNITED KINGDOM |
| SUBJECT AREAS / TAX TOPICS | PERSONNEL, PEOPLE, BIOGRAPHIES<br>TAX SYSTEM ADMINISTRATION |
| AUTHORS | STEPHANIE SOONG JOHNSTON |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-4129 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-7 |

# Individual Opposes Dismissal of Suit Related to Russian Tax Fraud

DATED JAN. 31, 2019

**Citations:** Rinat Akhmetshin v. William Browder; No. 1:18-cv-01638

SUMMARY BY TAX ANALYSTS

In a memorandum filed in a U.S. district court, an individual opposed dismissal of his suit against British citizen William Browder for allegedly defaming the individual by making assertions regarding his involvement with Russian officials who committed tax fraud, arguing that the court has jurisdiction over Browder and that the complaint states a claim.

FULL TEXT PUBLISHED BY TAX ANALYSTS

**RINAT AKHMETSHIN,**
**Plaintiff,**
**v.**
**WILLIAM BROWDER,**
**Defendant.**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

Michael Tremonte (*pro hac vice*)
Michael W. Gibaldi (*pro hac vice*)
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
mtremonte@shertremonte.com
mgibaldi@shertremonte.com

Kim Sperduto (D.C. Bar No. 416127)
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, N.W., Suite 1250
Washington, D.C. 2006

(202) 408-8900
ksperduto@stglawdc.com

*Attorneys for Plaintiff Rinat Akhmetshin*

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES

PRELIMINARY STATEMENT

FACTUAL BACKGROUND

ARGUMENT

I. THE COURT HAS SPECIFIC JURISDICTION OVER BROWDER BECAUSE BROWDER'S DEFAMATORY STATEMENTS CAUSED TORTIOUS INJURY WITHIN THE DISTRICT OF COLUMBIA

A. Browder's Defamatory Statements Caused Tortious Injury Within the District of Columbia, Where Akhmetshin Resides and Works

B. Browder's Other Contacts with the District of Columbia Satisfy the "Plus Factors" Requirement of § 13-423(a)(4)

C. This Court's Exercise of Specific Jurisdiction Over Browder Comports with the Due Process Clause

D. In the Alternative, the Court Should Order Limited Jurisdictional Discovery

E. Permitting Browder to Escape the Reach of this Court Would Effectively Grant Browder Total Immunity for His Tortious Actions

II. THE COMPLAINT STATES A CLAIM FOR DEFAMATION UNDER THE LIBERAL PLEADING STANDARD OF FED. R. CIV. P. 8(a)(2)

A. Browder's Statements Concerning Akhmetshin Are Entirely False

B. Browder's Statements Are Actionable Statements of Fact

C. Browder's Statements Accusing Akhmetshin of Serving as a Russian Spy Were Made Negligently, or Alternatively, with "Actual Malice"

D. The Complaint Properly Alleges All Other Elements of a Defamation Claim

E. In the Alternative, the Court Should Grant Akhmetshin Leave to Replead His Defamation Claim

CONCLUSION

## TABLE OF AUTHORITIES

### Cases

*Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1 (D.D.C. 2013)

*Atherton v. D.C. Office of Mayor*, 567 F.3d 672 (D.C. Cir. 2009)

*Bechtel & Cole v. Graceland Broad. Inc.*, 18 F.3d 953 (D.C. Cir. 1994)

*Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006)

*Blodgett v. Univ. Club*, 930 A.2d 210 (D.C. 2007)

*Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281 (D.D.C. 2011)

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998)

*Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp. 2d 142 (D.D.C. 2006)

*Calder v. Jones*, 465 U.S. 783 (1984)

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998)

*Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29 (D.C. Cir. 1990)

*Cohen v. Bd. of Trustees of Univ. of D.C.*, 311 F. Supp. 3d 242 (D.D.C. 2018)

*Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127 (D.C. 2012)

*Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d 369 (D.C. Cir. 2011)

*Companhia BrasileiraCarbureto De Calcio v. Applied Indus. Materials Corp.*, 464 F. App'x 1 (D.C. Cir. 2012)

*Competitive Enter. Inst. v. Mann*, 150 A.3d 1213 (D.C. 2016)

*Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987)

*Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454 (D.C. Cir. 1990)

*Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985)

*Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017)

*Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808 (D.C. 1976)

*Etchebarne-Bourdin v. Radice*, 982 A.2d 752 (D.C. 2009)

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)

*FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008)

*Fisher v. Washington Post Co.*, 212 A.2d 335 (D.C. 1965)

*Foman v. Davis*, 371 U.S. 178 (1962)

*Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099 (D.D.C. 1991)

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)

*Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 (1989)

*Helmer v. Doletskaya*, 393 F.3d 201 (D.C. Cir. 2004)

*Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, No. CIV A 04-01161 HHK, 2006 WL 2844190 (D.D.C. Sept. 29, 2006)

*Johnson v. Johnson Pub. Co.*, 271 A.2d 696 (D.C. 1970)

*Jones v. Metro Prop. Grp., LLC*, No. 13-11977, 2014 WL 1305142 (E.D. Mich. Mar. 28, 2014)

*Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116 (D.D.C. 2010)

*Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244 (D.C. 1990)

*Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003)

*Mallinckrodt Med., Inc. v. Sonus Pharm., Inc.*, 989 F. Supp. 265 (D.D.C. 1998)

*Marshall v. Honeywell Tech. Sols., Inc.*, 536 F. Supp. 2d 59 (D.D.C. 2008)

*Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 750 F. Supp. 330 (N.D. Ill. 1990)

*Mazur v. Szporer*, No. CIV.A. 03-00042(HHK), 2004 WL 1944849 (D.D.C. June 1, 2004)

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996)

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)

*Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994)

BDO_00034661

*Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)

*Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983)

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984)

*Osborn v. Visa Inc.*, 797 F.3d 1057 (D.C. Cir. 2015)

*Parsi v. Daioleslam*, 595 F. Supp. 2d 99 (D.D.C. 2009)

*Pinkett v. Dr. Leonard's Healthcare Corp.*, No. CV 18-1656 (JEB), 2018 WL 5464793 (D.D.C. Oct. 29, 2018)

*Redding v. Edwards*, 569 F.Supp.2d 129 (D.D.C. 2008)

*Rose v. Silver*, 394 A.2d 1368 (D.C. 1978)

*Rudder v. Williams*, 666 F.3d 790 (D.C. Cir. 2012)

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018)

*St. Amant v. Thompson*, 390 U.S. 727 (1968)

*Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927 (D.C. Cir. 1981)

*Time, Inc. v. Firestone*, 424 U.S. 448 (1976)

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)

*Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41 (D.D.C. 2010)

*Vasaturo v. Peterka*, 177 F. Supp. 3d 509 (D.D.C. 2016)

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)

*Walden v. Fiore*, 571 U.S. 277 (2014)

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001)

*Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157 (1979)

*Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257 (D.D.C. 2017)

**Statutes and Rules**

U.S. Const., amend. I

Fed. R. Civ. P. 8

26 Fed. R. Civ. P. 15

D.C. Code § 13-423

---

Plaintiff Rinat Akhmetshin ("Akhmetshin") respectfully submits this memorandum of points and authorities in opposition to the Motion to Dismiss the Complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure filed by Defendant William Browder ("Browder").

## PRELIMINARY STATEMENT

This case is not about the Magnitsky Act or Russia's interference with the 2016 elections, despite the pages that Browder devotes in his motion papers to touting his lobbying efforts and his status as a leading opponent of the Russian government. The case is far simpler and narrower in scope. Over a series of days, Browder falsely claimed in public fora that Akhmetshin, a United States citizen, was engaged in treasonous criminal activity. Specifically, he identified Akhmetshin as a "Russian GRU officer," a "Russian intelligence asset," "a member of Putin's secret police," and a "shady former Soviet spy, current spy operator in Washington." Browder's widely-broadcast statements were completely false and made with utter disregard for their truth. His pursuit of fame as a critic of Putin does not grant him license to defame a perceived political rival and cannot shield him from liability for doing so. *Cf.* Jason Motlagh, *Fighting Putin Doesn't Make You a Saint*, New Republic, Dec. 31, 2015 (criticizing Browder).

The parties to this lawsuit moved in opposite directions following the collapse of the Soviet Union. Although born in the United States, Browder moved to Russia, and later renounced his U.S. citizenship; Akhmetshin was born in Russia, moved to the United States, and became a U.S. citizen. Years later, Akhmetshin and Browder found themselves on opposite sides of a debate over sanctions legislation known as the Magnitsky Act. As part of Browder's conflict with Akhmetshin, Browder investigated Akhmetshin's background and even filed a baseless complaint against Akhmetshin with the Department of Justice. As a result of these efforts, Browder is surely well aware that Akhmetshin is not a spy or other sort of intelligence operative for the Russian Federation.

Yet once the media reported Akhmetshin's presence at the widely-covered Trump Tower meeting between a Russian lawyer and high-ranking members of the Trump campaign on June 9, 2016, Browder pounced on the opportunity to smear a perceived rival. In the context of a public debate concerning Russian interference with the 2016 President election, Browder quickly accused Akhmetshin of being a "Russian GRU officer," a "Russian intelligence asset," "a member of Putin's secret police," and a "shady former Soviet spy, current spy operator in Washington." Browder's highly-charged statements constitute defamation, plain and simple.

Browder's pending motion presents no basis to prevent this case from proceeding to discovery. *First*, the Court has personal jurisdiction over Browder because Browder's statements caused tortious injury within this District to Akhmetshin, who resides and works here. In addition to his defamation of a D.C. resident, Browder has had substantial contacts with this forum, separate and apart from his extensive lobbying activities here. In any event, the Court should consider Browder's lobbying activities in conducting its personal jurisdiction

analysis, notwithstanding the "government contacts" exception, because Browder renounced his United States citizenship and, therefore, enjoys no First Amendment right to petition the U.S. government. *Second*, the Complaint adequately alleges a cause of action for defamation. Browder's statements concerning Akhmetshin, which expressly and unambiguously accuse Akhmetshin of serving as a Russian spy, are false, and they are plainly actionable statements of fact. Browder cannot rely upon other news reports concerning Akhmetshin to claim, contrary to the allegations of the Complaint, that his statements were substantially true, as Browder was himself the source of nearly all these reports. Moreover, Browder made these false statements negligently and with actual malice. Although Akhmetshin is not required to prove actual malice, for the reasons discussed below, the Complaint satisfies that heightened standard. As noted, the Complaint alleges that Browder had previously investigated Akhmetshin's background. Thus, Browder was in a unique position to know that his defamatory statements concerning Akhmetshin were false.

## FACTUAL BACKGROUND

The following facts are drawn from the Complaint, which for the purposes of this motion must be liberally viewed in Akhmetshin's favor, the Declaration of Michael Tremonte, and other documents of which this Court may take judicial notice.

### Akhmetshin Emigrates to the United States, Launches a Successful Strategic Communications Business, and Becomes a United States Citizen

Rinat Akhmetshin is a dual citizen of the United States and the Russian Federation, and a resident of the District of Columbia. (Compl. ¶ 9.) He emigrated to the United States from Russia in the early 1990's after the collapse of the Soviet Union, and he proudly became a United States citizen in 2009. Akhmetshin holds a PhD in bioorganic chemistry from the Catholic University of America, and he later found his niche in strategic communications and consulting in matters relating to Eurasian affairs. (*Id.* ¶ 14.) Given his fluency in Russian, his experience in Eurasia, and his contacts in that part of the world, Akhmetshin is considered an expert on the legal, political, social, and economic characteristics of many of the countries that formerly comprised the Soviet Union. (*Id.* ¶ 16.) Accordingly, American and Eurasian clients have sought Akhmetshin's assistance for strategic communications advice, and more recently lobbying services, on Eurasian affairs. (*Id.*) For instance, in 2008 and 2009, Akhmetshin worked with various U.S. agencies and the government of Kyrgyzstan to facilitate the relocation of a U.S. military base within Kyrgyzstan. (*Id.* ¶ 15.) He has also worked on matters relating to RussoAmerican efforts to combat the heroin trade in Afghanistan, and he has consulted in connection with private arbitration proceedings. (*Id.*)

Akhmetshin is not, and has never been, a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union.[1] (Compl. ¶ 53.)

### Browder Leaves the United States for Russia and Renounces His United States Citizenship

While Akhmetshin left Russia for the United States, Browder moved from the United States to Russia to make his fortune in the new Russian economy. (Compl. ¶ 18.) By all accounts, Browder proved financially successful; his hedge fund Hermitage Capital Management became one of the largest hedge funds in Russia with over $4 billion in assets under management. (*See id.*) But whereas Akhmetshin proudly sought U.S. citizenship, Browder renounced his own U.S. citizenship in 1998. (*See id.* ¶ 10.) According to reporting in the *New Yorker*,

BDO_00034664

Browder did so to avoid paying taxes. *See* Joshua Yaffa, *How Bill Browder Became Russia's Most Wanted Man*, New Yorker, Aug. 20, 2018 ("A person who was friendly with Browder at the time said, 'He told me he didn't want to pay U.S. taxes.' He added, 'If there has been a consistent passion in Bill's life over the last twenty or thirty years, it is not wanting to pay taxes.'").

**Browder Lobbies To Enact the Magnitsky Act**

In 2008, Russian authorities detained Sergei Magnitsky, an auditor working for Hermitage's law firm in Russia. (Compl. ¶ 19.) Tragically, Magnitsky died in a Russian prison on or about November 16, 2009. (*Id.* ¶ 20.) Browder has publicly maintained that Russian prison guards killed Magnitsky because Magnitsky discovered that Russian government officials and members of organized crime had perpetrated a tax fraud scheme using the identities of several Hermitage portfolio companies (the "Hermitage Tax Refund Scheme"). (*Id.* ¶ 21.) The story of Magnitsky's imprisonment and death has been widely reported, and Browder has published his own book on the subject, *Red Notice*, which claims to tell the truth about the Hermitage Tax Refund Scheme. (*Id.* ¶ 60.)

Following Magnitsky's death, Browder embarked on an extensive public relations and lobbying campaign to vindicate Magnitsky and to oppose those whom he believes contributed to Magnitsky's death in prison. (Compl. ¶ 22.) Although he had long since renounced his U.S. citizenship, Browder lobbied the U.S. government to pass legislation that would punish the perpetrators of the Hermitage Tax Refund Scheme. For instance, Browder engaged numerous lobbying and public relations firms; met with members of Congress and their staff, including Senators Benjamin Cardin and John McCain; and testified before various congressional bodies. (*Id.* ¶ 23.)

Browder's lobbying efforts culminated in the passage of the Sergei Magnitsky Rule of Law Accountability Act of 2012, Pub. L. No. 112-208, 126 Stat 1496 (2012) (the "Magnitsky Act") on December 14, 2012. (Compl. ¶ 24.) The Magnitsky Act includes factual findings that largely match Browder's version of events. (*Id.* ¶ 25.) It authorized the President to impose sanctions against individuals thought to have been responsible for Magnitsky's death, those who allegedly benefitted financially from his death, and those who were thought to have been involved in the underlying crimes that Magnitsky purportedly discovered. (*Id.* ¶ 26.)

In retaliation for the passage of the Magnitsky Act, Russia swiftly passed a law banning the adoption of Russian orphans by Americans. (Compl. ¶ 27.)

**The Prevezon Case Pits Browder Against Akhmetshin**

On or about September 10, 2013, the U.S. Attorney's Office for the Southern District of New York commenced a civil forfeiture action against Prevezon Holdings Ltd. and related entities ("Prevezon"), alleging that Prevezon had laundered a portion of the purportedly ill-gotten gains from the Hermitage Tax Refund Scheme through certain New York real estate. *See United States v. Prevezon Holdings Ltd, et al.*, No. 13 Civ. 6326 (S.D.N.Y.) (the "Prevezon Case"). Discovery in the Prevezon Case revealed that Browder had been a driving force behind that lawsuit, and that Browder made numerous documents available to the U.S. Attorney's Office for use in prosecuting the case.[2] (Compl. ¶ 29.)

In August 2015, Baker & Hostetler LLP, which represented Prevezon, engaged Akhmetshin as a consultant to help its attorneys review and analyze documents in connection with the Prevezon Case. (Compl. ¶ 30.) As he reviewed forensic reports, criminal filings, and other documents, Akhmetshin began to question Browder's version of events concerning the Hermitage Tax Refund Scheme and Magnitsky's death. (*Id.* ¶ 31.) Ultimately, Akhmetshin became convinced that Browder had engaged in a misleading lobbying campaign based upon numerous falsehoods. (*Id.* ¶ 32.)

On the basis of his work for Baker & Hostetler, Akhmetshin proposed the idea for a lobbying campaign that would challenge Browder's version of events and petition the U.S. government for a critical examination of the factual findings underlying the Magnitsky Act. (Compl. ¶ 33.) His proposal culminated in the formation of the Human Rights Accountability Global Initiative ("HRAGI"), a lobbying organization with the goal of restarting Russian adoptions in America by removing Sergei Magnitsky's *name* from the Magnitsky Act (but not repealing the law itself). (*See id.* ¶ 34.) As a lobbyist for HRAGI, Akhmetshin attended meetings with members of Congress and their staffers throughout the spring of 2016. (*See id.* ¶¶ 35–36.) Akhmetshin also organized a screening of a documentary entitled *The Magnitsky Act. Behind the Scenes* at the Newseum in Washington, D.C. on June 13, 2016, which questioned the accuracy of Browder's narrative and raised questions as to his credibility. (*Id.* ¶ 37.) The gist of Akhmetshin's pitch was that Browder's story concerning the Hermitage Tax Refund Scheme and Magnitsky's death were false, and that Browder had committed tax fraud with Magnitsky's assistance. (*See id.* ¶ 36.)

**Browder Files a Meritless Complaint Against Akhmetshin with the Department of Justice**

Akhmetshin's work on behalf of Baker & Hostetler and HRAGI put Akhmetshin on Browder's radar (*see* Compl. ¶ 38), and Browder went on the attack. As part of his concerted effort to ruin Akhmetshin's reputation, Browder submitted a letter to the Department of Justice on July 15, 2016, alleging that Akhmetshin and others had violated the Foreign Agent Registration Act by secretly working for the Russian government (the "Hermitage Letter"). (*See* Compl. ¶ 39.) The Hermitage Letter confirms that Browder had conducted a thorough investigation of Akhmetshin's background as of July 2016. Thus, Browder's letter specifically identified certain lobbying and consultancy work performed by Akhmetshin, including Akhmetshin's former work on behalf of Andrey Vavilov and Akhmetshin's role as a consultant in a legal dispute involving International Mineral Resources B.V. and Eurochem Volga-Kaliy LLC. (*Id.* ¶ 40.) The letter further reported that Akhmetshin had been involved in organizing an attempted screening of *The Magnitsky Act. Behind the Scenes* in the European Parliament. And it reported that Akhmetshin had attended a hearing before the House Foreign Affairs Committee on June 14, 2016. (*Id.* ¶ 41.) In fact, the list of appendices at the end of the letter confirms that Browder had Akhmetshin and others followed and photographed in Brussels, Belgium and in Washington, D.C. (*See* Shube Decl., Ex. E, ECF No. 20-9 at 15.[3])

The Department of Justice has not taken any public action in response to Browder's baseless allegations in the Hermitage Letter. (*See* Compl. ¶ 42.) But it appears that Browder did pass along the Hermitage Letter to Senator Charles Grassley, who in turn wrote two letters concerning Akhmetshin — one to the Department of Justice on March 31, 2017, and another to the Department of Homeland Security on April 4, 2017. Browder litters his motion papers with references to Senator Grassley's letters, claiming repeatedly that Senator Grassley's letters somehow justify Browder's defamatory statements because they are independent from Browder. But the opening paragraph of each letter confirms that Senator Grassley wrote these letters *in direct*

*response to, and on the basis of, the Hermitage Letter*. Indeed, the Hermitage Letter is the first attachment to each letter.[4] It is, therefore, apparent that Browder was the driving force behind Senator Grassley's letters.

**Browder Escalates His Attack and Publicly Defames Akhmetshin**

On July 14, 2017, the media reported that Akhmetshin had attended a meeting with Donald Trump, Jr. and others at Trump Tower on June 9, 2016. (Compl. ¶ 45.) Akhmetshin did not represent the Russian government or any Russian government official at the Trump Tower meeting (or anywhere else for that matter). (*Id.* ¶ 46.) Nevertheless, immediately after news of Akhmetshin's attendance broke, Browder seized upon the opportunity to smear his rival's name by calling him a Russian spy. (*Id.* ¶ 47.)

*First*, on July 14, 2017, at 5:00 a.m., Browder posted on Twitter: "Huge development in the Veselnitskaya/Trump Jr story. Russian GRU officer Rinat Akhmetshin was also present." (Compl. ¶ 48.) Browder's post contained a hyperlink to a news article published by *NBC News*. Despite Browder's unqualified statement that Akhmetshin is a "Russian GRU officer," the *NBC News* article contains no support for Browder's outrageous lie and, in fact, the stated source for NBC's reporting on Akhmetshin's background is none other than Senator Grassley's letter concerning Akhmetshin dated April 4, 2017. (*See* Shube Decl., Ex. A, ECF No. 20-5 at 5.) As noted above, Senator Grassley's letters concerning Akhmetshin rely explicitly on Browder's Hermitage Letter.

*Second*, less than two hours later, on July 14, 2017, at 6:51 a.m., Browder posted on Twitter: "Russian intelligence asset Rinat Akhmetshin confirms he was in the meeting with Trump Jr." (Compl. ¶ 49.) This time, Browder's post contained a hyperlink to a news article published by the *Associated Press*. Despite Browder's unqualified statement that Akhmetshin is a "Russian intelligence asset," the *AP* story contains no support for this defamatory statement, either. (*See* Shube Decl., Ex. B, ECF No. 20-6 at 5.)

*Third*, later that morning at 8:31 a.m., *Business Insider* published an article concerning Akhmetshin's presence at the Trump Tower meeting. The article presented Browder as a credible source of fact, reporting that Browder himself had been the one to identify Akhmetshin's presence at the Trump Tower meeting: "NBC News initially declined to name Akhmetshin as the lobbyist who attended with [Natalia] Veselnitskaya. But William Browder, the founder of the investment advisory firm Hermitage Capital who spearheaded the Magnitsky Act, told Business Insider that there was 'only one person' who fit the profile described by NBC News." (Shube Decl., Ex. C, ECF No. 20-7 at 2.) Immediately following this statement of fact, Browder was quoted as stating: "In the world of Russian intelligence, there is no such thing as a 'former intelligence officer.' So in my opinion you had *a member of Putin's secret police* directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin." (*Id.* at 3 (emphasis added).) Browder provided no support, because there is none, for this scandalous lie concerning Akhmetshin.

*Fourth*, on July 18, 2017, Browder appeared on *CBS This Morning* to discuss the Trump Tower meeting. Purporting to explain the facts, Browder stated: "[Natalia Veselnitskaya] then hires this guy Rinat Akhmetshin, who is a — by all accounts, some kind of *shady former Soviet spy, current spy operator* in Washington." (Compl. ¶ 51 (emphasis added).) Again, Browder provided no support, because there is none, for this scurrilous accusation.

**Many News Articles Report Negative Information About Akhmetshin on the Basis of Browder's Defamatory Statements**

In a clear effort to erect a shield for his own defamatory statements, Browder's moving papers cite a slew of news articles concerning Akhmetshin. (*See* Browder Mem. 2–4, nn.2–3.[5]) The purpose of these citations, it seems, is to demonstrate that Browder was simply commenting on what others were already saying. But many of these articles serve only to demonstrate Browder's pernicious influence over the coverage of Akhmetshin. All news articles cited in Browder's footnote 2 were published on or after July 14, 2017, *i.e.*, *after* Browder had already poisoned Akhmetshin's reputation with his rapid-fire Twitter posts and interview with *Business Insider*. (*See* Browder Mem. 2–3 n.2.) Indeed, many of these articles directly reference either Browder's lies about Akhmetshin or Senator Grassley's letters concerning Akhmetshin, which can be traced directly to Browder.[6] Five use photographs of Akhmetshin that are credited to “Hermitage Capital” — Browder's firm.[7] And other articles cited by Browder paint a much more nuanced picture of Akhmetshin, demonstrating just how unsupportable Browder's defamatory statements are.[8] As for the eight news articles in Browder's footnote 3, which predate the challenged statements in this case, three rely on Browder as a source of information,[9] one more cites to the Grassley letters,[10] and others simply report on Akhmetshin's work as a lobbyist and consultant.[11]

## ARGUMENT

### I. THE COURT HAS SPECIFIC JURISDICTION OVER BROWDER BECAUSE BROWDER'S DEFAMATORY STATEMENTS CAUSED TORTIOUS INJURY WITHIN THE DISTRICT OF COLUMBIA

“The jurisdictional reach of this Court is determined by looking to the District of Columbia long-arm statute and the constitutional requirements of due process.” *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 122 (D.D.C. 2010). Here, the relevant provision of the D.C. long-arm statute provides:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code § 13-423(a)(4). This section “provides specific jurisdiction over non-resident defendants whose tortious acts outside the District of Columbia cause injury within the District if defendants satisfy one of the three enumerated 'plus factors.'” *Lewy*, 723 F. Supp. 2d at 123.

The “plaintiff bears the burden of establishing a factual basis for asserting personal jurisdiction over a defendant.” *Lewy*, 723 F. Supp. 2d at 118 (citing *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)). However, “[t]o make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; rather, she may rest her arguments on the pleadings, 'bolstered by such affidavits and other written materials as [she] can otherwise obtain.'” *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010) (quoting *Mwani v. Bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005)) (brackets in original). Moreover, on a motion to dismiss for lack of personal jurisdiction, “a district court must resolve factual disputes in favor of the plaintiff.” *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004).

For the following reasons, the Complaint and other evidence submitted in connection with this memorandum demonstrate that the Court may exercise specific personal jurisdiction over Browder, an individual with

extensive ties to the District of Columbia.

**A. Browder's Defamatory Statements Caused Tortious Injury Within the District of Columbia, Where Akhmetshin Resides and Works**

Akhmetshin easily satisfies the first element of the D.C. long-arm statute — a tortious act outside the District causing injury within the District — and Browder's motion does not argue otherwise. *First*, Browder agrees that he published the challenged statements outside the District. (*See* Browder Mem. 19–20.) *Second*, the law is clear that a defamatory injury occurs where the plaintiff resides and works — here, the District of Columbia. *See, e.g.*, *Lewy*, 723 F. Supp. 2d at 123 n.3 ("When a District of Columbia plaintiff is injured by a defamatory article published in and mailed from another state, the tortious act is considered to have occurred outside the District of Columbia and the injury is considered to have occurred inside the District of Columbia."); *Blumenthal v. Drudge*, 992 F. Supp. 44, 53 (D.D.C. 1998) (noting that location of defamatory injury in D.C. was "undisputed" where plaintiffs resided and worked in D.C.). *See also Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987) (holding that "claims in suit, libel and 'false light,' are the kind in which the injury, foreseeably, is felt with greatest force in the place where the plaintiff lives").

**B. Browder's Other Contacts with the District of Columbia Satisfy the "Plus Factors" Requirement of § 13-423(a)(4)**

Akhmetshin also satisfies the second element of the long-arm statute, which requires proof of one or more of the "plus factors" connecting the defendant to the District: that the defendant (i) "regularly does or solicits business," (ii) "engages in any other persistent course of conduct," or (iii) "derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4). The requirement of "plus factors" is "intended to ensure that there are minimum contacts with the forum sufficient to satisfy due process concerns." *Etchebarne-Bourdin v. Radice*, 982 A.2d 752, 762 (D.C. 2009). "The claim need not arise, however, from the 'plus factors' that are imposed by subsection (a)(4) on those claim-related acts or omissions." *Id.* at 763; *see also Crane*, 814 F.2d at 763. Moreover, "[c]ourts have routinely considered *the totality of defendants' contacts* in assessing the 'plus factors' of subsection (a)(4)." *Lewy*, 723 F. Supp. 2d at 126 (emphasis added).

Browder's numerous contacts with the District of Columbia satisfy the "plus factors" element of the long-arm statute — and certainly demonstrate "more than a 'scant' connection to the forum." *Etchebarne-Bourdin*, 982 A.2d at 763 (quoting *Crane*, 814 F.2d at 763). As alleged in the Complaint, Browder has appeared in the District on numerous occasions to tell his version of events relating to the Hermitage Tax Refund Scheme. (*See* Compl. ¶¶ 23, 59(a)–(e), 61.) Apart from these contacts, none of which are subject to the narrow "government contacts" exception for the reasons discussed below, Browder has also appeared in the District on many other occasions — including, but not limited to, the promotion of his book, which he sells here.

**1. The "Government Contacts" Exception Does Not Preclude This Court from Considering Browder's Lobbying Contacts, As Browder Renounced His United States Citizenship Long Ago**

It is undisputed that Browder has repeatedly appeared in this District to meet with government officials and to testify before factfinding bodies in connection with the Magnitsky Act. (*See* Compl. ¶¶ 23, 59(a)–(e), 61.) In his own book, *Red Notice*, Browder describes these frequent trips to the District of Columbia. *See* Bill Browder, *Red Notice* 310 (2015) ("While I was flying back and forth to Washington working the political angles . . .").[12] For

instance, Browder describes an in-person meeting with Senator John McCain at the Russell Senate Office Building. *See id.* at 307–09. Browder has continued to travel to this District well after the passage of the Magnitsky Act — ostensibly for purposes of lobbying the U.S. government. On March 25, 2018, he posted on Twitter that he "was in Washington last week asking for a congressional inquiry into why US money is being used to help the Kremlin destroy their enemies[.]" (Tremonte Decl., Ex. C.)

Given his "persistent course of conduct" within this District, D.C. Code § 13-423(a)(4), it comes as no surprise that Browder tries to invoke the "government contacts" exception, a judicially-crafted exception to the D.C. long-arm statute according to which "entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies is not a basis for the assertion of in personam jurisdiction." *Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 813 (D.C. 1976). (*See* Browder Mem. 20–23.) Browder, who long ago left this country and renounced his citizenship (apparently to avoid paying taxes), should not benefit from a rule that "finds its source in the unique character of the District as the seat of national government and in the correlative need for unfettered access to federal departments and agencies *for the entire national citizenry*." *Id.* (emphasis added).

While "[t]he scope of the government contacts exception is unsettled" in some respects, *Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 371 (D.C. Cir. 2011), its underpinnings are clear. In *Rose v. Silver*, the D.C. Court of Appeals held that the First Amendment's Petition Clause, which protects the "right of the people . . . to petition the Government for a redress of grievances," U.S. Const., amend. I, provides "the *only* principled basis" for the doctrine. *See* 394 A.2d 1368, 1374 (D.C. 1978) (emphasis added); *see also Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127, 1132–33 (D.C. 2012); *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 248–49 (D.C. 1990). As the courts have reasoned, "[t]o hold that people have the right to petition their government but then to subject them to personal jurisdiction in the District of Columbia merely because they have exercised that right would pose a threat to free public participation in government." *Companhia Brasileira Carbureto De Calcio*, 35 A.3d at 1133 (internal citations and quotation marks omitted).

Given the doctrine's clear roots in the First Amendment, it follows that the scope of the government contacts exception should be limited by the scope of the First Amendment. Thus, in *Companhia Brasileira Carbureto De Calcio*, the D.C. Court of Appeals considered on a certified question from the D.C. Circuit whether a petition that "fraudulently induced unwarranted government action against the plaintiff" fell within the government contacts exception. *See* 35 A.3d at 1130. The D.C. Court of Appeals considered the scope of the First Amendment and answered that the government contacts exception does *not* exempt a *fraudulent* government petition from the jurisdictional analysis because the First Amendment does not protect fraud. *See id.* at 1133–34.

Likewise, Browder's contacts with the U.S. government do not implicate the First Amendment because, having renounced his U.S. citizenship, Browder enjoys no First Amendment right to petition the United States government. As noted, the First Amendment enshrines certain rights of "the people." U.S. Const., amend. I. While "the people" may be broader than the citizenry, the Supreme Court has held in *United States v. Verdugo-Urquidez* that "the people" protected by the Bill of Rights, including the First Amendment, is limited to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. 259, 265 (1990). Browder quite deliberately left

Apart from his book sales, Browder travels regularly to this District for media appearances. *See Blumenthal*, 992 F. Supp. at 57 (noting that defendant "engaged in a persistent course of conduct in the District of Columbia" where he "sat for an interview with C-SPAN in Washington, D.C. and visited the District of Columbia on at least one other occasion," in addition to his out-of-district contacts directed at D.C. residents). Indeed, Browder has not sat for just one interview in this District, like the defendant in *Blumenthal*; Browder has done *many* media appearances here. Because Akhmetshin has not yet taken discovery, the following media appearances are limited to those available in the public record.

- Browder sat for an interview with the *New Republic* at the Hay-Adams hotel for an article that was published on November 16, 2012. (Tremonte Decl. ¶ 8 & Ex. G.)
- Browder sat for an interview with *BBC News Magazine* at "a Washington hotel" for an article that was published on December 10, 2013. (Tremonte Decl. ¶ 9 & Ex. H.)
- Browder participated in a panel discussion concerning "Russia's Future" at the National Endowment for Democracy in Washington, D.C. on April 30, 2015. (Tremonte Decl. ¶ 10 & Ex. I.)
- Browder sat for an interview with *The American Interest* for an article that was published on June 16, 2016. The article shows Browder posing for a photograph outside a government building in Washington, D.C. (Tremonte Decl. ¶ 11 & Ex. J.)
- Browder sat for a television interview in Washington, D.C. with Fox News, which aired on July 26, 2017. (Tremonte Decl. ¶ 12 & Ex. K.)
- Browder sat for a television interview in Washington, D.C. with CNBC on July 27, 2017. (Tremonte Decl. ¶ 13 & Ex. L.)
- Browder sat for a podcast interview in Washington, D.C. with C-SPAN on or about July 29, 2017." (Tremonte Decl. ¶ 14 & Ex. M.)
- Browder sat for a television interview in Washington, D.C. with C-SPAN on April 27, 2018. (Tremonte Decl. ¶ 15 & Ex. N.)
- Browder sat for a television interview in Washington, D.C. with *Kasie DC* on MSNBC, which aired on July 16, 2018. (Tremonte Decl. ¶ 16 & Ex. O.)
- Browder sat for a television interview in Washington, D.C. with *Kasie DC* on MSNBC, which aired on July 23, 2018. (Tremonte Decl. ¶ 17 & Ex. P.)
- Browder sat for a television interview in Washington, D.C. with Ali Velshi on MSNBC, which aired on August 27, 2018. (Tremonte Decl. ¶ 18 & Ex. Q.)
- Browder sat for an interview in Washington, D.C. with *The American Interest* for an article that was published on November 5, 2018. In this article, Browder explains his substantial ties to this District: "What I can say is that I've had three careers so far in my life. I've had a career on Wall Street, a career in Moscow, and a career in Washington, and one deals with some really hairy characters in each place." (Tremonte Decl. ¶ 19 & Ex. R.)

Relatedly, Browder has taken measures in this District to squash at least one news story that he perceived to be critical of himself. In 2016, he retained a law firm with offices in this district, which sent two separate letters to NBC Universal demanding that NBC refrain from publishing an article concerning Browder. (*See* Tremonte Decl. ¶ 20 & Exs. S–U.) Browder also threatened to sue the Newseum in Washington, D.C. over its decision to screen a documentary that criticized Browder and offered a contrary narrative of the Magnitsky affair. (*See* Tremonte Decl., Ex. V ("In a phone call with FP, Browder said he would pursue legal action against the Newseum if he perceived it as backing the movie 'in any way.'").)

Finally, publicly-available evidence shows that Browder has traveled to this District on many other occasions. For instance, in his book, Browder described his attendance at "a large group dinner at Café Milano, a trendy Italian restaurant in Georgetown" with Juleanna Glover and others. *See* Bill Browder, *Red Notice* 306. He also described his travel to the District again in October 2009. *See id.* at 269. And he explained how he traveled here again in March 2010 to attend several meetings, at least one of which included only a private individual outside the government, *i.e.*, not a lobbying contact. *See id.* at 289 (describing meeting with "a top international criminal lawyer"). Following the Magnitsky Act's enactment, Browder returned to the District for a reception on April 17, 2013, and again in November 2013 for an event at a private residence in Washington, D.C. featuring Elena Servettaz, who edited another book on a topic similar to Browder's. (Tremonte Decl., Exs. W–X.) More recently, Browder traveled here on September 1, 2018, to attend a funeral. (Tremonte Decl. ¶ 24 & Ex. Y.) Additionally, Browder has served on the Advisory Council of the Kleptocracy Initiative of the Hudson Institute, which is based in the District. (*See* Tremonte Decl., Ex. E at 00:03:35.)

These contacts, some of which are entirely commercial in nature, together establish Browder's persistent course of conduct in this District, such that Browder "might expect to be subjected to jurisdiction here." *Lewy*, 723 F. Supp. 2d at 124; *see also Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981) (holding that the 'persistent course of conduct' to which the statute refers denotes connections considerably less substantial than those required to establish general, 'all purpose' jurisdiction on the basis of 'doing business' in the forum").

**C. This Court's Exercise of Specific Jurisdiction Over Browder Comports with the Due Process Clause**

Browder does not challenge the Court's exercise of specific jurisdiction under the Due Process Clause. That is because, since the Supreme Court's decision in *Calder v. Jones*, the law is clear that "a court may exercise personal jurisdiction over an out-of-state defendant who knowingly causes injury in the forum through intentional tortious conduct." *Lewy*, 723 F. Supp. 2d at 129 (citing *Calder v. Jones*, 465 U.S. 783, 789–91 (1984)). In *Calder*, the Supreme Court held that the Due Process Clause permitted a California court to exercise personal jurisdiction over defendants who had published an allegedly defamatory story concerning "the California activities of a California resident." 465 U.S. at 788. "The crux of *Calder* was that the reputationbased 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort." *Walden v. Fiore*, 571 U.S. 277, 287 (2014). This case is on all fours with *Calder*. The reputation-based effects of Browder's defamatory statements, which Akhmetshin has unquestionably suffered in this District, connect Browder to this forum.

Aside from *Calder*, evidence of the "plus factors" ensures that the exercise of personal jurisdiction in this case satisfies the constitutional standard. *See Crane*, 814 F.2d at 763; *Etchebarne-Bourdin*, 982 A.2d at 762.

**D. In the Alternative, the Court Should Order Limited Jurisdictional Discovery**

If the Court remains unconvinced that Browder's contacts with this District satisfy § 13423(a)(4), then the Court should permit Akhmetshin to engage in limited jurisdictional discovery. Such discovery is appropriate where, as here, the plaintiff has "'at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant.'" *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1093–94 (D.C. Cir. 2008) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)). For instance, in *Crane*, the D.C. Circuit held that the plaintiff was "entitled to a fair opportunity to inquire into [the

defendant's] affiliations with the District" to establish the "plus factors" set forth in § 13-423(a)(4). *See* 814 F.2d at 764. Similarly, Judge Boasberg recently ordered jurisdictional discovery related to the nature and extent of the defendant's business aimed at the District of Columbia. *See Pinkett v. Dr. Leonard's Healthcare Corp.*, No. CV 181656 (JEB), 2018 WL 5464793, at *5 (D.D.C. Oct. 29, 2018). In granting this limited jurisdictional discovery, Judge Boasberg noted that it would be "an unjust result if a defendant defeats the jurisdiction of a federal court by withholding information on its contacts with the forum." *Id.* (internal brackets, citation, and quotation marks omitted).

Akhmetshin should be afforded the same opportunity in this case. Specifically, Akhmetshin should be permitted to take discovery concerning (i) Browder's personal appearances in the District, and (ii) his book sales in the District, which he has indisputably promoted and sold here.[14] Such limited discovery would impose a minor burden on Browder, who presumably has easy access to this information, and would address any outstanding issues that the Court has concerning Browder's pertinent contacts with this forum.

**E. Permitting Browder to Escape the Reach of this Court Would Effectively Grant Browder Total Immunity for His Tortious Actions**

In assessing challenges to personal jurisdiction — particularly based on statements made over the Internet — courts often take care to avoid crafting rules that would permit "nationwide jurisdiction for defamation actions." *Mallinckrodt Med., Inc. v. Sonus Pharm., Inc.*, 989 F. Supp. 265, 273 (D.D.C. 1998). That concern does not exist here, as Browder has injured Akhmetshin's reputation in this District, where Akhmetshin lives and works.

If anything, the opposite concern exists here. If Browder cannot be sued here, where Akhmetshin lives, then he likely cannot be sued anywhere. The Court may take judicial notice of the fact that Browder was separately sued for defamation in London, where Browder lives, by a Russian police officer; however, Browder managed to have that case dismissed because the Russian did not live in England and, therefore, had no reputation in England to protect. *See Karpov v. Browder*, [2013] EWHC 3071 (QB) ¶¶ 138–46. For the same reasons, it is likely that Akhmetshin would be unable to sue Browder in London, where Browder lives. This Court should not apply the D.C. long-arm statute in a way that would grant Browder *carte blanche* to defame D.C. residents. *See Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 750 F. Supp. 330, 336 (N.D. Ill. 1990) ("What seems most important to me, however, is . . . the fact that if there is no jurisdiction in this district, there may be no jurisdiction anywhere in the world.").

**II. THE COMPLAINT STATES A CLAIM FOR DEFAMATION UNDER THE LIBERAL PLEADING STANDARD OF FED. R. CIV. P. 8(a)(2)**

The Complaint adequately alleges a cause of action for defamation, which requires proof of the following four elements under D.C. law: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 104 (D.D.C. 2009) (quoting *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007)). Where the plaintiff is a "public figure," then the third element requires proof of "actual malice" in lieu of negligence. *See, e.g.*, *id.*

The ordinary pleading rule and the standard for pre-discovery dismissal, which unequivocally favor a plaintiff, apply equally in defamation cases such as this one. *See, e.g.*, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140 (D.D.C. 2017) ("There is no heightened pleading standard for defamation claims in the District of Columbia."). These rules are wellsettled. "A plaintiff's complaint need only provide 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to survive a motion to dismiss." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting Fed. R. Civ. P. 8(a)(2)). "In considering a motion to dismiss, the Court should liberally view the complaint in the plaintiff's favor, accepting all factual allegations as true, and giving the plaintiff the benefit of all inferences that can be drawn therefrom." *Cohen v. Bd. of Trustees of Univ. of D.C.*, 311 F. Supp. 3d 242, 247 (D.D.C. 2018) (Sullivan, J.) (citing *Redding v. Edwards*, 569 F.Supp.2d 129, 131 (D.D.C. 2008)). Thus, even after the Supreme Court's oft-cited decisions in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*, the D.C. Circuit has held that "[a] court may not grant a motion to dismiss for failure to state a claim even if it strikes a savvy judge that recovery is very remote and unlikely." *Atherton*, 567 F.3d at 681 (internal citation and quotation marks omitted). "So long as the pleadings suggest a plausible scenario to show that the pleader is entitled to relief, a court may not dismiss." *Id.* (internal citation and quotation marks omitted).

**A. Browder's Statements Concerning Akhmetshin Are Entirely False**

The Complaint alleges that Browder made a series of four statements which, in sum and substance, accuse Akhmetshin of serving as a Russian spy. In the span of just four days, Browder publicly labeled Akhmetshin a "Russian GRU officer," a "Russian intelligence asset," "a member of Putin's secret police," and "some kind of shady former Soviet spy, current spy operator in Washington." (Compl. ¶¶ 48–51.) The Complaint unambiguously alleges that these accusations of treason are entirely false. (*See id.* ¶ 53 ("Akhmetshin is not, and has never been, a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union.").) These allegations, which must be accepted as true at this juncture, directly establish the falsity of Browder's statements.

Browder ignores the applicable standard of review by urging this Court to dismiss the Complaint on the grounds that Browder's statements concerning Akhmetshin were, contrary to the allegations of the Complaint, substantially true. (*See* Browder Mem. 42–44.) Browder's arguments concerning the truth of his statements are entirely inappropriate on a motion to dismiss and also meritless. For instance, Browder cites Akhmetshin's voluntary testimony before the U.S. Senate Judiciary Committee on November 14, 2017, for the false proposition that Akhmetshin has admitted "ties to Soviet or Russian intelligence." (Browder Mem. 42.) Such extrinsic evidence has no place in a motion to dismiss and, in any event, Browder completely mischaracterizes Akhmetshin's testimony. In truth, Akhmetshin vehemently denied any such ties to Soviet or Russian intelligence during his testimony. Akhmetshin respectfully refers the Court to the following exchange, which Browder ignores entirely:

> Q. Mr. Akhmetshin, you said in this deposition that the statement that you are a former Soviet Army counterintelligence officer is not 'exactly correct.' Is it partially correct?
>
> A. It's not correct at all.
>
> Q. Okay. What was incorrect about it?

A. I was never a — I was served — I served — let me use my words carefully here. I served in a unit as a Soviet soldier of the — as an army — enlisted army officer, sergeant at that time. I served in a unit which provided support for Osoby, for counterintelligence unit.

Q. Have you ever served in an intelligence or counterintelligence capacity for the Soviet Union or the Russian Federation?

A. I have not.

Q. Have you ever worked with the GRU?

A. I have never worked with GRU.

MR. FOSTER: What was your answer to the last question? I never worked with?

MR. AKHMETSHIN: *I never served with GRU*.

BY MR. DAVIS:

Q. Did you ever work with them informally?

A. *I never worked with them informally*.

(Tremonte Decl., Ex. A at 20:15 – 21:13 (emphasis added).) Additionally, Browder disingenuously asserts that his statements must be substantially true because the *Associated Press* previously reported that "Akhmetshin has been identified in media reports as a former officer in Russia's military intelligence service known as the GRU," and because Senator Charles E. Grassley published letters stating that Akhmetshin is "reportedly a former Russian GRU counterintelligence officer specializing in active measures campaigns." (Browder Mem. 43–44.) As described in the Factual Background section, Browder improperly uses *reporting for which he served as a source* as cover for his own defamation. Senator Grassley's letters concerning Akhmetshin, which Browder uses as a shield for his own false statements, were based on Browder's own Hermitage Letter. And the *Associated Press* story cited by Browder, in turn, references Senator Grassley's letters. (Shube Decl., Ex. B, ECF No. 20-6 at 11.) Browder cannot credibly distance himself from these reports, which lead back directly to Browder himself.

Moreover, Browder fails to explain how these third-party statements, which themselves report only prior *accusations* concerning Akhmetshin, establish the *truth* of Browder's own false claims. Indeed, the *Associated Press* story, which reported only that Akhmetshin has been previously *accused* of having served in the GRU, also included that Akhmetshin had denied that claim. (Shube Decl., Ex. B, ECF No. 20-6 at 10.)

**B. Browder's Statements Are Actionable Statements of Fact**

Browder further asserts that his statements concerning Akhmetshin are nonactionable statements of opinion. Once again, Browder misapprehends the law and the allegations in the Complaint.

The legal framework for the actionability of false statements begins with the longestablished proposition that "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). It is, therefore, beyond dispute that a false statement of fact is actionable. *See, e.g., Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001). Moreover, contrary to Browder's suggestion, "there is no wholesale exemption from liability in defamation for statements of 'opinion.'" *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994). Indeed, "statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Id.* For instance, the Supreme Court has used the following hypothetical to illustrate actionable statements of opinion:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). Only a pure statement of opinion, which "cannot reasonably be interpreted as stating actual facts about an individual," is nonactionable under the First Amendment. *See Weyrich*, 235 F.3d at 624 (internal citations and quotation marks omitted).

To distinguish statements of fact (including implied facts) from statements of pure opinion, courts in this jurisdiction often consider the following four factors: (1) "whether a defendant's statement 'has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous' and thus less likely to carry specific factual connotations"; (2) "whether the statement can be 'objectively characterized as true or false' or instead 'lacks a plausible method of verification'"; (3) "whether the context would influence an average reader's perception that the challenged statement has factual content"; and (4) whether "the broader context, including social conventions surrounding different types of writing, . . . signals that a statement concerns fact or opinion." *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 90 (D.D.C. 2018) (quoting *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)).

Each of Browder's statements concerning Akhmetshin are actionable under these wellsettled principles of defamation law.

**1. The fair comment privilege does not protect Browder's Twitter statements, which falsely labeled Akhmetshin a "Russian GRU officer" and a "Russian intelligence asset"**

Browder's first and second statements were posted on Twitter in short succession. The first states, in full: "Huge development in the Veselnitskaya/Trump Jr story. Russian GRU officer Rinat Akhmetshin was also present." (Compl. ¶ 48.) The second states, in full: "Russian intelligence asset Rinat Akhmetshin confirms he was in the meeting with Trump Jr." (*Id.* ¶ 49.) Both statements convey clear statements of fact concerning Akhmetshin — namely, that he is a "Russian GRU officer" and a "Russian intelligence asset." Browder does not, because he cannot, deny that these statements bear all the traditional hallmarks of fact statements; they are precise and unambiguous, and both can be objectively characterized as either true or false. *See, e.g., Fairbanks*, 314 F. Supp. 3d at 90.

Browder claims that these statements are nonactionable because he published them along with hyperlinks to news stories concerning Akhmetshin's attendance at the Trump Tower meeting. (Browder Mem. 41.) Browder thus invokes the "fair comment" defense, which protects only "the honest expression of *opinion* on matters of legitimate public interest when based upon a true or privileged statement of fact.'" *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 18 (D.D.C. 2013) (emphasis added) (quoting *Milkovich*, 497 U.S. at 13). But this defense is entirely inapposite. Browder's statements that Akhmetshin is a "Russian GRU officer" and a "Russian intelligence asset" are clear statements of fact, not opinion. *See Fisher v. Washington Post Co.*, 212 A.2d 335, 337 (D.C. 1965) ("The fair comment defense goes only to opinions expressed by the writer and does not extend to misstatements of fact."). Further, it is plain that Browder was not *commenting* on these news articles — neither of which state that Akhmetshin is a Russian GRU officer or intelligence asset. Browder did not use any language that even remotely suggests he was offering an opinion based on these news articles. *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1245 (D.C. 2016) (noting that absence of "language normally used to convey an opinion, such as 'in my view,' or 'in my opinion,' or 'I think,'" may be "one indication of how the article would come across to the reader," even if such language does not "automatically insulate the ensuing statements from liability"). Rather, Browder purported to *add facts not reported in either article*, namely, that Akhmetshin is a "Russian GRU officer" and "Russian intelligence asset."

Moreover, the law is clear that context matters to distinguish fact from opinion. Here, Browder's own status as a public investigator and critic of the Russian government cannot be ignored. For example, Browder publicly filed the Hermitage Letter on July 15, 2016. (*See* Compl. ¶ 39.) This letter purported to convey *facts* that Browder had unearthed about Akhmetshin and others. (*See id.* ¶¶ 39–41.) More generally, Browder consistently promotes himself as a trustworthy source of facts about concerning Russian affairs. For instance, Browder has testified before the United States Helsinki Commission, the Tom Lantos Human Rights Commission of the U.S. House of Representatives, the Committee on Foreign Affairs, Subcommittee on Africa, Global Health, Global Human Rights, and International Organizations, of the U.S. House of Representatives, and the Senate Judiciary Committee. (*See id.* ¶ 59.) In 2015, Browder also published a book, *Red Notice*, which reports his own direct experiences in Russia and his investigation of the conduct of Russian government officials and business people. (*Id.* ¶ 60.) To elevate his status as an authoritative source of factual information concerning such matters, Browder has appeared numerous times on television programs and radio segments, at think tank events, and at NGO gatherings — in Washington D.C. and elsewhere — in his purported capacity as an expert on Russian finances, politics, and intelligence. (*Id.* ¶ 61.) Given Browder's prominence in this role and his claim to be a truthteller and expert, a reasonable reader would understand that Browder's additional statements in response to other news articles were meant to be additional statements of fact, not opinion commentary.

**2. The *Business Insider* statement, which accused Akhmetshin of being "a member of Putin's secret police," is an actionable statement of fact**

Browder's third statement concerning Akhmetshin was published in *Business Insider* shortly after his two Twitter posts. Concerning Akhmetshin, Browder stated: "In the world of Russian intelligence, there is no such thing as a 'former intelligence officer.' So in my opinion you had a member of Putin's secret police directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin." (Shube Decl., Ex. C, ECF No. 20-7 at 3.)

For substantially the same reasons discussed above, Browder's statement that Akhmetshin is a "member of Putin's secret police" is actionable. Notably, like Browder's other statements, this statement carries a specific meaning and can be objectively characterized as either true or false; Akhmetshin is either a member of Putin's secret police, or he is not. *See, e.g.*, *Fairbanks*, 314 F. Supp. 3d at 90. Additionally, Browder's status as a purported source of facts is important for context. In fact, as described above in the Factual Background, the *Business Insider* article itself presents Browder as a source of facts, claiming that he had been the one to identify Akhmetshin's presence at the Trump Tower meeting. (Shube Decl., Ex. C, ECF No. 207 at 2–3.[15]) A reasonable person, reading statements of fact attributed to Browder followed directly by Browder's defamatory statements concerning Akhmetshin, could conclude only that Browder was purporting to convey *facts* about Akhmetshin.

Browder cannot escape liability for this statement merely because he prefaced a factual claim with "in my opinion." The First Amendment does not exempt statements of opinion wholesale from liability in defamation. *Moldea*, 22 F.3d at 313. Rather, the First Amendment protects only "statements that cannot reasonably be interpreted as stating actual facts about an individual." *See Weyrich*, 235 F.3d at 624 (internal citations and quotation marks omitted). Thus, the statement, "In my opinion John Jones is a liar," is actionable despite the prefatory clause because it "implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Milkovich*, 497 U.S. at 18. "Simply couching such statements in terms of opinion does not dispel" their defamatory meaning and impact. *Id.* at 19. That is the case here, where Browder indisputably purported to convey "actual facts about an individual," *Weyrich*, 235 F.3d at 624, namely, that Akhmetshin is a "member of Putin's secret police." (Compl. ¶ 50.)

Nor can Browder avoid responsibility for this injurious statement by reasoning that, "because Mr. Browder believes that there is no such thing as a 'former' Russian intelligence officer, his 'opinion' is that Mr. Akhmetshin is a 'member of Putin's secret police.'" (Browder Mem. 39.) The stated basis for Browder's "opinion" is itself false, as "Akhmetshin is not, and *has never been*, a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union." (Compl. ¶ 53 (emphasis added).) Because the "fact" upon which Browder based his "opinion" is false, and because Browder's assessment of that fact is erroneous, Browder's statement as a whole implies an actionable "false assertion of fact." *See Milkovich*, 497 U.S. at 18–19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.").

**3. The *CBS This Morning* statement, which claimed that Akhmetshin is a "former Soviet spy, current spy operator in Washington," is an actionable statement of fact**

Finally, Browder made his fourth statement concerning Akhmetshin in an appearance on *CBS This Morning* on July 18, 2017. Concerning Akhmetshin, Browder stated: "[Natalia Veselnitskaya] then hires this guy Rinat Akhmetshin, who is a — by all accounts, some kind of shady former Soviet spy, current spy operator in Washington." (Compl. ¶ 51.)

This statement is also actionable. Browder did not simply call Akhmetshin "shady"; he called him a "spy" and a "spy operator." (Compl. ¶ 51.) The term "spy" is not vague or hyperbolic, as Browder baselessly asserts, but carries a rather specific meaning as "one who keeps secret watch on a person or thing to obtain information" or, more specifically, "a person employed by one nation to secretly convey classified information of strategic importance to another nation." Merriam-Webster Dictionary, *Spy*,

https://www.merriamwebster.com/dictionary/spy (last visited Jan. 30, 2019). And Browder's charge is objectively either true or false; Akhmetshin is either a Russian spy, or he is not.

Browder's argument to the contrary borders on frivolous. Browder contends that his statement cannot be one of fact because, as a practical matter, Russia does not publicly identify its intelligence agents, so Browder cannot prove the truth of his statement. (Browder Mem. 40 & n.47.) That is not the law. The distinction between fact and opinion turns on whether a statement "can be *objectively* characterized as true or false," *Fairbanks*, 314 F. Supp. 3d at 90 (emphasis added) — not whether supporting the truth of the statement will prove difficult as a practical matter. *See Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 110 (D.D.C. 2009) ("[T]he 'sting of the charge' is that plaintiffs are agents of the Iranian government. This is a statement of fact. It can be verified — plaintiffs either are or are not agents of the Iranian government.").

If anything, Browder's argument demonstrates the utterly reckless nature of Browder's statements. Browder accused an American citizen of spying for a foreign government, yet he essentially concedes that he cannot prove the truth of this statement. (*See* Browder Mem. 40 (claiming that "the question whether [Akhmetshin] was formerly or is currently a 'spy operator' would be impossible to determine").) Browder's argument only raises the question: if Browder had no support for such a grave charge of criminal behavior, even treason, then why did he make the challenged statements?

**C. Browder's Statements Accusing Akhmetshin of Serving as a Russian Spy Were Made Negligently, or Alternatively, with "Actual Malice"**

Why did Browder make any of the challenged statements concerning Akhmetshin if he cannot prove them? The Complaint supplies the answer: Browder used his platform and influence to strike a low blow against a perceived rival. (*See, e.g.*, Compl. ¶ 1.) Browder made these outrageous statements without any support despite having already investigated Akhmetshin. The Complaint raises at least a plausible inference that, at a minimum, Browder purposefully avoided the truth in publishing the challenged statements. Browder's statements were, therefore, made negligently and with "actual malice."

Browder does not dispute that his statements were made negligently. Instead, he argues (i) that Akhmetshin is a limited purpose public figure, which would trigger the "actual malice" showing of fault, *see, e.g.*, *Parsi*, 595 F. Supp. 2d at 104, and (ii) that the Complaint fails to plead actual malice. (*See* Browder Mem. 26–37.) Browder is wrong on both counts. Akhmetshin is not a limited purpose public figure, but even if he were, the Complaint adequately pleads Browder's actual malice.

**1. Because Akhmetshin Did Not Thrust Himself to the Forefront of the Public Controversy Concerning Russian Interference with the 2016 Elections, Akhmetshin Cannot Be Considered a Public Figure**

The Supreme Court has defined limited purpose public figures as those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," such that "they invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).[16] Relying on *Gertz*, the D.C. Circuit has traditionally taken three steps to determine whether the plaintiff is a limited purpose public figure: *first*, "isolate the public controversy"; *second*, "analyze the plaintiff's role in it"; and *third*, determine whether the alleged defamation was "germane to the plaintiff's participation in the controversy." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297–98 (D.C. Cir. 1980). Although the *Waldbaum* inquiry is "useful," the

D.C. Circuit has advised that "the touchstone remains the standard the Supreme Court set forth for classifying an individual as a public figure, namely whether an individual has assumed a role of especial prominence in the affairs of society that invites attention and comment." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003) (internal brackets, citations, and quotation marks omitted).

Browder misapplies *Gertz* and the three *Waldbaum* elements because he misconstrues the pertinent public controversy to be the merits of the Magnitsky Act. (*See* Browder Mem. 27–28.) Browder's defamatory statements and their surrounding context make plain that the relevant public controversy was Russian interference with the 2016 Presidential election — not the merits of the Magnitsky Act. Russian interference has been the controversy since the very first reports on the Trump Tower meeting, even before Akhmetshin's reported participation.[17] In contrast to Russian interference with the 2016 Presidential election, inarguably one of the leading controversies in the nation today, there has been only limited public debate about the factual findings underlying the Magnitsky Act, whether the Magnitsky Act should be renamed (as Akhmetshin lobbied), or whether it should be repealed. The Magnitsky Act saga is only tangentially relevant to the Trump Tower meeting, which has generated such serious interest because the Trump campaign appeared willing to accept incriminating evidence on Hillary Clinton from the "Crown prosecutor of Russia." *See, e.g.*, Jo Becker, Adam Goldman & Matt Apuzzo, *Russian Dirt on Clinton? 'I Love It,' Donald Trump Jr. Said*, New York Times (July 11, 2017), https://www.nytimes.com/2017/07/11/us/politics/trump-russia-email-clinton.html.

It was within this context that Browder accused Akhmetshin of working as Russian spy, and his statements were newsworthy precisely because they bore on the public controversy over Russian interference. Browder's first defamatory statement on Twitter explicitly tied Akhmetshin to "the Veselnitskaya/Trump Jr story," and his second similarly referred to "the meeting with Trump Jr." (Compl. ¶¶ 48–49.) Browder's third defamatory statement purported to explain the significance of "a member of Putin's secret police directly meeting with the son of the future next president of the United States asking to change US sanctions policy crucial to Putin" — an obvious insinuation of Russian influence. (*Id.* ¶ 50.) Finally, Browder's fourth statement concerning Akhmetshin was made on a *CBS This Morning* segment titled "The Kremlin Connection." (*See* Shube Decl., Ex. D, ECF No. 20-8.)

Once the challenged statements are placed within the proper public controversy, *i.e.*, Russian interference with the 2016 Presidential election, it becomes clear that Akhmetshin cannot be classified as a limited purpose public figure because he never "thrust" himself "to the forefront" of that controversy. *See Gertz*, 418 U.S. at 345. To satisfy the standard set forth in *Gertz*, "[t]he plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Waldbaum*, 627 F.2d at 1297. Under no circumstances can Akhmetshin's attendance at the Trump Tower meeting be interpreted as Akhmetshin's purposeful attempt to influence the public debate over Russian interference, as *Gertz* requires. Nor can Akhmetshin's limited public comments denying Browder's defamatory statements convert him into a public figure. *See, e.g.*, *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 32–33 (D.C. Cir. 1990) (holding that statements answering the alleged defamation are insufficient to thrust the plaintiff to the forefront of a controversy).

Instead, Akhmetshin's involuntary venture into the spotlight closely resembles those cases in which the Supreme Court determined that an individual "was dragged unwillingly into the controversy" and, therefore, could not be considered a limited purpose public figure. *See Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157,

166 (1979). In *Gertz*, the Supreme Court held that "a reputable attorney" was not a limited purpose public figure even though he participated in a newsworthy case, as he "plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 352. Similarly, in *Time, Inc. v. Firestone*, the Supreme Court held that a prominent woman who sought to divorce her husband was not a limited purpose public figure because she did not "freely choose to publicize issues as to the propriety of her married life"; rather, "[s]he was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony." 424 U.S. 448, 454 (1976). And in *Wolston v. Reader's Digest Association, Inc.*, the Supreme Court held that an accused Soviet spy was not a limited purpose public figure merely because he refused to appear before a grand jury investigating Soviet espionage, as his failure to appear "was in no way calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue." *See* 443 U.S. at 166–68. A constant theme drives these cases: "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Id.* at 167.

That theme holds true in this case. Akhmetshin did not become a public figure merely because he attended a private meeting that only attracted attention one year later. Indeed, in June 2016 Akhmetshin never could have imagined that the Trump Tower meeting would have placed him in the national spotlight — and in Browder's crosshairs.[18] For this reason, Akhmetshin cannot be considered a public figure, and Browder's negligence in making the challenged statements should suffice to state a claim for defamation. *See Mazur v. Szporer*, No. CIV.A. 03-00042(HHK), 2004 WL 1944849, at *4 (D.D.C. June 1, 2004) ("The allegations in the complaint do not indicate that Mazur engaged the attention of the public in an attempt to influence the resolution of the controversies at issue. Consequently, based on the allegations in the complaint, the court is unable to conclude that Mazur is a limited public figure who, thus, is required to allege actual malice in the complaint.").[19]

**2. In Any Event, the Complaint Pleads Browder's Actual Malice**

Actual malice requires proof of "reckless disregard for truth or falsity," *i.e.*, proof "that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "Purposeful avoidance of truth" constitutes actual malice, although a failure to investigate does not. *See Parsi*, 595 F. Supp. 2d at 106 (citing *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 692 (1989)). Moreover, evidence that the defendant harbored a grudge against the plaintiff may bolster a plaintiff's claim that the defendant purposefully avoided the truth. *See Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, No. CIV A 04-01161 HHK, 2006 WL 2844190, at *7 (D.D.C. Sept. 29, 2006) ("Mayeur demonstrates a grudge against Houlahan, also bolstering Houlahan's claim that Defendants acted with actual malice by willfully not investigating Mayeur's claims.").

While the actual malice standard undoubtedly creates a high bar for the defamation plaintiff to clear, it is by no means insurmountable — particularly at this early juncture. In fact, other courts in this jurisdiction have held that, given the factual nature of the actual malice inquiry, a defendant's actual malice "is normally a question of fact for the jury" that cannot necessarily be resolved on a motion to dismiss. *Parsi*, 595 F. Supp. 2d at 106; *see Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 284 (D.D.C. 2017) (holding that "complaint survives the preliminary obstacle that a motion to dismiss constructs, because the complaint's allegations of fact support the inference that Al Jazeera and Davies entertained serious doubts as to Sly's claims and failed to investigate these claims adequately, which, together, suffice to support a plausible finding of actual malice"); *Parsi*, 595 F.

Supp. 2d at 107–08 ("A failure to investigate adequately could not alone amount to actual malice, but purposeful avoidance of the truth could. Discovery is needed, then, to determine what defendant knew at the time he made the contested statements."); *see also Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1109–10 (D.D.C. 1991) (denying summary judgment motion on actual malice issue, noting that "[t]he particular reasons defendants disregarded the contrary evidence have not been fully explored on the present record").

The Complaint, along with all reasonable inferences that can be drawn therefrom, satisfies the actual malice standard. First and foremost, it is clear that Browder actually investigated Akhmetshin, so he must have entertained serious doubts about the truth of his false statements. (*See* Compl. ¶ 39.) As discussed above, Browder's Hermitage Letter purported to have performed an investigation of Akhmetshin; it specifically identified certain lobbying and consultancy work performed by Akhmetshin, and it even included photographs of Akhmetshin in Brussels, Belgium and Washington, D.C. — indicating that Browder had Akhmetshin followed.[20] (*See id.* ¶¶ 40–41, 56; Shube Decl., Ex. E, ECF No. 20-9 at 15.) Although he had investigated Akhmetshin, Browder could not have found evidence confirming his defamatory statements, as "Akhmetshin is not, and has never been, a Russian GRU officer, intelligence asset, or spy for the Russian Federation or former Soviet Union." (*See* Compl. ¶ 53.) Indeed, Browder now insists that he cannot prove the truth of his defamatory statements.[21] (*See* Browder Mem. 40 ("the question whether [Akhmetshin] was formerly or is currently [a] 'spy operator' would be impossible to determine").) To the contrary, given the apparent lengths to which Browder has investigated Akhmetshin, his investigation likely uncovered Akhmetshin's prior work with U.S. government agencies. (*See* Compl. ¶ 15.) This work experience seriously undermines any suggestion that Akhmetshin is a Russian "asset," as it strains credulity to believe that the United States would have worked with Akhmetshin without having vetted him. In any event, such information could not have served as a basis to believe the truth of Browder's assertion that Akhmetshin was a Russian spy. Based on the foregoing allegations (which must be accepted as true) and evidence, the Complaint creates at least a plausible inference that Browder purposefully avoided the truth about Akhmetshin when he made the challenged statements. *See Zimmerman*, 246 F. Supp. 3d at 284; *Parsi*, 595 F. Supp. 2d at 107–08.

*Second*, the Complaint attributes an ulterior motive for Browder's statements, namely, that Browder harbored a grudge against Akhmetshin because Akhmetshin had worked on the Prevezon Case and lobbied to remove Sergei Magnitsky's name from the Magnitsky Act. (Compl. ¶¶ 4–6, 38, 43.) Allegations of Browder's grudge satisfy the actual malice standard, especially when coupled with his investigation and purposeful avoidance of the truth. *See Houlahan*, 2006 WL 2844190, at *7.

In response to the well-pleaded allegations of the Complaint, Browder maintains that his reliance on other news articles about Akhmetshin precludes a finding of actual malice. (Browder Mem. 33–36.) But as noted above, *many (if not all) of those news articles trace back directly to Browder*, and others simply do not support Browder's conclusions about Akhmetshin. Browder cannot credibly claim a "good faith reliance on previously published reports in reputable sources," *see McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996), where either (i) he was a source of those reports about Akhmetshin, or (ii) the reports do not support Browder's defamatory statements.

**D. The Complaint Properly Alleges All Other Elements of a Defamation Claim**

Browder does not dispute that the Complaint adequately alleges all remaining elements of a defamation claim. *First*, Browder does not contest that he published the statements without privilege to a third party. (The Declaration of Melissa Shube confirms that Browder posted the challenged Twitter statements under the username @Billbrowder.) *Second*, Browder does not challenge the Complaint's allegations concerning the harm that Akhmetshin has suffered. In any event, Browder's statements are actionable as a matter of law because they accuse Akhmetshin of serious criminal conduct. *See, e.g.*, *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (noting that "statements about extreme subjects, such as criminal behavior . . . or a person's suitability for his chosen profession" are defamatory *per se*); *Johnson v. Johnson Pub. Co.*, 271 A.2d 696, 698 (D.C. 1970) (holding that "to accuse one of a crime is libel per se").

**E. In the Alternative, the Court Should Grant Akhmetshin Leave to Replead His Defamation Claim**

Browder requests that the Complaint be dismissed with prejudice. (Browder Mem. 44.) However, at this juncture "[d]ismissal with prejudice is the exception, not the rule, in federal practice because it 'operates as a rejection of the plaintiff's claims on the merits and [ultimately] precludes further litigation of them.'" *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (alteration in original) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)). Dismissal with prejudice is warranted only where "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency" — an "exacting standard." *Id.* at 794–95 (internal citations and quotation marks omitted).

To the contrary, "absent futility or special circumstances (such as undue delay, bad faith, or dilatory motive), a plaintiff should have the opportunity to replead so that claims will be decided on merits rather than technicalities." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1062 (D.C. Cir. 2015) (citing *Foman v. Davis*, 371 U.S. 178, 181–82 (1962)). "The court should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), even if the Court harbors "grave doubts" about factual legitimacy of the complaint, *Vasaturo v. Peterka*, 177 F. Supp. 3d 509, 512 (D.D.C. 2016) (granting leave to replead).

Such leave to replead should be granted here, to the extent the Court concludes that Akhmetshin's defamation claim falls short of Rule 8's requirements. Any issue that Browder raises — actual malice, the circumstances surrounding his statements, substantial truth — could be cured by an amended pleading.[22]

**CONCLUSION**

For the foregoing reasons, the Defendant's Motion to Dismiss the Complaint should be denied in its entirety. In the alternative, the Court should (a) permit the Plaintiff to take limited jurisdictional discovery to establish the Defendant's contacts with the District of Columbia, and/or (b) grant the Plaintiff leave to replead.

Dated: New York, New York
January 31, 2019

Michael Tremonte (*pro hac vice*)
Michael W. Gibaldi (*pro hac vice*)
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

(212) 202-2600
mtremonte@shertremonte.com
mgibaldi@shertremonte.com

Kim Sperduto (D.C. Bar No. 416127)
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, N.W., Suite 1250
Washington, D.C. 2006
(202) 408-8900
ksperduto@stglawdc.com

*Attorneys for Plaintiff Rinat Akhmetshin*

**FOOTNOTES**

[1]The Russian GRU, or Main Intelligence Directorate, is the Russian Federation's foreign intelligence agency. (Compl. ¶ 53 n.1.)

[2]Although Browder was the catalyst behind the Prevezon Case, he actively avoided testifying under oath in that case. *See, e.g.*, Joshua Yaffa, *How Bill Browder Became Russia's Most Wanted Man*, New Yorker, Aug. 20, 2018 ("In 2015, as Browder was busy promoting his book, he expounded on the Katsyv case in television and radio interviews, but was reluctant to testify in court. Prevezon's lawyers sent process servers to issue a subpoena twice in person — first in July, 2014, as Browder was leaving a talk he had given at the Aspen Institute. He let it drop to the ground and drove off with his teen-age son. In February, 2015, outside the New York studio of 'The Daily Show,' where Browder had filmed an interview with Jon Stewart, another server tried to hand him a subpoena. He leaped out of a waiting town car and fled down Fifty-first Street."). And Judge Thomas Griesa, who presided over the Prevezon Case, lambasted Browder's efforts to avoid sitting for a deposition on the basis of "credible threats" to his safety: "THE COURT: Apparently the credible threats did not prevent him from going on The Daily Show on February 3, Fox and Friends on February 3, appearing on Sirius on February 3, going on CNBC Squawk Box on February 3, going on MSNBC on February 5, going on Greg Greenberg's program on February 6th. Apparently the threats didn't prevent him from doing that. Now why could he not have been deposed?" Tr. of Hearing at 45:2–8, *United States v. Prevezon Holdings, Ltd., et al.*, No. 13 Civ. 6326 (S.D.N.Y. Mar. 20, 2015), ECF No. 261.

[3]Akhmetshin agrees with Browder that the Court may take judicial notice of the Hermitage Letter as a document upon which the Complaint relies. *See, e.g.*, *Marshall v. Honeywell Tech. Sols., Inc.*, 536 F. Supp. 2d 59, 65–66 (D.D.C. 2008).

[4]*See* Letter from Charles E. Grassley, Chair, Committee on the Judiciary, U.S. Senate, to Dana Boente, Acting Deputy Attorney Gen., U.S. Dep't of Justice (Mar. 31, 2017), *available at* https://www.judiciary.senate.gov/imo/media/doc/2017-03-31%20CEG%20to%20DOJ%20(Anti-Magnitsky%20FARA%20violations)%20with%20attachments.pdf ("In July of 2016, Mr. William Browder filed a formal FARA complaint with the Justice Department regarding Fusion GPS, Rinat Akhmetshin, and their associates. His complaint alleged that lobbyists working for Russian interests in a campaign to oppose the pending Global Magnitsky Act failed to register under FARA and the Lobbying Disclosure Act of 1995. The

Committee needs to understand what actions the Justice Department has taken in response to the information in Mr. Browder's complaint."); Letter from Charles E. Grassley, Chair, Committee on the Judiciary, U.S. Senate, to John Kelly, Sec'y, U.S. Dep't of Homeland Sec. (Apr. 4, 2017), *available at* https://www.judiciary.senate.gov/imo/media/doc/2017-04-04%20CEG%20to%20DHS%20(Akhmetshin%20Information)%20with%20attachment.pdf ("In July of 2016, Mr. William Browder, the CEO of Hermitage Capital Management, filed a formal complaint with the Justice Department alleging that Mr. Akhmetshin, among others, has failed to register under the Foreign Agents Registration Act ('FARA') despite undertaking a lobbying campaign on behalf of Russian interests. The Committee is looking into the circumstances surrounding this lobbying effort and the potential FARA violations involved.").

[5]References to "Browder Mem. __" are to the Memorandum of Points and Authorities in Support of Defendant William Browder's Motion to Dismiss the Complaint, ECF No. 20.

[6]*See* Terence Cullen, *Rinat Akhmetshin, lobbyist at Trump Jr. meeting, has been trying to repeal a major sanctions bill*, NY Daily News (July 15, 2017), http://www.nydailynews.com/news/politics/lobbyist-trump-jrmeeting-lifting-russia-sanctions-article-1.3326774?barcprox=true (quoting Browder as telling the *Daily News* that "Rinat Akhmetshin has been working feverishly in Washington on behalf of the Kremlin"); Isaac Arnsdorf, *Who Is the Russian Lobbyist Who Met With Donald Trump Jr.?*, ProPublica (July 14, 2017), https://www.propublica.org/article/who-is-the-russian-lobbyist-who-met-with-donald-trump-jr (quoting Browder as saying, "None of these people are carrying KGB business cards"); Brian Naylor, *Donald Trump Jr. Meeting Included Russian Lobbyist*, NPR (July 14, 2017), https://www.npr.org/2017/07/14/537219554/donald-trump-jr-meeting-included-secondrussian?t=1535560131329 (reporting that "Browder was among the first to publicly identify Akhmetshin Friday morning"); Jacob Pramuk & John W. Schoen, *Who is Rinat Akhmetskin, the Russian-American lobbyist at the Donald Trump Jr. meeting?*, CNBC (July 14, 2017), https://www.cnbc.com/2017/07/14/who-is-rinat-akhmetshinthe-lobbyist-at-the-donald-trump-jr-meeting.html (reporting on the Hermitage Letter and Senator Grassley's letters concerning Akhmetshin); Ken Dilanian, Tracy Connor & Kenzi Abou-Sabe, *Rinat Akhmetshin: Who Is the Russian Lobbyist Who Met the Trump Team?*, NBC News (July 14, 2017), https://www.nbcnews.com/news/us-news/rinatakhmetshin-who-russian-lobbyist-who-met-trump-team-n783161 (reporting Browder's Hermitage Letter); Marshall Cohen, Tal Kopan & Adam Chan, *The new figure in the Trump-Russia controversy: Rinat Akhmetshin*, CNN Politics (July 15, 2017), https://www.cnn.com/2017/07/15/politics/who-is-rinat-akhmetshin/index.html (reporting Browder's Hermitage Letter, "as picked up by Grassley").

[7]Chris Geidner, *The Russian Lawyer And The Lobbyist From The Trump Jr. Meeting Had A Busy Month In America Last Summer*, BuzzFeed News (July 14, 2017), https://www.buzzfeednews.com/article/chrisgeidner/therussian-lawyer-and-the-lobbyist-from-the-trump-jr; Cohen *et al.*, *supra* note 6; Cullen, *supra* note 6; Andrew Higgins & Andrew E. Kramer, *Soviet Veteran Who Met With Trump Jr. Is a Master of the Dark Arts*, New York Times (July 15, 2017), https://www.nytimes.com/2017/07/15/world/europe/rinat-akhmetshin-donald-trump-jrnatalia-veselnitskaya.html; Sharon LaFraniere, David D. Kirkpatrick & Kenneth P. Vogel, *Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections*, New York Times (Aug. 21, 2007), https://www.nytimes.com/2017/08/21/us/rinat-akhmetshin-russia-trump-meeting.html.

[8]Steve LeVine, *Meet the ex-Soviet intel officer at Don Jr.'s Trump Tower meeting*, Axios (July 14, 2017), https://www.axios.com/meet-the-ex-soviet-intel-officer-at-don-jrs-trump-tower-meeting-1513304200-f52f2e6fbf14-418a-a913-03b77a8c05c2.html ("Nothing I picked up in numerous intense reporting experiences with Akhmetshin over the years — in the former U.S.S.R. and the U.S. — suggested any current such relationships [with Russian intelligence]."); Zack Beauchamp, *Rinat Akhmetshin, the potential Russian spy who met Donald Trump Jr., explained*, Vox (July 14, 2017), https://www.vox.com/world/2017/7/14/15972770/rinat-akhmetshin-explained (reporting that the record of Akhmetshin's ties to Russia "is not conclusive either way"); Aidan Quigley, *Who is Rinat Akhmetshin, Former Soviet Intelligence Officer in Donald Trump Jr. Meeting?*, Newsweek (July 14, 2017), https://www.newsweek.com/who-rinat-akhmetshin-former-soviet-intelligence-officer-donald-trump-jr-637050 (noting that "Akhmetshin has been involved in a high-profile feud with American investor Bill Browder").

[9]Sam Thielman, *Inside The Russian Lawyer's And An Accused Spy's 'Adoption' Crusade*, Talking Points Memo (July 13, 2017), https://talkingpointsmemo.com/muckraker/rinat-akhmetshin-nataliaveselnitskaya-magnitskyact (noting that "Browder provided two photos to TPM, shown at the top of the page and below," of Akhmetshin); Isaac Arnsdorf, *FARA complaint alleges pro-Russian lobbying*, Politico (Dec. 8, 2016), https://www.politico.com/tipsheets/politico-influence/2016/12/fara-complaint-alleges-prorussian-lobbying-217776 (reporting on Browder's Hermitage Complaint); Michael Weiss, *US Congressman talks Russian money laundering with alleged ex-spy in Berlin*, CNN Politics (May 4, 2017), https://edition.cnn.com/2017/05/04/politics/rohrabacher-prevezon/index.html (quoting Browder).

[10]Mollie Hemingway, *Top Senator: Wait, The Firm Behind Trump Dossier Was Funded By Russia?*, The Federalist (May 3, 2017) http://thefederalist.com/2017/05/03/top-senator-wait-the-firm-behind-trump-dossier-wasfunded-by-russia/.

[11]Stephanie Saul & Louise Story, *At the Time Warner Center, an Enclave of Powerful Russians*, New York Times (Feb. 11, 2015), https://www.nytimes.com/2015/02/12/nyregion/russia-time-warner-center-andreyvavilov.html (reporting Akhmetshin's work as a "Washington operative"); Nick Rummell, *Mining Company Says Law Firm Hacked It*, Courthouse News Service (Nov. 16, 2015), https://www.courthousenews.com/miningcompany-sayslaw-firm-hacked-it/ (reporting on lawsuit against Akhmetshin that was later dismissed); Michael Weiss, *Putin's Dirty Game in the U.S. Congress*, The Daily Beast (May 18, 2016), https://www.thedailybeast.com/putins-dirty-game-in-the-us-congress (reporting on Akhmetshin's lobbying work); Isaac Arnsdorf & Benjamin Oreskes, *Putin's Favorite congressman*, Politico (Nov. 23, 2016), https://www.politico.com/story/2016/11/putincongress-rohrabacher-trump-231775 (reporting on Akhmetshin's lobbying work, and quoting Akhmetshin as saying, "Just because I was born in Russia doesn't mean I am an agent of [the] Kremlin").

[12]Relevant excerpts of *Red Notice* are attached as Exhibit B to the Declaration of Michael Tremonte.

[13]In *Companhia Brasileira Carbureto De Calcio*, the defendants included both American corporations and two foreign parent companies; however, the government contacts exception did not apply for the separate reason that the government petition was fraudulent. *See* 464 F. App'x 1 (D.C. Cir. 2012) (vacating judgment of dismissal in light of D.C. Court of Appeals' holding that the government contacts exception does not cover fraudulent petitions).

[14]Evidence of Browder's book sales in this District would establish the "substantial revenue" prong of § 13423(a)(4), which requires only "enough revenue to indicate a commercial impact in the forum, such that a defendant fairly could have expected to be hauled into court there." *Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp. 2d 142, 153. (D.D.C. 2006) (internal citations and quotation marks omitted).

[15]Other news outlets similarly reported that Browder was no bystander with an opinion, but that *Browder himself* identified Akhmetshin's presence at the Trump Tower meeting. *See* Brian Naylor, Donald Trump Jr. Meeting Included Russian Lobbyist, *NPR*, July 14, 2017, https://www.npr.org/2017/07/14/537219554/donaldtrump-jr-meeting-included-second-russian?t=1535560131329 ("Browder was among the first to publicly identify Akhmetshin Friday morning after an NBC News report that said that network had learned the identity of a second Russian advocate in the meeting with Trump Jr. and top aides to the Trump campaign.").

[16]Browder does not, because he cannot, claim that Akhmetshin is a "general public figure" — a category of persons limited to the "'celebrity,' his name a 'household word' whose ideas and actions the public in fact follows with great interest." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980).

[17]Browder is entirely off-base to claim that Akhmetshin's presence at the Trump Tower meeting was the catalyst for "a frenzy of media speculation about the meeting's connection, if any, to Russian efforts to influence the 2016 election." (Browder Mem. 31–32.) The media "frenzy" over the Trump Tower meeting began one week before Akhmetshin's presence at the meeting was reported, when the initial news of the meeting between the Trump campaign and Natalia Veselnitskaya broke. *See, e.g.*, Jo Becker, Matt Apuzzo & Adam Goldman, *Trump Team Met With Lawyer Linked to Kremlin During Campaign*, New York Times (July 8, 2017), https://www.nytimes.com/2017/07/08/us/politics/trump-russia-kushner-manafort.html. Apart from the meeting, Russia's interference with the election has been a hot topic for debate even before President Trump took office.

[18]Akhmetshin has consistently maintained that he was invited to the Trump Tower meeting only several hours beforehand; that he was "honestly surprised" that Veselnitskaya had secured a meeting with Donald Trump, Jr.; and that "really nothing happened" at the meeting itself. (*See* Tremonte Decl., Ex. A at 50:9 – 51:2, 96:3, 108:14–21.)

[19]Akhmetshin does not fit into the "exceedingly rare" category of cases involving a "truly involuntary public figures." *See Gertz*, 418 U.S. at 345. Such cases necessarily must involve an individual who involuntarily becomes the "central figure" in a specific public controversy. *See Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 741 (D.C. Cir. 1985) (holding that air traffic controller involuntarily became public figure when an airplane crash occurred on his watch). Akhmetshin's tangential involvement in one aspect of the larger investigation into Russian interference stands in marked contrast to the facts of *Dameron*, where the air traffic controller was a central figure in the public controversy.

[20]Browder has separately bragged to *GQ* that he "has another PowerPoint presented on [Akhmetshin]." Sean Flynn, *Bill Browder, Putin Enemy No. 1*, GQ (Nov. 14, 2017), https://www.gq.com/story/bill-browder-putin-enemynumber-1.

[21] In addition to supporting the conclusion that the statements at issue here were made recklessly, Browder's insistence that it would be "impossible to determine" if a given individual were engaged in unlawful espionage is contradicted by the many successful investigations and prosecutions of spies by U.S. law enforcement.

[22] For instance, only after filing the Complaint in this action, counsel learned that Browder had openly declared in an email dated May 31, 2016, that he was "in a conflict with" Akhmetshin. Browder sent this email to attorneys at Kobre & Kim LLP and then forwarded it to Kyle Parker, who, in turn, forwarded the email to the private email account of State Department official Robert Otto. Otto's private emails, including this one, were hacked and publicly released online. *See* Jenna McLaughlin, Robbie Gramer & Jana Winter, *Private Email of Top U.S. Russian Intelligence Official Hacked*, Foreign Policy (July 14, 2017), https://foreignpolicy.com/2017/07/14/private-email-of-top-u-s-russia-intelligence-official-hacked/. Many news organizations, including the *New Yorker*, have reported on the substance of those emails. *See, e.g.*, Joshua Yaffa, *How Bill Browder Became Russia's Most Wanted Man*, New Yorker, Aug. 20, 2018 (quoting from hacked Otto email).

**END FOOTNOTES**

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | UNITED STATES |
| SUBJECT AREAS / TAX TOPICS | FRAUD, CIVIL AND CRIMINAL PRACTICE AND PROCEDURE |
| INSTITUTIONAL AUTHORS | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA |
| CROSS REFERENCE | OPPOSING *AKHMETSHIN V. BROWDER*, NO. 1:18-CV-01638 (D.D.C. 2018). |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3963 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-23 |

# Japan, Morocco Begin Tax Treaty Negotiations

DATED FEB. 1, 2019

SUMMARY BY TAX ANALYSTS

Officials from Japan and Morocco will hold the first round of negotiations on an income tax treaty February 4 in Tokyo, the Japanese Ministry of Finance has announced.

FULL TEXT PUBLISHED BY TAX ANALYSTS

**Negotiations for Tax Convention with Morocco will be Initiated**

February 1, 2019

[Provisional translation]

1. The Government of Japan and the Government of the Kingdom of Morocco will initiate negotiations for a tax convention between the two countries.

2. The first round of negotiations will take place from February 4 in Tokyo.

**Contact**

- Ministry of Finance Tel 03(3581)4111
  International Tax Policy Division, Tax Bureau (ext. 5335)

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | JAPAN MOROCCO |
| SUBJECT AREAS / TAX TOPICS | TREATIES |
| INSTITUTIONAL AUTHORS | JAPANESE MINISTRY OF FINANCE |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3937 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-21 |

# Madagascar Amends Thin Cap Regime, Expands Scope of VAT Credit

POSTED ON FEB. 4, 2019

By

SLIM GARGOURI

Madagascar's Budget Law 2019 amended the country's thin capitalization regime and expanded the definition of exports for VAT refund purposes.

The new thin capitalization measures under Law 2018-001, which entered into force January 1, limit the corporate income tax deduction for loan interest paid to shareholders by companies with wholly paid-up capital to the rate calculated by the Central Bank of Madagascar, increased by 2 percentage points. The debt-to-equity ratio is set at 2 to 1 as before, but using the share capital value instead of the equity value.

Last year's budget law watered down the thin capitalization restrictions applicable to companies licensed under the Industrial Development Act, establishing a debt-to-equity ratio of 3 to 1 for those companies. The interest rate cap remains at the same level as for other companies.

In all cases, shareholders' loans should be accompanied by a registered agreement recorded in the company's accounting books; otherwise, the tax deductibility of the interest may be challenged.

Like expenses incurred in connection with royalties and services fees, interest expenses paid by resident taxpayers to nonresident lenders (whether individuals or companies) are deductible if they are directly linked to the taxpayer's business operations, are regularly documented, and are valued at a reasonable level.

Budget Law 2019 expanded the definition for exports to include sales between entities operating under free zone status of domestic-source goods and services. Foreign currency derived from export sales must be converted to Malagasy ariaries in an amount corresponding to the sale proceeds.

Companies operating under free zone status, exporting companies, financial leasing institutions, and any other VAT payer undertaking investments may qualify for VAT credits. For exports, the credit will initially be determined by dividing the value of the export sales by the total sales amount subject to VAT in the previous year. The credit will later be definitively determined based on the actual sales carried out during the financial year at issue.

Any VAT credit not claimed for reimbursement within three months will no longer be available, but may be computed among the taxpayer's expenses and deducted from its taxable profits for corporate income tax purposes.

Tax authorities should issue VAT credits within 60 days of the receipt of a taxpayer's application.

Slim Gargouri, chartered accountant, Sfax

DOCUMENT ATTRIBUTES

BDO_00034691

| | |
|---|---|
| JURISDICTIONS | MADAGASCAR |
| SUBJECT AREAS / TAX TOPICS | BUDGETS CORPORATE TAXATION CREDITS EXEMPTIONS AND DEDUCTIONS LEGISLATION AND LAWMAKING VALUE ADDED TAX |
| AUTHORS | SLIM GARGOURI |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3989 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-13 |

BDO_00034692

# Mali Expands PE Definition, Limits Expense Deductions

POSTED ON FEB. 4, 2019

By

SLIM GARGOURI

Mali's Budget Law 2019 introduced a detailed definition of permanent establishment and amended the eligibility rules and limits for claiming royalties, interest payments, and service fees as deductible expenses for corporate income tax purposes.

The measures, which entered into force January 1, define a PE as a fixed place of business through which the operations of an enterprise are wholly or partly conducted. The definition covers, among other things, the following:

- places of management;
- branches;
- sales outlets;
- offices;
- factories;
- workshops;
- warehouses;
- mines, oil or gas wells, quarries, or any other place of extraction of natural resources; and
- building sites, assembly or installation projects, and related supervisory activities that last more than three months.

The provision of services by an enterprise through its own employees or other personnel engaged by the enterprise is also considered to constitute a PE if the supply of services in Mali continues for a period or periods totaling more than 183 days in any 12-month period commencing or ending in the relevant fiscal year.

The definition of PE does not cover the following activities:

- the use of facilities solely for the purpose of storage or display of goods or merchandise belonging to the enterprise;
- the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage or display;
- the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;
- the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;
- the maintenance of a fixed place of business solely for the purpose of advertising or of collecting information, conducting scientific research, or supervising the execution of a contract relating to a patent or know-how, if those activities are of a preparatory or auxiliary character; or
- the maintenance of a fixed place of business solely for any combination of activities mentioned above, if the overall activity of the fixed place of business resulting from that combination of activities is of a preparatory or auxiliary character.

A person, other than an independent agent, acting in Mali on behalf of a nonresident enterprise will qualify as a PE if he:

- has, and habitually exercises, in Mali the authority to negotiate and conclude contracts in the name, or on behalf, of the enterprise; or
- habitually maintains in Mali a stock of goods or merchandise from which he regularly delivers products in the name, or on behalf, of the enterprise.

A nonresident insurance or reinsurance company will be deemed to have a PE in Mali if it collects premiums in Mali or insures risks in Mali through an employee or representative other than an independent agent.

A nonresident company will not be considered to have a PE in Mali merely because it purchases goods or merchandise for an enterprise or conducts business in Mali through a broker, general commission agent, or any other independent agent, if those persons are acting in the ordinary course of their business.

The budget law also limits the deduction for expenses incurred in connection with royalties, interest, or service fees paid to related nonresidents to 3.5 percent of the taxpayer's annual sales income.

Interest paid to shareholders on loans to a company is deductible to the extent that the interest rate does not exceed the rate of the Central Bank of West African States, increased by 3 percentage points, and the company's share capital is fully paid up.

Budget Law 2019 added other conditions for the deductibility of loan interest expenses for corporate income tax purposes. Among other things, the value of the shareholders' loans cannot exceed the company's capital amount and the interest rate cannot exceed the London Interbank Offered Rate (LIBOR) referred to in an establishment agreement concluded with the Malian government, increased by 2 percentage points.

Slim Gargouri, chartered accountant, Sfax

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | MALI |
| SUBJECT AREAS / TAX TOPICS | BUDGETS CORPORATE TAXATION<br>EXEMPTIONS AND DEDUCTIONS<br>LEGISLATION AND LAWMAKING<br>PERMANENT ESTABLISHMENT |
| AUTHORS | SLIM GARGOURI |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3965 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-14 |

# Missouri Guidance Treats GILTI as a Dividend

POSTED ON FEB. 4, 2019

By

JAD CHAMSEDDINE
Contact Author

Missouri will treat global intangible low-taxed income as a dividend for purposes of the state's corporate income tax.

Guidance released by the Missouri Department of Revenue February 1 clarifies that GILTI, minus deductions, is to be included in a corporate taxpayer's federal taxable income.

Stephen Kranz of McDermott Will & Emery welcomed the department's news.

"We are pleased at the approach taken by the Missouri DOR and hope that other states follow this approach in issuing guidance," Kranz told *Tax Notes*. "This guidance means that GILTI will be excluded from the Missouri tax base for most taxpayers," he continued.

The DOR explained that it took these steps because of Missouri's status as a rolling conformity state following new federal GILTI provisions introduced in the Tax Cuts and Jobs Act, which would automatically include income arising from IRC section 951A as the starting point for calculating taxable income.

For companies using the Multistate Tax Commission's three-factor apportionment formula, GILTI business income will be apportioned to Missouri and deducted as a dividend from Missouri sources, according to the guidance.

"The guidance indicates that the net GILTI may, nevertheless, be included in the computation of the sales factor," Kranz said, explaining that if GILTI is nonbusiness income for the taxpayer, it would be allocated as nonbusiness income to the taxpayer's state of commercial domicile.

Kranz said the guidance means that GILTI should be excluded from the tax base as a dividend from a non-Missouri payor for taxpayers using a single-factor formula. "Pursuant to the guidance, GILTI is not included in computing the single-factor apportionment factor," he said.

Kranz requested guidance from the Missouri DOR in July to determine how the state will treat GILTI. The letter shows that Kranz requested that GILTI be treated as dividend income for the purposes of computing Missouri corporate income tax. Kranz also requested that GILTI should be excluded from income if a taxpayer is using a single-factor apportionment formula because the income isn't sourced from within Missouri.

The guidance follows similar information published by the DOR in October, which informed corporate taxpayers that the state would treat repatriated income as dividend income.

## DOCUMENT ATTRIBUTES

| JURISDICTIONS | MISSOURI |
| --- | --- |

| | |
|---|---|
| SUBJECT AREAS / TAX TOPICS | GLOBAL INTANGIBLE LOW-TAXED INCOME (GILTI)<br>CORPORATE TAXATION CODE AND REGULATIONS |
| AUTHORS | JAD CHAMSEDDINE |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-4061 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-10 |

# News Analysis: Brexit Tax Uncertainty Looms Over U.K.

**POSTED ON FEB. 4, 2019**

By

NANA AMA SARFO
Contact Author

The latest dispatches from the Brexit battle lines are warning that the United Kingdom could face growing food insecurity if the country leaves the EU without a deal. People across the country are stockpiling food, Y2K style, in case Brexit entangles supply chains and grinds retail to a halt. These people have a name: Brexit Preppers. They also have a book: *Preparing for Brexit: How to Survive the Food Shortages* — available on Amazon. Their fears are very real — the United Kingdom grows about 50 percent of its food, but another 30 percent comes from the EU. In cold winter months, like March, up to 90 percent of some kinds of produce comes from the EU.

Unluckily for corporations, stockpiling for Brexit is not as simple as stocking up on canned goods. The past few weeks have shed light on that complexity as growing numbers of multinationals, including Sony and Panasonic, are moving their European headquarters from the United Kingdom. Tax insecurity is also a large part of the problem, and right now there are multiple layers to the U.K. conundrum.

### What Happens to EU Directives?

When the United Kingdom leaves the EU on March 29, it will not have to start over from scratch, legislatively speaking. Most EU legislation in force in the United Kingdom before Brexit will continue because of the European Union (Withdrawal) Act 2018. The Withdrawal Act serves a few key functions. First, it severs U.K. ties with the EU by repealing the European Communities Act 1972. That act is the linchpin that secures the United Kingdom to the EU — it allows the United Kingdom to transpose EU directives and other law into national law and allows EU treaty provisions and regulations to automatically take effect. Many of those directives enter into force in the United Kingdom via statutory instruments or, to a lesser extent, through Acts of Parliament.

The Withdrawal Act also allows lawmakers to convert in-force EU law into U.K. domestic law to ensure that U.K. statute books are still running when the country exits, regardless of whether there is a deal. The new domestic law, which will be known as "retained EU law," creates a bridge between the country's current body of legislation and its future laws. But even with this head start, the process won't be easy. There are over 900 EU directives, and most of them have application in the United Kingdom — lawmakers will have to amend many of those provisions to remove references to the EU and ensure they are tailored to the United Kingdom. Redundant laws will be removed via the Withdrawal Act. Lawmakers will also have the authority to create secondary legislation to allow legislative corrections and subsequent modifications.

The question of how specific EU directives will be treated under a Brexit agreement is murky right now. Parliament on January 15 rejected Prime Minister Theresa May's initial Brexit plan — her Plan A — but two weeks later on the 29th approved a renegotiation of her agreement — her so-called Plan B. May's revised version essentially is her first plan with some promises to work harder on resolving the Ireland/Northern Ireland border issue. There's no guarantee that the renegotiation will work. Shortly after Parliament's vote, European Council President Donald Tusk said the withdrawal agreement is not open for renegotiation. But assuming that Plan B passes, there are several things that will happen. Most EU law will still apply under a transitional Brexit, and the

United Kingdom will have to implement new laws that fall within Brexit agreement limits. Article 127 of May's draft agreement establishes that EU law will continue to apply in the United Kingdom unless otherwise provided for in the document. The agreement doesn't specifically make any changes to EU tax directives, so those laws will apply throughout the transition period. These include:

- the EU parent-subsidiary directive;
- the EU interest and royalties directive; and
- the EU merger directive.

In the event of a no-deal Brexit, however, those directives would immediately cease to have effect since the country would no longer be a part of the EU single market. Taxpayers that rely on the withholding tax benefits in the parent-subsidiary directive and the interest and royalties directive would have to consult any applicable bilateral tax treaties to see what withholding benefits they offer. In some cases, the treatment may be favorable.

"In terms of dividend flows into U.K. holding companies from EU subsidiaries, for the most part the U.K. treaty network works pretty well and will get you back to zero, although taxpayers will have the added administrative burden of filing treaty claims," Ashley Greenbank, a tax partner with Macfarlanes LLP, told *Tax Notes*.

There are some exceptions, however, chief among them being Germany and Italy, Greenbank pointed out. Under the Germany-U.K. treaty, dividends paid to a U.K. subsidiary may face 5 percent withholding. The same is true for the Italy-U.K. treaty.

A no-deal scenario could also have ripple effects beyond U.K. tax treaties. Several U.S. treaties with EU countries contain a limitation on benefits provision that requires the United States to treat all subsidiaries of an EU company as equivalent beneficiaries. In those instances, EU companies that are subsidiaries of U.K. parents would be affected when the United Kingdom is no longer an EU jurisdiction, according to Greenbank.

"That U.K. company ceases to be an equivalent beneficiary under the terms of the treaty between the U.S. and the EU country in which the subsidiary is established. So odd things can happen," he said. For example, in relation to the Germany-U.S. treaty, interest payments between the U.S. and Germany potentially may not get the benefit of the treaty because the ownership chain has been blocked with a U.K. company, a non-EU company. That's a potential problem," Greenbank said.

**Tax Governance Disputes**

The taxation portion of the draft agreement (annex 4) opens with a promise: The United Kingdom will implement good governance tax principles (including those promoted by the G-20), follow the OECD's anti-base-erosion-and-profit-shifting standards, and help improve international tax cooperation. European officials have been worried that the United Kingdom will try to undercut EU tax standards once it leaves the bloc. The draft agreement makes it clear that the United Kingdom will abide by EU rules in several respects. In the document, the United Kingdom commits to follow the EU Code of Conduct for business taxation and continue to apply several directives including the directive on administrative cooperation in (direct) taxation in the EU (Council Directive 2011/16/EU), and the EU anti-tax-avoidance directive (Council Directive (EU) 2016/1164) via transposed national law.

But it is unclear under the draft agreement whether the EU would have any recourse in the event that it doubts whether the United Kingdom is abiding by those good governance promises. Under draft agreement articles 170 and 171, disputes that arise between the two during the transition period will be submitted to an arbitration panel. But several U.K. tax commitments, including commitments to the OECD standards, would not be eligible for an arbitration review.

### Tax Dispute Policies

EU member states are cleaning up their tax dispute policies and making them more efficient because of a new EU directive on intrabloc tax dispute resolution mechanisms. Under the new rules (Council Directive (EU) 2017/1852), member states must try to amicably resolve double taxation disputes within two years. Cases that are not concluded within that period must be sent to an alternative dispute resolution commission or to arbitration, governed by a special advisory commission manned by representatives of the competent authorities from both countries in addition to three independent members. If national authorities fail to appoint a special commission, taxpayers may seek a court order compelling them to do so. From there, the commission must issue a final, binding decision within six months. The European Council approved these rules in October 2017 to speed up case timelines and give taxpayers greater certainty. The measure applies to double taxation disputes stemming from bilateral tax treaties and the EU arbitration convention, which largely deals with transfer pricing issues.

EU lawmakers created the directive because it was clear that bilateral tax treaties and the EU arbitration convention weren't helping taxpayers solve their disputes within a reasonable time frame. The directive is designed to supplement rather than replace treaties and the arbitration convention. But it isn't clear whether this will apply to the United Kingdom. Member states must transpose the directive into their national law by June 30, 2019, and it will apply to complaints filed from July 1 onward — after Brexit.

The United Kingdom released draft enabling legislation on the matter in July 2018, and the government included it in its Finance Bill 2018-2019. But there is no timeline on when the directive might go into effect. In the event of a Brexit deal, the directive ostensibly would apply throughout the transition period. If there isn't a deal, some of the provisions are present in some of the country's double taxation treaties with EU countries and are also applicable through the OECD multilateral instrument, which the United Kingdom implemented via the Double Taxation Relief (Base Erosion and Profit Shifting) Order 2018.

The EU arbitration convention was designed to compensate for deficiencies in the mutual agreement procedure process, but it has a narrower application than the new dispute directive — it only applies to transfer pricing disputes and attribution issues with permanent establishments. Under the EU arbitration convention, double taxation disputes must be resolved by competent authorities within two years or be submitted to arbitration. From there, the arbitration commission must issue its opinion within six months, and then competent authorities have another six months to determine whether they want to abide by the decision or implement a different resolution. Under a Brexit deal, the arbitration convention would still be available to U.K. taxpayers; but without one, taxpayers' recourse would be the standard MAP procedure or any other dispute resolution processes provided for in their applicable bilateral treaty.

### Taxation (Cross-Border Trade) Act 2018

Cross-border trade in the United Kingdom post-Brexit will be governed by the Taxation (Cross-Border Trade) Act 2018, which received royal assent in September 2018. When international disputes arise between the United Kingdom and other governments, the act gives U.K. lawmakers the authority to vary import duty rates, as allowed by international law. Right now, the European Commission performs that function for the United Kingdom as a member state.

Dispute settlement procedures will follow WTO rules or rules established in specific trade arrangements with partner countries.

Separate from the Taxation Act, May's draft agreement preserves an EU directive (Council Directive 2008/52/EC) that addresses mediation on civil and commercial matters. Parties that agree to conduct mediation before the end of the transition period and parties that are ordered or invited by a court by the same deadline are eligible.

For customs disputes, issues between an importer and customs authorities within the importing country would be settled under that country's law, according to the draft agreement. Importantly, some court cases winding their way through the EU system before December 31, 2020, would be allowed to run their natural course. Regulation (EU) No. 1215/2012, which governs jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, would still apply to judgments issued in cases started before the transition period ends and to legal instruments that are formally drawn up or registered before that time. Court settlements that are concluded or approved before the end of the transition period would also be honored.

## CJEU

One of the largest and most contentious issues surrounds the Court of Justice of the European Union and its role in U.K. disputes. The CJEU ensures that EU law is interpreted and applied uniformly across the bloc. It also weighs in on challenges against EU institutions and rulings from national courts that interpret or assess the validity of EU law, among other functions. There are several questions that need to be resolved, but a large one is whether U.K. courts should continue to be bound by CJEU decisions on the books at the time of exit (whether there is a transition period or not). Treatment of pending CJEU cases is also unclear — should judgments or orders delivered after Brexit bind the country's courts, and should their treatment depend on whether there is a hard or soft Brexit?

Under the withdrawal agreement, the CJEU would maintain jurisdiction over any proceedings filed before the transition period ends, regardless what stage those proceedings are in, including appeal proceedings before the Court and proceedings before the CJEU's General Court, if they involve cases that were referred back to the General Court.

The CJEU would also have the authority to issue preliminary rulings on requests sent from U.K. courts and tribunals if the requests were made before the end of the transition period. CJEU judgments and orders issued before the end of the transition period would be binding on the United Kingdom, and judgments and orders issued in cases that were pending at the time of transition, or in cases brought by the European Commission, would also be binding under article 89 of the draft agreement.

Article 4 of the draft withdrawal agreement establishes that U.K. courts and administrative authorities will have "due regard" for CJEU case law that is issued after the end of the transition period. In contrast, there will be no

"due regard" in the event of a no-deal Brexit — U.K. judicial authorities will not be obligated to follow or consider CJEU rulings, and U.K. courts and tribunals will not be bound by any CJEU decisions or principles established after March 29. They also will not be able to refer matters to the Court after that date. Decisions issued before Brexit may be considered to the extent that they are relevant, but the country's highest court — the Supreme Court — will not be bound by retained EU case law, according to the Withdrawal Act. Instead, the Supreme Court's justices will have the authority to depart from that law, applying the same standards that they use when determining whether to follow the Supreme Court's own case law.

On the state aid side, the European Commission would be able to file cases against the United Kingdom for an additional four years after the transition period ends, according to the agreement.

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | UNITED KINGDOM EUROPEAN UNION |
| SUBJECT AREAS / TAX TOPICS | CORPORATE TAXATION |
| MAGAZINE CITATION | TAX NOTES INTERNATIONAL, FEB. 4, 2019, P. 464<br>93 TAX NOTES INTERNATIONAL 464 (FEB. 4, 2019) |
| AUTHORS | NANA AMA SARFO |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3393 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-2 |

# News Analysis: Consolidated Groups Face Challenges from Proposed 163(j) Regs

POSTED ON FEB. 4, 2019

The choice of whether to file a consolidated tax return can affect an affiliated group's ability to deduct interest expense under new section 163(j) rules. A parent that owns at least 80 percent of a subsidiary's vote and value constitutes an affiliated group and can therefore elect to file a single consolidated tax return.

The section 163(j) proposed regulations' deduction limitation, business interest income (BII), allocation of interest expense among multiple businesses, and carryforward ordering rules are among those that apply differently to affiliated groups depending on whether they file consolidated returns (REG 106089-18). Especially notable is the disregard of intercompany transactions between group members.

**Relevant Section 163(j) Provisions**

Section 163(a) provides that interest payments are tax deductible. But section 163(j), as amended by the Tax Cuts and Jobs Act, severely curtails a taxpayer's ability to deduct interest payments. However, disallowed interest expense can be carried forward to future years. (Prior coverage: *Tax Notes* , Jan. 28, 2019, p. 447.)

Under section 163(j), business interest expense (BIE) deductions cannot exceed the sum of BII, 30 percent of the adjusted taxable income, and floor plan financing interest.

The deduction limit does not apply to small businesses, however, defined by reference to section 448(c) as having average annual gross receipts of $25 million or less.

BII includes interest within a taxpayer's gross income allocable to a trade or business, but does not include investment income. Furthermore, trade or business does not include services performed as an employee, an electing real property or farming trade or business, and certain specific rate-regulated public utilities.

The proposed regulations refer to real property and farming businesses that elect out of section 163(j) in exchange for less favorable depreciation deductions, and rate-regulated utilities as excepted trades or businesses (ETBs).

ATI includes taxable income computed without regard to items of income, gain, deduction, or loss not allocable to a trade or business, BIE or BII, net operating loss deductions, section 199A deductions, and (until January 1, 2022) deductions for depreciation, amortization, or depletion.

Floor plan financing interest is interest on debt that financed the acquisition of and is secured by motor vehicles held for sale or lease, including boats and farm equipment.

The proposed regulations contain guidance on calculating ATI, BIE, BII, and interest expense allocable to ETBs. The results can differ when affiliated groups file consolidated returns. ATI and BII rules relevant to consolidated

BDO_00034702

groups are generally included in prop. reg. sections 1.163(j)-4 and 1.163(j)-5. Allocation of tax items between ETBs and non-ETBs are in section 1.163(j)-10.

**Consolidated Groups as Single Taxpayers**

Under section 1.163(j)-4(d), a consolidated group as defined in section 1.1502-1(h) has a single section 163(j) limitation, in contrast to members of an affiliated group that do not file a consolidated return.

The starting point for computing ATI is the group's consolidated taxable income under section 1.1502-11 without regard to section 163(j) disallowances or carryforwards.

For purposes of determining a member's BIE, BII, and the group's ATI, all intercompany obligations are disregarded. That is, interest income and expense from intercompany obligations are not treated as BII and BIE.

Section 1.163-4(d) cross-references the consolidated group investment basis adjustment rules in section 1.1502-32(b). If a member has a current-year BIE and a deduction is disallowed under section 163(j), the basis in that member's stock is adjusted in a later year when the interest expense is absorbed by the group.

Two examples illustrate the rules in section 1.163(j)-4(d), which also contains a cross-reference to examples 18 and 19 in section 1.1502-13(c).

Example 1 illustrates the difference in ATI between affiliated groups that consolidate and those that don't. An affiliated group consists of P, the group parent, and S, P's wholly owned subsidiary. P has BIE and depreciation deductions, while S has only depreciation deductions. (See Table 1.)

**Table 1. Example 1, Structure**

| | | |
|---|---|---|
| P | 150 | Gross income |
| | (65) | BIE |
| | (35) | Depreciation |
| | 50 | Taxable income |
| S | 50 | Gross income |
| | (10) | Depreciation |
| | 40 | Taxable income |

Consolidation allows S's income to absorb P's BIE by including S's tax items in the ATI calculation. A group that is not consolidated would need to structure its operations so that members generating ATI are also the ones paying BIE. (See Table 2.)

**Table 2. Example 1, ATI Calculation**

| | Not Consolidated | Consolidated |
|---|---|---|
| ATI | 150 | 200 |
| 163(j) limit | 45 | 60 |
| BIE disallowed | 20 | 5 |

Example 2 illustrates the disregard for intercompany transactions in computing BII, BIE, and ATI. P has borrowed from an unrelated lender, and has in turn lent some of the loan proceeds to S. P's interest income and S's interest expense on that intercompany loan are disregarded.

**Allocating Items Between ETBs and Non-ETBs**

Section 1.163(j)-10 contains rules for allocating BII, BIE, and other income and expense items between ETBs and non-ETBs for taxpayers that conduct both. Interest expense allocated to ETBs is not subject to the deduction limit in section 163(j). The allocation method assumes that money is fungible and so a taxpayer's BIE is attributable to all activities and property even when borrowed for a specific purpose.

Generally, BIE and BII are allocated under section 1.163(j)-10(c) between ETBs and non-ETBs based on the relative amounts of the taxpayer's adjusted basis in the assets used in the ETB and non-ETB. A taxpayer determines the adjusted basis in its assets quarterly and averages those amounts to determine the relative amounts of asset basis used in its ETB and non-ETB. Those relative percentages are applied to BIE to determine the amount subject to the section 163(j) limitation, or the BIE allocable to the non-ETB.

If an asset is used in more than one trade or business, its adjusted basis is allocated using the method that best reflects the asset's use, or reflects the proportionate benefit derived by each trade or business. Permissible methods include relative amounts of gross income generated, physical space used (for inherently permanent structures like land), or output generated.

BIE on nonrecourse indebtedness secured by an asset is allocated to the trade or business that uses the asset.

For purposes of calculating ATI, tax items other than BII and BIE are allocated to a trade or business under rules in section 1.163(j)-10(b). Gross income other than dividends or interest is allocated to the trade or business that generated the gross income. Dividends and gains or losses from dispositions of non-consolidated stock and other entities are allocated either by looking through to the adjusted basis in the entity's assets or by defaulting to treat the item as allocable to a non-ETB.

Expenses, losses, and other deductions that are "definitely related" to a trade or business are allocable to that trade or business. A deduction is definitely related to a trade or business if it is incurred "as a result of, or incident to," a trade or business's activity or in connection with its property. If a deduction is related to more than one trade or business, it is apportioned based on the relative amounts of their asset bases. Deductions not definitely related to a trade or business are ratably apportioned to all gross income.

For purposes of applying these allocation rules, section 1.163(j)-10(a)(4) treats all members of a consolidated group as one corporation. The rules apply to activities conducted by the group as if those activities are conducted by a single corporation. For example, the whole group rather than a particular member is treated as engaged in an EBT or non-EBT.

For purposes of allocating asset basis between an EBT and non-EBT, intercompany loans are not considered an asset of the lender, and neither is stock of a group member owned by another member. Intercompany transactions are disregarded and property is not treated as used in a trade or business to the extent that its use is derived from an intercompany transaction.

A taxpayer's activities are not treated as a trade or business at all if they don't involve providing services or products to a person other than the taxpayer. For example, in-house legal personnel that provide legal services solely to the taxpayer are not treated as engaged in the trade or business of providing legal services.

After a group has determined the percentage of its interest expense allocable to an EBT, that percentage is applied to the BIE accrued by each member to any lender that is not a group member. Therefore, an identical percentage of each member's BIE is treated as allocable to an EBT, regardless of whether any individual member actually engaged in an ETB.

Example 2 in section 1.163(j)-10(a)(7) shows how intercompany transactions are treated under these rules. P owns a building and conducts an ETB while S conducts a non-ETB. P leases the building to S for use in its non-ETB. The intercompany lease is disregarded and basis in the building is allocated to S's non-ETB. Section 1.163(j)-10(e)'s Example 4 shows that gain from a sale of that building would also be traced to a non-ETB and included in ATI.

## Carryforward Ordering Rules

Recall that a consolidated group's section 163(j) limitation includes its consolidated BII and floor plan financing interest, in addition to 30 percent of its consolidated ATI. A consolidated group determines whether its aggregate BIE exceeds its section 163(j) limitation. If the aggregate BIE exceeds the limitation, ordering rules in section 163(j)-5 determine which member's BIE is deducted in the current year and which is carried forward.

If the group's section 163(j) limitation is less than its BIE, then each member with floor plan financing interest or BII is only able to deduct those amounts. For any remaining section 163(j) limitation, the BIE deductions are determined pro rata. The remaining limitation is applied pro rata to each member's disallowed BIE carryforwards on a first-in, first-out basis. Each member deducts its allocable share of the group's remaining limitation in proportion to that member's BIE as a share of the group's BIE.

Proposed regulations define a member's allocable share of a group's limitation as the limitation multiplied by that member's current-year interest ratio, or the ratio of the member's BIE to the total amount of BIE for all members of the group.

Current-year BIE is deducted before any disallowed BIE carryforwards from a prior taxable year. BIE carryforwards are deducted in the order of the taxable years in which they arose, beginning with the earliest taxable year.

In cases in which taxpayers make interest payments to foreign related parties, proposed regulations issued under section 59A's base erosion and antiabuse tax provide guidance on how BIE deductions and carryforwards are classified for purposes of determining whether an interest payment is a base erosion payment (REG 104259-18). Those rules also treat consolidated groups as a single taxpayer.

## Miscellaneous

Additional rules in the section 163(j) proposed regulations address disallowed BIE incurred by a partnership allocated to a member of a consolidated group and extend separate return limitation year (SRLY) concepts to BIE carryforwards.

Section 163(j) generally applies to partnerships at the partnership level. When a consolidated group member is a partner in a partnership with disallowed BIE, the basis adjustments to the subsidiary member's stock don't align with the basis adjustments to the member's basis in the partnership. There is no reduction in member stock basis when the BIE is disallowed, even though the subsidiary reduces its own basis in the partnership interest the year the BIE is disallowed. The basis in the subsidiary member's stock does not change by reason of a BIE disallowance — it is reduced only when the subsidiary's BIE is absorbed by the group. This leads to a temporary basis difference regarding the member's outside basis in the subsidiary's stock and the subsidiary's inside basis in its own assets — that is, the partnership interest.

The rules generally limit a group's ability to use specific losses and credits generated in a SRLY. The limitation is computed based on the amount of income and tax liability that the SRLY member has contributed to the consolidated taxable income while a member. The SRLY member's BIE carryforwards may not exceed the member's contribution to the limitation.

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | MULTINATIONAL |
| SUBJECT AREAS / TAX TOPICS | TAX REFORM CONSOLIDATED RETURNS |
| MAGAZINE CITATION | TAX NOTES INTERNATIONAL, FEB. 4, 2019, P. 473<br>93 TAX NOTES INTERNATIONAL 473 (FEB. 4, 2019) |
| AUTHORS | CARRIE BRANDON ELLIOT |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3364 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-4 |

# News Analysis: Hybrids, BEPS, and the TCJA

POSTED ON FEB. 4, 2019

By

MINDY HERZFELD
Contact Author

In contrast to the global intangible low-taxed income regime and the base erosion and antiabuse tax, which have received widespread attention since enactment, the anti-hybrid rules enacted in the Tax Cuts and Jobs Act have received relatively little. That's partly because of the complexity of GILTI and the BEAT, which had immediate, significant consequences on multinational taxpayers' 2018 earnings and tax calculations; the anti-hybrid statutory provisions are brief and mostly needed Treasury guidance to become effective.

Now that Treasury has proposed regulations (REG-104352-18) implementing and interpreting the anti-hybrid rules, the effect of those rules on companies' earnings is likely to be greater. Treasury took an expansive approach in writing the regs, enlarging the statute's scope beyond what observers may have expected (it also used the opportunity to expand regulations in another part of the code). The proposed regulations will require taxpayers to scrutinize structures to determine where problem instruments, entities, and transactions occur. Because hybrid transactions are the most common — and until now, the easiest — way to reduce the tax base in a high-tax jurisdiction without increasing the taxable amount in another jurisdiction, the impact on multinationals' effective tax rates could be significant.

The anti-hybrid rules and proposed regulations also somewhat refute claims that in passing the TCJA, Congress acted unilaterally, with little regard for the multilateral tax reform efforts led by the OECD over the past several years. Much of the language of the anti-hybrid rules and regulations mimics that in the action 2 report of the base erosion and profit-shifting project. However, there are questions regarding the extent to which Treasury really intended to incorporate the principles of the BEPS action 2 reports, and whether taxpayers can rely on the examples and guidance in those reports in interpreting the Treasury guidance. Speaking at a District of Columbia Bar Taxation Community event on January 29, John Merrick, senior counsel to the IRS chief counsel (international), said that while the U.S. anti-hybrid rules are consistent with BEPS, they effectuate different policies, and Congress departed from the OECD's approach in specific ways.

## The Statute

Two anti-hybrid rules were enacted as part of the TCJA. One is part of the new participation exemption in section 245A that allows corporations a 100 percent dividends received deduction for some dividends from 10-percent-owned foreign companies. Section 245A(e) provides that the deduction that would otherwise be allowable for that dividend is disallowed if the dividend is a hybrid dividend. Section 245A(e)(2) applies that principle to dividends from one controlled foreign corporation to another.

The second provision, section 267A, is much broader, and generally denies a deduction for any disqualified related-party amount paid or accrued under a hybrid transaction or by or to a hybrid entity. The statute defines a disqualified related-party amount to mean any interest or royalty paid or accrued to a related party that's not included in the income of the related party under the tax law of the country where it's tax resident or is subject to tax, or the related party is allowed a deduction for the amount under its country's tax laws. It excludes amounts

otherwise described as disqualified related-party amounts that are included in a U.S. shareholder's gross income under section 951(a) (but not section 951A).

The statute defines a hybrid transaction to generally mean a transaction, instrument, or agreement for which a related payment is treated as interest or royalties under U.S. tax laws but not the recipient's tax laws. A hybrid entity is any entity that's treated as fiscally transparent under U.S. tax rules but not under the tax law of the country where the entity is tax resident or subject to tax, or vice versa.

While the rule is brief, it also includes an extensive set of instructions giving Treasury broad authority to issue regulations or other guidance as may be necessary or appropriate to carry out the purposes of the section, including on:

- treating some conduit arrangements involving a hybrid transaction or entity as subject to the general rule of section 267A(a);
- the application of the section to branches or domestic entities;
- treating some structured transactions as subject to section 267A(a);
- treating a tax preference as an exclusion from income if it has the effect of reducing the generally applicable statutory rate by at least 25 percent;
- treating the entire amount of interest or royalties paid or accrued to a related party as a disqualified related-party amount if it's subject to a participation exemption system or other system that provides for the exclusion or deduction of a substantial portion of that amount; and
- determining the tax residence of a foreign entity if it can be considered a resident of more than one country, or of no country.

Treasury is also authorized to write regulations containing exceptions to the general rule if the disqualified related-party amount is taxed under the laws of a foreign country other than that where the related party is a tax resident, and in other cases it finds no risk of eroding the federal tax base.

**Legislative History**

The House bill that would become the TCJA didn't include an anti-hybrid rule similar to section 267A, or the limitation on the dividends received deduction of section 245A(e), which were introduced by the Senate. It gave no reason for section 245A(e) but said section 267A was necessary because hybrid arrangements "have an overall negative impact on competition, efficiency, transparency and fairness." The Senate bill mentions the risks of double nontaxation, including the possibility of long-term deferral, as possible consequences of hybrid arrangements. The committee report references the OECD's work on action 2, saying section 267A is consistent with many of the approaches to the same or similar problems in the code, the OECD BEPS project, tax treaties, and other countries' laws.

In general, the Joint Committee on Taxation's explanation of the TCJA (JCS-1-18) mostly reiterates the statutory language, caveating any deviation from the statutory language with a statement that a technical amendment might be necessary to achieve the result. But it adds an extensive gloss on section 267A, describing the scope of Treasury's regulatory authority to include addressing over- or underinclusive applications of the provision. (Like the Senate committee report, the JCT document doesn't explain section 245A(e).) One example of an underinclusive application of section 267A is an imported mismatch arrangement in which deductible payments

made through an intermediary payee aren't taxable on ultimate receipt. The example, which is unusual in the level of detail it provides, involves a transaction in which Foreign Parent is resident in country X with a subsidiary in country Y (Foreign Sub) that in turn wholly owns a U.S. corporation (U.S. Sub). In the example, Foreign Parent capitalizes Foreign Sub with cash in exchange for a hybrid instrument that's treated as debt in country Y, but as equity in country X. Foreign Sub then lends the cash to U.S. Sub in exchange for a note on which interest paid is deductible. The result is a deduction for interest in the United States, and an inclusion (of interest income) offset by a deductible payment on the hybrid instrument by Foreign Sub in country Y. The payment on the hybrid instrument made by Foreign Sub to Foreign Parent may not be includable to Foreign Parent in country X if the payment is treated as a distribution on equity that's tax exempt in country X.

The JCT also suggested Treasury write expansive rules applying the anti-hybrid provision to branches, saying those rules should apply even if the branches or entities do not meet the statutory definition of a hybrid entity. In a footnote, it said Treasury could issue guidance that addresses some disregarded branch structures or diverted branch payments. It explained that unlike hybrid mismatches, branch mismatches can arise when the ordinary rules for allocating income and expenditure between a branch and head office result in a portion of the taxpayer's net income escaping tax in both the branch and residence jurisdictions.

The JCT explanation provides an example of a disregarded branch structure, in which Foreign Parent resident in country X has a U.S. subsidiary and forms a separate financing branch in the United States (U.S. Branch) that lacks sufficient presence in the United States to be subject to tax there. Foreign Parent lends money to U.S. Sub through U.S. Branch. Country X exempts or excludes from tax the interest U.S. Sub pays to U.S. Branch on the grounds that it's attributable to a foreign branch. U.S. Branch's interest income is not taxed in the United States, however, because U.S. Branch doesn't have sufficient presence in the United States for its interest to be subject to tax there. As the JCT explains, the result of that disregarded branch structure is a deduction for the interest paid by U.S. Sub to U.S. Branch, with no corresponding income inclusion for Foreign Parent in either country X or the United States. That structure is one Treasury has been trying to shut down for several years by including a similar provision in the 2016 U.S. model treaty and pressuring other countries to change their domestic laws. Now Congress has given Treasury the tools to take matters into its own hands.

According to the JCT, a diverted branch payment has the same structure and outcome as a payment to a disregarded branch — but the statute doesn't precisely define the structure. That's because the mismatch arises not because of a conflict in the characterization of the branch, but as a result of a difference between the laws of the residence and branch jurisdictions in the attribution of the payments to the branch.

The JCT explanation also provides an example of what it calls an overbroad application of section 267A, involving a debt issuance primarily targeted and sold to a tax-exempt domestic investor base, a minor portion of which is acquired by unrelated persons who benefit from hybrid treatment in their countries of residence. The explanation says that debt issuance shouldn't be considered a structured transaction covered by section 267A because the hybrid treatment is unrelated to the tax-exempt status of the domestic investor base.

The explanation also says Treasury may issue guidance identifying circumstances under which the hybrid nature of a transaction or entity is deemed unrelated to the application of a preferential tax regime (implying that only tax benefits resulting from hybridity are intended to be caught by the statute). It provides as an example a case in which Foreign Parent from country X wholly owns U.S. Sub, which wholly owns disregarded entity (DRE). DRE pays a royalty directly to Foreign Parent. Several years after DRE's formation, country X implements a preferential tax

regime under which royalties paid by DRE to Foreign Parent are subject to a reduced rate of tax. The JCT said that under those facts, Treasury could determine that DRE's hybrid nature is unrelated to the application of country X's preferential regime and thus outside the scope of section 267A.

### The OECD Reports

As noted, the Senate committee report states that section 267A is consistent with the OECD's approaches in the BEPS project — namely, to action 2 on hybrid mismatch arrangements. The Senate bill refers to the harm hybrid mismatch arrangements inflict on competition, efficiency, transparency, and fairness and is copied directly from the 2015 final report.

The 2015 report sets out recommendations regarding the design of domestic rules and the development of model treaty provisions to neutralize the tax effects of hybrid mismatch arrangements. Because of the complex and controversial nature of the topic, two discussion drafts and an interim report were released before consensus was reached; the final report runs to 458 pages and includes numerous examples illustrating how the rules are intended to be applied.

But even so, observers soon realized that the "final" report failed to address important hybrid mismatches. In 2016, following the United Kingdom's lead, the OECD issued another discussion draft expanding the scope of the hybrid mismatch rules to apply to branch mismatch structures. It said branch mismatch arrangements aren't "hybrid" in the sense that they're not the result of differences in the tax treatment or characterization of an instrument or entity. But it pointed out that those arrangements — which occur when the residence and branch jurisdictions take different views regarding the allocation of income and expenditure between the branch and head office, or when the branch jurisdiction doesn't treat the taxpayer as having a taxable presence there — are closely aligned to the hybrid entity mismatches described in the action 2 report. That's because they result from differences in the way the residence and branch jurisdiction treat payments made by or to the branch or head office. The branch mismatch report and recommendations were finalized in 2017.

The 2015 report makes recommendations for how countries should address base erosion concerns resulting from hybrid mismatches. The first is that jurisdictions adopt as a primary rule a provision denying a deduction when an otherwise deductible item of income on a hybrid instrument or made by or to a hybrid entity doesn't result in an inclusion in the recipient's jurisdiction (a deduction/no-inclusion or D/NI result). Section 267A generally adopts that recommendation, but limits it to interest and royalty payments. As a defensive measure, the action 2 report also recommends that when jurisdictions have failed to adopt a rule like that, the recipient jurisdiction deny what otherwise would be an exemption from income, which section 245A essentially adopts (but limits to apply only to dividends). An important question for taxpayers seeking to interpret the proposed regulations is to what extent those rules adopt the details of the OECD recommendations, including their proposed application to specific structures, and what to do when they appear to conflict. Speaking to the D.C. bar, Merrick emphasized that the OECD work isn't binding on U.S. reg writers, but also said there's a lot of overlap between the U.S. rules and the OECD recommendations.

### The Proposed Regulations

The IRS and Treasury adopted an expansive scope of their regulatory authority as provided in section 267A(e), consistent with the JCT's explanation. The proposed regulations expand the scope of the statute to apply to

transactions involving disregarded branch structures. They also adopt the JCT's point about the statute's potential overinclusiveness, writing a rule to exclude hybrid amounts that are included or includable in the income of a U.S. tax resident or U.S. taxable branch, including under GILTI (prop. reg. section 1.267A-3(b)). The preamble states that payments that are included directly in the U.S. tax base or in GILTI do not give rise to a D/NI outcome, and so it's consistent with the policy and grant of authority to exempt them from disallowance under section 267A.

The preamble also states that section 267A and the proposed regulations are antiabuse measures needed because taxpayers take aggressive positions to benefit from tax treatment mismatches between jurisdictions to achieve favorable tax outcomes to the detriment of tax revenue. It cites the OECD hybrid mismatch reports in support of that statement. In a show of support for multilateralism, the preamble states that the statute and the proposed regulations "serve to conform the U.S. tax system to recently agreed-upon international tax principles," which is consistent with statutory intent. It says international tax coordination is particularly advantageous for hybrids because it could greatly curb opportunities for hybrid arrangements while avoiding double taxation. Merrick elaborated on those points at the D.C. bar discussion, stressing the U.S. government's "holistic concerns" in writing anti-hybrid rules.

The preamble cites the Senate Budget Committee's explanation for the provision and reference to the OECD's BEPS project, noting that the types of hybrid arrangements that give rise to tax avoidance concerns are only those that "exploit differences in the tax treatment of a transaction or entity under the laws of two or more tax jurisdictions to achieve double non-taxation, including long-term deferral." As a result, targeted hybrid arrangements are only those that rely on a hybrid element to produce those types of outcomes. To effectuate that principle, the proposed regs disallow a deduction under section 267A only if the D/NI outcome is a result of a hybrid arrangement.

As an example, the preamble suggests that a royalty payment made to a hybrid entity in the United Kingdom qualifying for a low tax rate under the U.K. patent box regime could be denied a deduction in the United States under the statute. But because the low U.K. rate is a result of the lower rate on patent box income and not a result of any hybrid arrangement, the proposed regs say there's no link between hybridity and the D/NI outcome and thus don't deny a deduction in that type of arrangement.

The proposed regulations incorporate the OECD action 2 documents by reference, defining the term "hybrid mismatch rules" to mean rules, regulations, or other tax guidance substantially similar to section 267A and including rules to neutralize the D/NI outcome of hybrid and branch mismatch arrangements. It says examples would include rules based on, or substantially similar to, the action 2 recommendations.

Part of the problem with Treasury citing the BEPS report in support of antiabuse provisions is that much of that project targeted U.S. multinationals for the benefit of other countries' fiscs. The preamble attempts to reconcile that discrepancy, noting that while the statute and regulations are consistent with and advance agreed-on international principles, they also serve to protect U.S. interests and the U.S. tax base. It cites a reduction in tax revenue loss caused by hybrid arrangements as an anticipated effect of the law.

The statute as written doesn't apply to some hybrid arrangements, including branch arrangements and specific reverse hybrids. But the preamble says the exclusion of those arrangements could have large economic and fiscal consequences as a result of taxpayers shifting toward those arrangements to avoid the new antiabuse statute. The proposed regulations close off the potential avenue for additional tax avoidance by applying the rules of

section 267A to branch mismatches, reverse hybrids, transactions with unrelated parties that are structured to achieve D/NI outcomes, structured transactions involving amounts similar to interest, and imported mismatches.

According to the preamble, the regs are generally consistent with the BEPS imported mismatch rule to provide certainty about when a deduction will or won't be disallowed and to neutralize the risk of double taxation and double nontaxation. It says coordinating with the global tax community reduces opportunities for economic distortions and that it expects the benefits of that approach, including comprehensiveness, administrability, and taxpayer certainty, to be substantially greater than the burdens of complexity.

But despite the numerous references to the consistency with the action 2 reports, the proposed regulations depart from them in some areas. For example, in the section 245A rules, they reference dividends paid deductions and other deductions allowed on equity under a relevant foreign tax law (such as notional interest deductions) as raising similar concerns as traditional hybrid instruments. That leads to questions about other types of instruments not mentioned in the proposed regulations that were explicitly carved out of the scope of the action 2 rules (see examples 1.13 and 1.14 of the 2015 report).

The proposed regulations provide taxpayers with welcome guidance on a brief statutory provision, but it's unclear how much taxpayers can rely on the OECD reports in interpreting and applying the anti-hybrid provisions. In general, Congress and the IRS have been inconsistent at best on whether the law and its regulations are supposed to follow the BEPS recommendations. Is the U.S. government's goal to ensure a single level of tax on multinationals' profits somewhere in the world? Some of the structures addressed suggest the goal is broader in some cases and narrower in others.

*Mindy Herzfeld is professor of tax practice at University of Florida Levin College of Law, director of its International Tax LLM program, and a contributor to Tax Notes International. Email: herzfeld@law.ufl.edu*

*Follow Mindy Herzfeld (@InternationlTax) on Twitter.*

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| CODE SECTIONS | SEC. 267A CERTAIN RELATED PARTY AMOUNTS PAID OR ACCRUED IN HYBRID TRANSACTIONS OR WITH HYBRID ENTITIES<br>SEC. 245A DEDUCTION FOR FOREIGN SOURCE-PORTION OF DIVIDENDS RECEIVED BY DOMESTIC CORPORATIONS FROM SPECIFIED 10-PERCENT OWNED FOREIGN CORPORATIONS. |
| JURISDICTIONS | UNITED STATES<br>ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT |
| SUBJECT AREAS / TAX TOPICS | TAX CUTS AND JOBS ACT<br>BASE EROSION AND ANTIABUSE TAX (BEAT)<br>BASE EROSION AND PROFIT SHIFTING (BEPS)<br>DEBT INSTRUMENTS |

| | |
|---|---|
| | GLOBAL INTANGIBLE LOW-TAXED INCOME (GILTI) |
| | TAX POLICY |
| MAGAZINE CITATION | TAX NOTES INTERNATIONAL, FEB. 4, 2019, P. 468<br>93 TAX NOTES INTERNATIONAL 468 (FEB. 4, 2019) |
| AUTHORS | MINDY HERZFELD |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3499 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-3 |

# News Analysis: Pending Cases in the CJEU

POSTED ON FEB. 4, 2019

By

LEE A. SHEPPARD
Contact Author

"Tax Lady."

That's U.S. President Donald Trump's nickname for Margrethe Vestager, the tall, politically ambitious Dane in her last year as European Union competition commissioner, who is leading the charge against EU member tax favors for mostly U.S. multinationals.

Americans have a bunch of problems with EU competition policy, not least of which is that it cramps the style of U.S. multinationals, which believe they are entitled to establish quasi-monopolies wherever they go and not pay any tax anywhere. After all, that's what they got away with in the United States for years, until the Tax Cuts and Jobs Act began clawing back some of their foreign income and questions started being asked about their monopolies. It's estimated that U.S. consumers buy most of their goods and services from 10 gargantuan companies.

Although U.S. appellate court judge Robert Bork never made it to the Supreme Court, his theories on the purpose of antitrust law have held sway with the U.S. executive branch in the last two decades. As long as consumers benefit, it should not matter how many competitors there are or how big they are. Historically, antitrust law intended to prevent larger competitors — think Walmart and Amazon — from pushing down prices to drive smaller ones out of business. But the Bork view isn't troubled when smaller, innovative competitors are gobbled up by larger incumbents, which get rich in the process. So whenever U.S. regulators see cheap consumer prices — leaving aside the hidden costs of abuse of power, offshored jobs, and monetization of personal data — they see no antitrust problem.

European law strives to prevent monopoly abuses. European competition policy protects competitors, and only indirectly consumers. The European philosophy is that more competitors serve consumers better. Smaller competitors, in particular, must be protected from larger predatory competitors. Vestager's office often prevents mergers that would reduce the number of competitors. And larger competitors must be regulated to protect consumers. Vestager is currently trying to prevent a merger between Siemens and Alstom, over the objections of their home governments.

Europe has ended up with the worst of both worlds — national monopolies that make consumers miserable but are too weak to compete globally. European citizens are losing their jobs to the Chinese — sometimes to Chinese immigrants — while still paying high consumer prices. Only recently did European consumers get hypermarkets, Sunday store openings, and discounted prices — and not without a fight. Indeed, the *gilets jaunes* are complaining about the constant struggle that ordinary life has become, especially in the wake of banker-imposed austerity.

BDO_00034714



TAX LADY FLEXES HER MUSCLES. (FRANCOIS LENOIR/REUTERS/NEWSCOM)

Why would a financial meltdown be met with austerity? Because, as former British Prime Minister David Cameron admitted to a party conference before he imploded with the Brexit vote, austerity was the plan all along. Some Europeans are horrified by the British parliamentary rejection of the EU withdrawal deal, but the British elites are simply working through the trauma of having lost the Brexit vote, loudly blaming each other. They should've had their Brexit bun fight two years ago, but Parliament was not yet involved in the process. And there's the additional matter of jostling for electoral advantage, which is why Labour has contributed nothing constructive to the debate.

British Prime Minister Theresa May listed getting out from under the yoke of the Court of Justice of the European Union as one of her Brexit goals. Under the proposed withdrawal agreement, which failed spectacularly, the United Kingdom would remain subject to CJEU jurisdiction for matters of EU law and the rights of EU citizens living there. The Court recently held that under some circumstances, the United Kingdom could withdraw its

invocation of article 50 of the Treaty on the Functioning of the European Union (*Wightman and Others v. Secretary of State for Exiting the European Union*, C-621/18). Members of Parliament appear to be counting on an extension, which European negotiators may be disinclined to grant.

Will the Court miss the British? That seems like a ridiculous question, but the British have had a lot of influence on the Court. British lawyers energetically brought the very cases to which their own government objects — decisions compelling the transfer of group losses, and the extension of dividend relief to third-country investors.

The British influence also may have been responsible for making the CJEU act like a common law court. There's no such thing as precedent in civil law. Each case is decided on its own. Although the CJEU has no discretion over the cases it hears, and must decide every case referred to it, it has deployed precedent to decide repetitive cases. Yet now the Court is on the verge of refusing to hear cases for the first time.

The Court hears the same issues over and over again, because — lacking precedent — Portugal doesn't believe that a decision against an identical Spanish rule should apply to it. And it's often necessary to get a judgment to persuade a member's legislature to change a law. The discussion at the recent seminar at the Vienna University of Economics and Business (WU) focused on the state of uncertainty in CJEU jurisprudence at the moment, especially when TFEU precedent conflicts with national revenue needs and euro-area budget constraints.

**State Aid**

Tax Lady is after Gibraltar, which is in the dock again with the European Commission, this time for its exemption for interest and royalties, as well as its rulings practice. The exemption regime favors group finance companies and certain kinds of royalties. The commission found five rulings it didn't like concerning Dutch partnerships deemed to be Gibraltar residents for purposes of the interest and royalties exception. But the other 160 rulings the commission examined were clean.

Tax goodies doled out to favored classes of companies clearly constitute state aid under European law (*Gibraltar*, C-106/09 and C-107/09; and *World Duty Free Group* , C-20/15 and C-21/15). That's black-letter law, no matter how much U.S. lawyers refuse to believe it. But requiring the particular company to pay more taxes to the EU member tax haven that gave it the benefits in the first place may not be the most efficacious remedy for the competitive wrong.

The state aid prohibition in TFEU article 107(1) prohibits subsidies. "It may not always make sense to regard tax discrimination as a subsidy," Richard Lyal of the commission commented at the recent WU discussion of pending cases. The state aid prohibition doesn't work to fix bad tax policy, in his view. He allowed that perhaps time limits on refunds might be warranted. Even Vestager has admitted that state aid cases are insufficient to correct European business tax policy to achieve fair competition.

In every state aid case, the accused smaller EU member — Ireland, the Netherlands, Luxembourg, Gibraltar, Belgium — was used as a way station to strip profits from larger European markets. The commission had to order the havens to collect the tax they are accused of having forgiven. It is also black-letter law that a tax paid somewhere in the EU is as good as a tax paid to any other member. But the fact is that the members with a real gripe about tax competition aren't the EU tax havens. They are the larger markets of France, Germany, Italy, and the United Kingdom (which operates its own version of a tax haven).

The CJEU agreed to hear the Engie case, in which the commission accuses Luxembourg of granting state aid to the French utility in the form of mismatches on hybrid securities (Statement/18/4231). Engie's Luxembourg gas trading company took an interest-free loan, convertible into equity, from a sister Luxembourg holding company. In a series of rulings, Luxembourg's tax authority agreed to allow the former to deduct notional interest expense, washing out its income, while no interest income was recognized by the latter, which treated the transaction as a share purchase. The commission is arguing for matching of income and expense, asserting a €120 million tax deficiency (*Luxembourg v. European Commission*, T-516/18).

Gee, isn't the commission getting out over its skis with retroactive enforcement of newly adopted tax theories? The ink is barely dry on the anti-tax-avoidance directive (ATAD, 2016/1164/EU) requirement that income and expense be matched or deductions disallowed for hybrid securities. Members aren't required to adopt the ATAD's hybrid rules until January 2020. As this column has frequently noted, matching of income and expense has not heretofore been a principle of European law.

The controversial state aid cases have been joined by an investigation into Dutch treatment of Nike's IP setup in the Netherlands. The Dutch tax administrator gave Nike five rulings permitting what the commission thinks might be excessive, non-arm's-length royalty payments to Nike's transparent Dutch licensing holding companies, stripping income from the payer operating companies. The Dutch companies had no employees or activity. The Nike IP they licensed was ultimately owned by a Bermuda affiliate during the years at issue; Nike transferred the IP to a new Dutch partnership in 2014. Like the Amazon, Apple, and Starbucks cases, this is a transfer pricing case. (Prior coverage: *Tax Notes Int'l* , Jan. 14, 2019, p. 216; and *Tax Notes Int'l* , Nov. 13, 2017, p. 630.)

Meanwhile, those more famous cases chug along (*Starbucks*, T-636/16; *Netherlands v. Commission* , T-760/15; *Apple Sales International and Apple Operations Europe v. Commission* , T-892/16; and *Fiat Chrysler Finance Europe v. Commission*, T-750/15). The commission released its formal decision on Amazon (SA.38944 (2014/C) (ex 2014/NN) (C(2017) 6740 final)). It also offered to drop its Apple case — Ireland having reformed its tax law — if Ireland would simply collect €13 million from Apple. How Vestager thinks that this payment would restore competition in the EU is anyone's guess. (Prior coverage: *Tax Notes Int'l* , Mar. 5, 2018, p. 972.) The commission backed down on McDonald's, concluding that Luxembourg had correctly applied its U.S. treaty to a mismatch of laws (Statement/18/5833).

Following hearings in the European Parliament, the commission also opened an investigation into Ikea (IP/17/5343). Ikea is also a transfer pricing case, involving two Dutch rulings for a transparent IP holding company that holds the franchising rights. As in the Starbucks and Amazon cases, the question is whether the license fees paid to the Dutch entity were arm's length. Also at issue is the Dutch entity's purchase of franchising rights with intragroup financing; the commission questions both the price and the interest rate (SA.46470 (2017/NN)). (Prior coverage: *Tax Notes Int'l* , Jan. 1, 2018, p. 40.)

Only the commission can determine the existence of state aid *ab initio*, as a pending case shows. The taxpayer, a German investment fund with tax-exempt investors, requested a refund of Dutch dividend withholding tax, which the tax administrator denied. The taxpayer went to court, which found a violation of free movement of capital. It also found the administrative practice of only refunding the tax to Dutch resident funds to be state aid. The Dutch Hoge Raad referred a question to the CJEU, asking whether the Dutch court has the power to adjudicate the free movement of capital question, and if the practice constitutes state aid, whether it can order a refund (*A-Fonds*, C-598/17).

Advocate General Henrik Saugmandsgaard opined that the Dutch court lacks the authority to adjudicate the free movement of capital question, because the administrative residence requirement is intrinsic to the state aid question. Member governments are required to notify state aid to the European Commission, which has the power to determine whether state aid is present. The Dutch court could grant a refund once the commission has concluded that the administrative refund practice constitutes existing state aid. If the commission determines that the practice constitutes new state aid, the court would lack the authority to order a refund. That is, the act of granting a refund could be an expansion of illegal state aid.

**Free Movement of Capital**

The CJEU accepted a case about whether free movement of capital is violated by an Italian financial transactions tax (*Société Générale SA v. Italy*, C-565/18). Free movement of services is also implicated. The tax is payable by derivative counterparties, regardless of the dealer's location, when the contract's reference asset is a security issued by an Italian company. The tax rises incrementally with the trading values of the derivatives and varies according to the type of instrument and the value of the contract.

Investment funds asked for a ruling that a nonresident fund is entitled to withholding relief on dividends paid by Dutch companies because a comparable Dutch resident mutual fund (unit trust) that distributed all its dividends would not incur withholding. The nonresident fund does not distribute dividends to investors, but investors are taxable on them regardless. It has not satisfied the Dutch tax administrator that its investors would be entitled to relief (*Koln Akteinfonds Deka*, C-156/17). Thousands of funds have applied to the Dutch tax administrator for withholding relief in excess of €1 billion.

The CJEU may actually be on the verge of dismissing this case, which is similar to a Danish dividend withholding case it just decided ( *Fidelity Funds v. Denmark* , C-480/16). It is trying to encourage a confused Hoge Raad to take the case back. There's also a question what an affected government is allowed to do to protect its tax base. The fund is resident in Luxembourg, to which it would have to pay withholding tax on its eventual distributions to its investors. Is the government required to give a credit for that later withheld tax? Should the fund be required to identify its investors? The Court hasn't faced those questions.

Does article 4 of the parent-subsidiary directive (90/435/EC replaced by 2011/96/EU) permit a Belgian rule that allows for 95 percent exemption of subsidiary dividends but takes dividends into account for determining corporate income tax liability? The imputation of dividends reduced the taxpayer's use of loss deductions, loss carryovers, and the notional interest deduction. The taxpayer's losses and notional interest deduction exceeded its taxable income, but those items were soaked up by imputed dividends. The taxpayer argued for an exemption for dividends instead, because it had a net loss (*Brussels Securities SA*, C-389/18). It is hard to see how the CJEU would even write an opinion stating that dividend exemption must be preserved at all costs.

A Canadian university pension fund found itself challenging Germany about disadvantageous treatment relative to German pension funds. The Canadian fund was taxable on dividends, while a German fund could reduce its tax liability by contributions to reserves to meet pension obligations. The Canadian fund argued in the alternative that free movement of capital or freedom to provide financial services was impeded (*College Fund of British Columbia*, C-641/17).

**Freedom of Establishment**

The imported corporate tax loss debate encapsulates the whole failed European corporate tax integration project. If members won't respect tax loss carryovers from another member, how will they ever accept the CCCTB? The commission successfully fought for cross-border use of losses, but the Court has restricted the reach of the holding (*Marks & Spencer PLC v. Halsey*, C-446/03). In Vienna, academics argued for getting rid of *Marks & Spencer* completely, despite their affinity for a borderless Europe. EU member governments predictably resist the idea of writing open-ended checks to corporate taxpayers for imported foreign losses and are testing restrictions in court. Sweden, which retained its own currency, is no different.

Sweden sent two imported loss cases to the CJEU. Swedish law is similar to British group relief in that a loss company surrenders its loss to its parent to use. Under Swedish law, a foreign surrendering company must be liquidated. Moreover, the foreign loss company must be 90 percent directly owned by the Swedish parent, and neither it nor any affiliate can conduct any further business in the loss country. Sweden justified the direct ownership requirement with the argument that it did not want to permit taxpayers to choose which country to use their losses in, which indirect ownership would have permitted.

A complicating factor in one case is that the group had not exhausted its remedies in the country where the loss was incurred. Spanish law allows perpetual use of the losses by other group members on combined returns, but limits each year's loss use, allowing unused losses to be carried forward. The loss carryforwards, which couldn't be used by any other group member, were in a Spanish branch (probably a hybrid) of the taxpayer's Spanish subsidiary. The taxpayer sold the branch assets as part of a plan to liquidate its Spanish operations, raising a factual question whether the loss carryforwards, which survived the asset sale, were final (*Sweden v. Holmen AB*, C-608/17).

The tax administrator ruled that a liquidation of the Spanish subsidiary — making the branch a directly held company — would qualify for the ownership requirement. But it also ruled that loss carryforwards from previous years were not final losses; only the carryforward from the year preceding liquidation would be final. The tax board and the taxpayer appealed the latter ruling. A purchaser could still use the Spanish branch loss carryforwards, so they were not final losses. The Swedish referring court appears to have been confused about the facts when it referred the case. The CJEU is not a fact-finder. Katia Cejie of the University of Uppsala commented that the Swedes appear to be confused about the order of the questions.

It was obvious to the Vienna academics that the direct holding requirement was a restriction on freedom of establishment, assuming comparability of domestic indirect subsidiaries. In *Marks & Spencer*, the loss companies sat underneath a Dutch holding company, which the British law looked through, noted Malcolm Gammie QC, who was a special master in the case. It might have been easier had Advocate General Juliane Kokott viewed the *Holmen* branch as transparent, but the Court views a branch as the equivalent of a subsidiary (*A/S Bevola, Jens W. Trock ApS v. Denmark*, C-650/16; and *NN A/S v. Denmark*, C-28/17).

But Kokott opined that the direct ownership requirement was an acceptable restriction because use of an indirectly held member's losses would undermine EU members' fiscal autonomy. How's that again? This new rationale is an offshoot of the balanced allocation of taxing powers. "A Member State would then have to adapt its tax legislation to that of another Member State," Kokott theorized.

On the finality question, Kokott opined that Swedish law does not have to permit the use of transferable Spanish loss carryforwards, which she appeared to believe should not be treated as final. Relying on the widely misread

paragraph 55 of *Marks & Spencer*, the taxpayer argued that the losses were theoretically usable in law but not in fact, which appears to refer to the inability to sell the carcass.

Kokott responded that there is no such differentiation. In paragraph 55 of *Marks & Spencer*, the Court held that losses should be usable in the parent's home country when no possibility exists for current or future use by any affiliate or third-party transferee, regardless of whether that inability is factual or legal. Kokott read paragraph 55 correctly, that the Court meant that losses should not be usable by anyone, even a third-party transferee. She differentiated a recent branch case that did not present a finality question (*Bevola*, C-650/16).

"There is no such thing as a factual loss — it's all a legal construct," Michael Lang of WU commented. Instead of creating new restrictions, the CJEU ought to reverse *Marks & Spencer* and be done with it, in his view. The academics discussed *Holmen* before Kokott's opinion was issued. Kokott knew she was setting limits. "To my knowledge there is neither a general principle of tax law nor a general principle of EU law to the effect that relief should somehow be granted for all losses at the end of a life cycle of a legal entity," she wrote.

In the other Swedish case, the loss company was a German subsidiary that merged upward into its Swedish parent. It had ceased business and retained an €8 million net operating loss carryover, raising a finality question (*Memira Holding AB*, C-607/17). When a liquidation is part of a merger, and losses are preserved for future use, there is no final loss (*A*, C-123/11). But the German losses were crystallized by the merger, making them final and causing the Vienna academics to wonder why the Swedish court bothered referring the case.

The tax administrator refused a favorable ruling because the loss carryover would not survive an all-German merger but could be transferred to a purchaser. There were no German affiliates that could have used the loss. Kokott found a restriction on freedom of establishment but held that it was justified for lack of taxpayer proof of finality. She sent the case back to the national court for findings on finality and double use of losses. Kokott opined that the merger directive (2009/133/EU) does not require cross-border carryover of losses on mergers.

Many EU countries, and their bilateral tax treaties, determine corporate residence using a management and control test. In a Czech case coming to the CJEU, the Dutch resident corporate taxpayer changed its place of management to the Czech Republic, while retaining its Dutch seat. The question is whether TFEU article 49 is violated when the Czech government prohibited the taxpayer's use of its €3 million loss incurred in the Netherlands. Although there had been no merger, the taxpayer relied on the merger directive. Adam Zalasinski of the European Commission argued that if the taxpayer retained a Dutch permanent establishment, the loss should remain with it (*AURES Holdings*, C-405/18).

Hungary has been creative about taxing foreign multinationals operating in its territory. It has a special progressive turnover tax that the British phone provider argues might violate both freedom of establishment and the VAT directive (2006/112/EC). The tax, which might be a transaction tax but not a VAT, is mostly paid by large foreign companies (*Vodafone*, C-75/18; and *Tesco*, C-323/18).

### Parent-Subsidiary Directive

Kokott has supplied several opinions in six joined Danish cases asking whether the withholding tax relief under the parent-subsidiary directive (2011/96/EU) or the interest and royalties directive (2003/49/EC) may be denied

when the payee of an interest payment or a dividend isn't the beneficial owner of the payment. In all cases, the ultimate beneficial owners of the payments were investment funds in non-treaty "small islands," as Kokott put it.

The question was the relevance of OECD model commentary stating that a beneficial owner must have the unconstrained right to use the funds. The answer is that the right to withholding tax relief under the parent-subsidiary directive is darn near absolute, and OECD views on beneficial ownership are irrelevant. The recently amended parent-subsidiary directive (2014/86/EU) has added a beneficial ownership requirement in addition to a main purpose clause.

In the two Danish dividend cases, the recipient had no contractual obligation to pass on the dividends or interest. Denmark hadn't written its own antiabuse rule or beneficial ownership rule; it had merely invoked OECD beneficial ownership guidance to disallow dividend relief. That was not proper, according to Kokott. While general principles of law may be invoked to interpret EU law in cases of abuse, OECD commentary does not apply. The parent-subsidiary directive is autonomous, and the taxable recipient of a dividend should be granted withholding relief.

Under Kokott's reading, Denmark has to give relief even when the intermediate recipient, a Luxembourg holding company, is an EU resident and subject to tax, regardless of whether the ultimate parent is neither. Dividends of €1 billion were passed up several levels to the ultimate third-country beneficiary, which would not have been entitled to treaty benefits. T Danmark, the payer of dividends, was a large Danish service provider that was a private equity target. Kokott opined that a decision to pass on profits to a third-country parent cannot be taken as indications of abuse (*Skatteministeriet v. T Danmark*, C-116/16).

Surely the OECD commentary would be relevant when the treaty between the two affected countries conditions relief on the recipient being the beneficial owner? There was a chain of entities, the ultimate parent of which wasn't taxable on the dividends. Kokott argued that if Denmark doesn't want to recognize a recipient as the beneficial owner, it has to say who the beneficial owner is in order to assume that abuse exists. She allowed that there could be abuse potential if the ultimate beneficial owner was resident in a tax haven to which the income would not be declared (*Skatteministeriet v. Y Danmark*, C-117/16).

**Interest and Royalties Directive**

The interest and royalties directive has always required that the recipient be the beneficial owner of an interest payment. As one commentator wrote in these pages, it's odd to imagine that the use of the term "beneficial owner" wouldn't invoke its OECD treaty meaning, given the OECD's heavy European membership and references to OECD criteria in the background documents. (Prior analysis: *Tax Notes Int'l* , June 18, 2018, p. 1389.)

In the four interest cases, Kokott nonetheless opined that the interest and royalties directive is autonomous and doesn't hinge on OECD theories of beneficial ownership. Denmark has a judicial rule of "rightful income recipient." Kokott rejected the invocation of the Danish substance-over-form "reality doctrine" to deny withholding relief because the intermediate company earned a tiny spread (*N Luxembourg 1 v. Skatteministeriet*, C-115/16).

In a restructuring, C Luxembourg became the parent of T Danmark and the owner of the preferred equity certificates issued by N Luxembourg 1. C Luxembourg used payments on the certificates to service its debt to a

BDO_00034721

trust set up for the benefit of the Luxembourg holding company, which in turn serviced its debt to the Cayman Islands fund. Kokott was flummoxed by the trust and sent the case back to the national court for fact finding.

In the cases at hand, the ultimate third-country beneficial owner was not taxable on the interest. Investor lists for island funds aren't disclosed. Kokott argued that abuse may be presumed when the structure takes advantage of lack of information exchange. But Denmark has to say who the beneficial owner is and can call on the taxpayer to assist (*Skatteministeriet v. Z Danmark*, C-299/16).

In another case not involving investment funds, Kokott looked at interest payments flowing through various companies to the U.S. parent of a manufacturing group. The taxpayer, a Danish subparent, was restructured underneath a pair of hollow Swedish holding companies that had a Cayman subparent, with loans having identical terms running up the chain. The Swedish companies passed on the interest payments from the taxpayer, taking no spread. The Cayman company paid a dividend to the U.S. parent (*C Danmark I v. Denmark*, C-119/16).

Kokott agreed with the Danish government that the arrangement might be wholly artificial. She compared the Swedish companies unfavorably with the lightly staffed asset managers of the private equity cases. Nonetheless, taxpayers are allowed to arrange their affairs to minimize taxes. And freedom of establishment was also implicated. So Kokott concluded that the Swedish companies should be treated in principle as beneficial owners pending development of the facts by the national court.

Kokott's opinions have implications for ATAD, which establishes as tax avoidance criteria many of the factors she rejected in the Danish analysis. Cumulatively these factors establish abuse, but treaties don't have subject-to-tax requirements, Roland Ismer of the University of Erlangen-Nuremberg commented.

Zalasinski disapproved of unwritten, uncertain antiabuse rules, as did Soren-Friis Hansen of Copenhagen Business School. Hansen argued that ATAD could potentially be held to violate the European principle of legal certainty, which Kokott cited against the Danish position (para. 103 of *N Luxembourg 1*; *Kofoed*, C-321/05). But Hansen agreed with Kokott that a secret investor list should shift the burden to the taxpayer to justify withholding relief. (Prior analysis: *Tax Notes Int'l* , Oct. 22, 2018, p. 363.)

## VAT

The CJEU will hear a case about whether Belgium may do a VAT audit based on illegally obtained information. The issue is whether Belgium violated the individual's right to a private life guaranteed by article 47 of the Charter of Fundamental Human Rights of the European Union (*JM v. Belgium*, C-470/18).

News you can use! The CJEU will address whether VAT can be charged on live erotic webcam sessions. Are those live sessions the provision of taxable electronically supplied services? If so, should VAT be collected in the country where the sessions are physically performed, or in the country of the viewer? How should the place of service be determined (*Geelen*, C-568/17)?

**DOCUMENT ATTRIBUTES**

| | |
|---|---|
| JURISDICTIONS | EUROPEAN UNION<br>ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT |
| SUBJECT AREAS / TAX TOPICS | LITIGATION AND APPEALS TAX POLICY |
| MAGAZINE CITATION | TAX NOTES INTERNATIONAL, FEB. 4, 2019, P. 457<br>93 TAX NOTES INTERNATIONAL 457 (FEB. 4, 2019) |
| AUTHORS | LEE A. SHEPPARD |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-2581 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-1 |

# Portugal Ratifies Tax Treaty, Mutual Assistance Pact With Angola

POSTED ON FEB. 4, 2019

By

IURIE LUNGU

Portuguese President Marcelo Rebelo de Sousa on January 31 signed two laws on the ratification of Portugal's pending income tax treaty and administrative assistance agreement with Angola, according to information published on the president's website.

**Tax Treaty**

The tax treaty was signed September 18, 2018, in Luanda. (Portuguese text.) It provides for the avoidance of double taxation regarding taxes on income and for the prevention of tax fraud and evasion.

Under the treaty, dividends are taxable at a maximum rate of 8 percent if the beneficial owner is a company (other than a partnership) that holds at least 25 percent of the capital of the payer company for a period of 365 days, which includes the day of payment of the dividends. A 15 percent rate applies in other cases.

Interest is subject to a 10 percent withholding rate. However, interest arising in a contracting state will be taxable only in the other contracting state if the interest is paid by, or beneficially owned by, a contracting state, a political or administrative subdivision or local authority of that state, or the central bank of a contracting state.

Royalties are subject to an 8 percent withholding tax rate. Both countries generally apply the credit method to eliminate double taxation.

The treaty is the first agreement of its kind between Angola and Portugal. It will enter into force after the exchange of ratification instruments. Portugal has completed the ratification process. Angola announced January 24 that the treaty had been approved by its parliament.

**Administrative Assistance Agreement**

The administrative assistance agreement was also signed September 18, 2018, in Luanda. (Portuguese text.) It provides for mutual administrative assistance and cooperation in tax matters and is the first agreement of its kind between Angola and Portugal. It will enter into force after the exchange of ratification instruments. Portugal has completed the ratification process.

Iurie Lungu, ALDD, Montreal

**DOCUMENT ATTRIBUTES**

| | |
|---|---|
| JURISDICTIONS | ANGOLA PORTUGAL |
| SUBJECT AREAS / TAX TOPICS | |

DIVIDENDS FOREIGN TAX CREDIT INCOME

INTEREST INCOME LEGISLATION AND LAWMAKING

ROYALTIES TAX AVOIDANCE AND EVASION TREATIES

WITHHOLDING INFORMATION EXCHANGE

| | |
|---|---|
| AUTHORS | IURIE LUNGU |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3948 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-16 |

# Romania, Vietnam Agree to Sign Tax Treaty Protocol

**POSTED ON FEB. 4, 2019**

By

**SARAH CARPENTER**
Contact Author

Officials from Romania and Vietnam have agreed to sign an amending protocol to their countries' income and capital tax treaty, according to Vietnamese media reports.

Romanian Vice Prime Minister Ana Birchall and Vietnamese Prime Minister Nguyen Xuan Phuc met January 24 on the sidelines of the World Economic Forum in Davos, Switzerland to discuss bilateral relations.

This would be the first amendment to the treaty, which was signed on July 8, 1995, in Hanoi and has been in effect since January 1, 1997. (Romanian text.) Romania authorized negotiations to conclude an amending protocol in 2016. The protocol must be finalized, signed, and ratified by both contracting parties before entering into force.

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | ROMANIA VIETNAM |
| SUBJECT AREAS / TAX TOPICS | TREATIES |
| AUTHORS | SARAH CARPENTER |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-3946 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-18 |

# Russia Clarifies Dividend Tax Treatment of Beneficial Owner

POSTED ON FEB. 4, 2019

By

IURIE LUNGU

Russia has issued guidance explaining the taxation of dividends paid to a nonresident entity by a Russian entity in which another Russian entity (that is the beneficial owner of the income) has an indirect stake.

Guidance letters 03-08-05/96037 and 03-08-05/96042, both dated December 28, 2018, state that under Tax Code article 7, section 2, a person is the beneficial owner of income if that person has the right — by virtue of its direct or indirect participation in or control over a legal entity, or because of other circumstances — to use the income for itself or to dispose of it.

Based on Tax Code articles 7, section 4(1), and 312, section 1.1, if a Russian entity pays dividend income to a permanent tax resident of a jurisdiction that has an effective tax treaty with Russia (Cyprus, in this case), the nonresident does not have actual rights to the dividend income, and the income payer knows the beneficial owner, which is treated as a Russian tax resident and participates, directly or indirectly, in the Russian entity that paid the dividends, the dividend income will be taxed as provided by the chapters of the Tax Code dealing with the taxation of residents. No tax will be withheld from the nonresident, provided that the Russian tax authorities know where the payer is registered and are informed of the transaction and the beneficial owner's identity.

Therefore, the MOF said, if a Russian resident legal entity is the actual beneficial owner of the dividend income, that income will be taxed at the rates stipulated by Tax Code article 284.

Article 284, section 3, stipulates the following corporate tax rates for dividend distributions:

- 0 percent, if on the date the payer decides to pay the dividends, the Russian beneficial owner has had a stake of at least 50 percent in the dividend payer's capital for an uninterrupted period of at least 365 days, or possesses depositary receipts that entitle it to receive dividends equivalent to at least 50 percent of the total amount of the dividends payable;

- 0 percent, if the dividend recipient is an international holding company and on the date the payer decides to pay the dividends, the international holding company has had a stake of at least 15 percent in the dividend payer's capital for an uninterrupted period of at least 365 days, or possesses depositary receipts that entitle it to receive dividends equivalent to at least 15 percent of the total amount of the dividends payable;

- 5 percent if the dividend income is received by foreign persons under shares (stakes) of international holding companies that are public companies on the date the decision to pay dividends was made;

- 13 percent if the dividend income is received by Russian resident legal entities other than those mentioned above, and on dividend income received on shares, the rights to which are certified by depositary receipts; or

- 15 percent if the dividend income is received by nonresident legal entities under shares of Russian legal entities or from other participation in the entity's capital.

Iurie Lungu, ALDD, Montreal

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | RUSSIA |
| SUBJECT AREAS / TAX TOPICS | CORPORATE TAXATION DIVIDENDS TAX POLICY |
| AUTHORS | IURIE LUNGU |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-4062 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-11 |

# Sweden Aims to Limit Regulatory Burden of Anti-Hybrid Rules

POSTED ON FEB. 4, 2019

By

RYAN FINLEY
Contact Author

The Swedish government has proposed legislation designed to transpose the 2017 EU directive on hybrid mismatches in a way that prevents abusive practices without creating excessive administrative burdens that would deter cross-border investment.

In a memorandum released February 1, Sweden's Ministry of Finance set out its proposals for anti-hybrid rules that comply with EU law without harming the country's economy. The proposed rules would seek to protect the Swedish tax base and promote competitive parity between multinationals and domestic companies, while only affecting taxpayers that use abusive tax planning structures, the memorandum says. The amendments would broaden the scope of Sweden's existing hybrid rules applicable to interest payments, which took effect January 1, to cover payments other than interest, branch mismatches, and tax-motivated "structured arrangements" between unassociated enterprises.

"The proposal to extend the hybrid rules entails, among other things, that more situations with hybrid mismatches should be covered by the Income Tax Act than today and that current hybrid rules should be applied to expenses other than interest expenses," the government said in its announcement of the proposals. "The proposal is designed not to affect the conditions for companies that do not use this type of aggressive tax planning and supplement previous legislative measures in the area."

Sweden and other EU member states have until January 1, 2020, to apply hybrid mismatch rules in line with the EU's 2017 anti-hybrid directive, which expanded the scope of the 2016 anti-tax-avoidance directive to include branch mismatches, imported hybrids, and mismatches involving non-EU countries. Using the general approach recommended by the OECD during the base erosion and profit-shifting project, the 2017 directive requires adoption of primary and defensive rules to neutralize double deduction and deduction-without-inclusion mismatches created by hybrid entities or instruments and branch or residency mismatches.

Noting the anti-hybrid rules' broader scope and specific terminology, the memorandum recommends that the rules be inserted into a new chapter instead of incorporated into the chapter on interest. In cases in which both measures could potentially apply, the anti-hybrid rules under the new chapter would apply before the fixed-ratio interest expense limitation.

For payments covered by the existing rules, the proposals would not amend the 25 percent common ownership threshold for companies to be considered associated enterprises. However, mismatches that are partially or completely outside the scope of the current rules — including entity classification and branch mismatches — would be subject to a higher threshold of 50 percent for double deductions and deduction-without-inclusion outcomes.

The proposals would explicitly void specific provisions of Sweden's bilateral treaties with Bulgaria, Cyprus, and Greece by asserting taxing rights over income of Swedish-resident companies conducting business through a permanent establishment in the contracting state if the contracting state does not recognize the PE. This is necessary to comply with the 2017 EU directive because the income would otherwise go untaxed under treaties using the exemption method, the memorandum says. The proposals would also establish a credit system to cover situations involving a deduction that is matched by an inclusion, but which is taxed at a low rate.

## Regulatory Burdens

Because of Sweden's heavy reliance on cross-border investment, its transposing legislation should generally go no further than the minimum standards set by the EU directive, the proposal says. "It is crucial that the regulations do not seem to be a deterrent [for] cross-border investments, whether by foreign companies that invest in Sweden or by Swedish companies that invest abroad," according to the proposal.

For the same reasons, the memorandum recommends an approach that maximizes both uniformity with international standards and congruence with existing Swedish law. The memorandum omits from its proposals the primary or secondary rule when existing law already neutralizes the mismatch.

"For the hybrid rules to function in an international environment where other states are also implementing the OECD's BEPS recommendations and the [EU] directive, the provisions that are implemented in Swedish law should be relatively close to the design of the directive's regulations and recommendations," the memorandum says. "At the same time, there is no intrinsic value in replacing existing, well-functioning systems if they are compatible with the provisions of the directive. Already established concepts should be used as much as possible."

The memorandum estimates that about 1,000 Swedish companies with foreign subsidiaries and 1,800 foreign-owned Swedish companies will need to be familiar with the rules, but only a small subset would be directly affected.

### DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | SWEDEN EUROPEAN UNION |
| SUBJECT AREAS / TAX TOPICS | BASE EROSION AND PROFIT SHIFTING (BEPS) PERMANENT ESTABLISHMENT TREATIES |
| AUTHORS | RYAN FINLEY |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-4131 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-9 |

# U.K. Reports on HMRC Employee Experiences

DATED FEB. 1, 2019

SUMMARY BY TAX ANALYSTS

HM Revenue & Customs Chief Executive Jonathan Thompson said that, "We will take forward immediate, fast-paced work to reform our policies and processes, make our data systems more robust, and most importantly communicate more clearly what behaviours we expect to see," following the release of a "Respect at Work" report that surveyed HMRC employee experiences.

FULL TEXT PUBLISHED BY TAX ANALYSTS

**HMRC publishes Respect at Work report**

Published 1 February 2019

HMRC leaders last year commissioned Laura Whyte, former HR Director at John Lewis Partnership, to carry out an independent review of what it's like to work in HMRC to help the department become the values-driven and inclusive employer it's committed to becoming.

HM Revenue and Customs has welcomed Laura Whyte's 2019 Respect at Work report, and has accepted all of its recommendations, with immediate effect.

We will now undertake a full review of our policies, processes and standards to ensure we provide our employees with a working environment they deserve, and a culture that meets our values.

The report found that most people in HMRC have amazing dedication, pride and commitment in the work they do and come to work every day to do a good job, serve customers and support their colleagues. And they expect and deserve to work in a safe, tolerant and supportive environment.

Laura Whyte believes this positive approach can be built on to deliver a place of work that brings the HMRC values to life in the everyday experiences of all our people.

Sir Jonathan Thompson, Chief Executive, HMRC said:

> I take seriously the scale of the challenge that HMRC has. As a result of the report, we will take forward immediate, fast-paced work to reform our policies and processes, make our data systems more robust, and most importantly communicate more clearly what behaviours we expect to see.
>
> It is for HMRC leaders to champion and take forward this work and for HR and other specialists to support — but we all have our part to play in responding to the Respect at Work report.

And Laura Whyte added:

> My report has sought to assess the gap between HMRC's stated ambitions and the reality on the ground. I've identified a range of areas for HMRC to consider taking action, and I know from my conversations with HMRC's leadership that they are committed to addressing this issue.

Laura Whyte's main findings and recommendations include:

- building on the amazing dedication, pride and commitment our people show in the work they do and the commitment of the HMRC executive committee and others to making HMRC an even better place to work
- that HMRC tackles 'low level' behaviours that would not be acceptable in other environments through setting clear standards of behaviour from the get-go of induction, through to training and policies
- that policy and processes used across HMRC should be improved to deliver a better experience for everyone
- using mediation more extensively across the organisation to help address problems before they need to be taken to formal processes
- enhancing the experience of colleagues with a disability through better reasonable adjustments and raising awareness of mental health conditions
- improving its data-driven approach to people by investing time and resources into examining how people data is used and collected in the organisation

## DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | UNITED KINGDOM |
| SUBJECT AREAS / TAX TOPICS | HARMONIZATION |
| INSTITUTIONAL AUTHORS | U.K. REVENUE & CUSTOMS |
| CROSS REFERENCE | RELATED COVERAGE. |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2019-4042 |
| TAX ANALYSTS ELECTRONIC CITATION | 2019 WTD 23-22 |